**CASE NO. 24-1886**

### IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## KIMBERLY LAFAVE; GLENN M. TAUBMAN; ROBERT HOLZHAUER,

*Plaintiffs-Appellants,*

v.

## THE COUNTY OF FAIRFAX, VIRGINIA; KEVIN DAVIS,
*in his official capacity as Chief of Police,*

*Defendants-Appellees.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

---

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS
### KIMBERLY LAFAVE, GLENN TAUBMAN, ROBERT HOLZHAUER

---

**Stephen P. Halbrook, PhD**
**ATTORNEY AT LAW**
**Suite 403**
**3925 Chain Bridge Road**
**Fairfax, Virginia  22030**
**PH (703) 352-7276**
**protell@aol.com**

**Earl N. "Trey" Mayfield, III**
**CHALMERS, ADAMS, BACKER**
**& KAUFMANN, LLC**
**Suite 200, 10521 Judicial Drive**
**Fairfax, Virginia  22030**
**PH (703) 268-5600**
**tmayfield@chalmersadams.com**

**Counsel for Plaintiffs-Appellants**
**Kimberly LaFave, Glenn Taubman and Robert Holzhauer**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1886__    Caption: __Kimberly LaFave v. The County of Fairfax, Va.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kimberly LaFave, Glenn Taubman, Robert Holzhauer__
(name of party/amicus)

who is _____appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

12/01/2019 SCC                              - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____Sept. 26, 2024_____

Counsel for: Appellants

- 2 -

[ Print to PDF for Filing ]

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..................................................1

STATEMENT OF THE ISSUES.................................................1

STATEMENT OF THE CASE ...................................................3

SUMMARY OF THE ARGUMENT ..............................................10

ARGUMENT ..............................................................13

I.   Standard of Review................................................13

II.  As In *Bruen*, Appellants Bring A Proper Facial Challenge.....................14

III. The Park Ban Violates the Second Amendment........................................15

   A.   Firearms Were Ubiquitous in Public in the Founding Era.................15

   B.   Restrictions on the Presumptive Right to Bear Arms in Public
        Places Must Be Analyzed Under *Bruen*'s Text-History Test..............19

   C.   The District Court Erred in Relying on Post-1850 Park Firearm
        Bans, Defying *Bruen's* Admonition that Late 19th Century
        Firearms Restrictions Without Founding Era Analogues Cannot
        Support Restricting the Presumptive Right to Bear Arms
        in Public...............................................................23

   D.   The District Court's Conclusion that Parks are a Unique Modern
        Circumstance Defies History And Logic................................26

   E.   The Second Circuit's *Antonyuk II* Decision Upholding New York's
        Firearms Ban in Parks & Public Gatherings is Untenable  Because
        It Ignores *Bruen*'s Plain Language, Makes Significant Historical
        Errors About Firearms Law in the Founding Era,  and Applies

Inapplicable Historical Analogues that Bruen Has Already Rejected. .................................................35

1. The British Statute of Northampton Remains Irrelevant to Interpreting America's Second Amendment..........................35

2. Both Virginia's and North Carolina's "Going Armed" Laws Included a "Terror" Element, Contrary to Antonyuk's Conclusion That Those States Had General Bans on Public Firearms in the Founding Era ...................................................36

3. Contrary to Antonyuk II, the Statute of Northampton Reprinted in Martin's Collection Was Not a "Law" Enacted by North Carolina...................................................38

4. Antonyuk II Disregards North Carolina Judicial Precedents Requiring the "Terror" Element to Render Bearing Arms in Public Illegal .......................................................39

5. Antonyuk II's Reliance on Late-19th Century Restrictions on Firearms in "Crowded Places" Misrepresents Those Cases, and/or Defies the Supreme Court's Rejection of Such Analogues in Bruen ..............................................................41

F. Unsecured Parks Open to the Public Are Not Sensitive Places ...........42

1. Post-Bruen Courts Have Found Park Bans Unconstitutional..........42

2. Using The Analytical Framework Later Adopted in Bruen, Pre-Bruen Courts Found Park Bans Unconstitutional Under Heller's Standard ...............................................................44

G. The Government Is Free to Restrict Firearms from Being Used in Criminal Conduct & Can Deprive Individuals of the Right to Bear Arms Through Judicial Adjudications of Illegal Conduct...................46

IV. The County's Ban On Possession Of A Firearm At An Event That Would Otherwise Require A Permit Or Adjacent Area Thereto Violates The Second Amendment. ............................................48

**V.  The Ban On Possessing a Firearm at an Event That Would Otherwise Require A Permit, Or at an Adjacent Area is Vague, & Violates Due Process**................................................................................**51**

**CONCLUSION**................................................................................**52**

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165 (4th Cir. 2024)...... 13, 35

*Andrews v. State,* 50 Tenn. 165, 186-87 (1871) ....................................................41

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022), *rev'd in relevant part* at 89 F.4th 271, 355-63 (2d Cir. 2023) ("*Antonyuk I*") .............. 11, 35, 36, 42, 44

*Antonyuk v. James*, 2023 WL 11963034 (2d Cir. 2024) ("*Antonyuk II*") . 11, 25, 37, 38, 39, 41, 42, 50

*Bridgeville Rifle & Pistol Club v. Small*, 176 A.3d 632 (Del. 2017) .....................44

*Carson as next friend of O.C. v. Makin*, 596 U.S. 767 (2022) ...............................33

*Carter v. Commonwealth*, 269 Va. 44, 47 (2005) ...................................................47

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................................................14

*Colautti v. Franklin*, 439 U.S. 379 (1979)..............................................................52

*DiGiacinto v. Rector & Visitors of George Mason University,* 281 Va. 127, 704 S.E.2d 365 (2011)........................................................................45

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............. 17, 20, 21, 44, 45, 47

*English v. State* 35 Tex. 473, (1872)........................................................................41

*Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. 464 (2020)...............................25

*Gamble v. United States*, 587 U.S. 678 (2019).......................................................26

*Hardaway v. Nigrelli,* 639 F. Supp. 3d 422, 440 (W.D.N.Y. 2022).......................18

Hawkins, *Pleas of the Crown*, B. 1, ch. 28, sect. 1.................................................40

iv

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) ...........................................................................25

*In re Dept. of Public Parks,* 85 N.Y. 459 (1881)....................................30

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................14

*Klopfer v. North Carolina*, 386 U.S. 213 (1967)....................................26

*Kolender v. Lawson*, 461 U.S. 352 (1983)...............................................14

*Koons v. Platkin,* 673 F. Supp. 3d 515  (D.N.J. 2023)
appeal filed (3d Cir. May 17, 2023).................................. 15, 18, 27, 43

*Lowell v. City of Boston*, 322 Mass. 709, 79 N.E.2d 713 (1948) ...........28

*Manning v. Caldwell*, 930 F.3d 264 (4th Cir. 2019).................................51

*Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120 (D. Idaho 2014) ...46

*Near v. Minnesota*, 283 U.S. 697 (1931) .................................................25

*Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)................25

*New York State Rifle & Pistol Association, Inc. v. Bruen,* 597 U.S. 1, 33
(2022)..10, 14, 15, 18, 19, 20, 21, 22, 23, 24, 30, 31, 33, 34, 35, 36, 42, 43, 47, 48, 49, 50

*People ex rel. Houghton v. Andrews*, 104 N.Y. 570 (1887) ....................30

*People v. Chairez*, 104 N.E.3d 1158 (Ill. 2018) ......................................51

*Quill Corp. v. North Dakota,* 504 U.S. 298 (1992) .................................33

*Ramos v. Louisiana*, 590 U.S. 83 (2020)................................................26

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991)...........................................................................33

*Solomon v. Cook County Bd. of Comm'rs*, 559 F. Supp. 3d 675
(N.D. Ill. 2021) .................................................................................. 45, 46

*State v. Dawson,* 272 N.C. 535 (1968) ...................................................40

*State v. Huntly,* 25 N.C. (3 Ired.) 418 (1843) .......................................40

*State v. Lancaster,* 895 S.E.2d 337 (N.C. 2023) ...................................40

*State v. Shelby*, 90 Mo. 302, 2 S.W. 468 (Mo. 1886) ...........................42

*Timbs v. Indiana*, 586 U.S. 146 (2019) ..................................................26

*United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) .........................13

*United States v. Rahimi,* 144 S. Ct. 1889 (2024) ..................... 11, 30, 37, 47, 48, 50

*United States v. Saunders*, 828 F.3d 198 (4th Cir. 2016) .......................52

*Vacco v. Quill*, 521 U.S. 793 (1997) .......................................................33

*Virginia v. Moore*, 553 U.S. 164 (2008) .................................................26

*Wolford v. Lopez*, 686 F. Supp. 3d 1034 (D. Haw. 2023),
*rev'd in relevant part*, 116 F.4th 959 (9th Cir. 2024) .......................... 43, 44, 49, 50

## Statutes

28 U.S.C. § 1291 ....................................................................................1,6

28 U.S.C. § 1331 ................................................................................... 1,6

28 U.S.C. § 1343(a)(3) ...........................................................................1,6

42 U.S.C. § 1983 ....................................................................................1,6

54 U.S.C. §104906 (a)(7), (b).) ........................................................... 32,38

Fairfax Cty. Code § 6-2-1 ........................................... 3,4,9,19,48,51,52

Va. Code § 18.2-53.1*et seq.* ...................................................................47

Va. Code § 18.2-56.1A *et seq.*...................................................................47

Va. Code § 18.2-280 *et seq.*......................................................................47

Va. Code § 18.2-282 *et seq.*......................................................................47

Va. Code § 18.2-283.1*et seq.*.....................................................................9

Va. Code § 18.2-283.2 *et seq.*....................................................................9

Va. Code § 18.2-287.01*et seq.*....................................................................9

Va. Code § 18.2-308.01 *et seq.*........................................................ 8,9,13, 52

## Other Authorities

1 J. Hammond Trumbell, The Public Records of the Colony Connecticut,
Prior to the Union with New Haven Colony
(Hartford, Brown & Parsons 1850).................................................... 17,22

1 John R. Bartlett, Records of the Colony of Rhode Island and Providence
   Plantations, in New England 94 (Providence, A.C. Greene & Bros. 1856)... 16,21

1 Nathaniel B. Shurtleff, Records of the Governor and Company of the
   Massachusetts Bay in New England 190
   (Boston, William White Press 1853) ............................................. 16,21

1 William Waller Hening, The Statutes at Large, Being a Collection of All the
   Laws of Virginia from the First Session of the Legislature, in the Year 1619
    (New York, R. & W. & G. Bartow 1823)..................................... 16,21

3 William Hand Browne, Archives of Maryland: Proceedings of the Council of
   Maryland 1636–1667 (Baltimore, Md. Hist. Soc'y 1885) ............................ 16,21

7 David J. McCord, Statutes at Large of South Carolina 417–19
   (Columbia, A.S. Johnston 1840)..................................................... 17,22

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and
   Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1
   (1021). ................................................................. 27,28,29,32

Central Park Bd. of Commissioners Mtg. Minutes, April 30, 1858.................31

Collection of All Such Acts of the General Assembly of Virginia ch. 21 (1794) ................................................................................................ 37,42

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 206, 229–236, 244–247 (2018) ........... 18,21,22,23, 26

*Fairfax County Police Department Statistical Report Calendar Years 2021 & 2022* (May 2023) .......................................................... 3,8

Horatio Marbury & William A. Crawford, Digest of the Laws of the State of Georgia  241–42 (Savannah, Seymour, Woolhopter & Stebbins 1802)...................................... 17,22

Collection of All of the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 131 (1751) (1741 statute)............. 38,39,43

Lyon Gardiner Tyler, Narratives of Early Virginia, 1606–1625 (Charles Scribner's Sons, 1907) ......................................................... 15,20

Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE 1 (June 2009) ........................................................270

Mark Smith, "Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868," HARV. J.L. & PUB. POL'Y, No. 31, 1 (Fall 2022). .............. 25,30

Noah Webster, *An American Dictionary of the English Language* (1828)....... 29,34

*Report of the Sec'y of the Interior* 662 (1894); JA672, 675 (*Fed. Reg.* June 27, 1936) ........................................................................................32

Stephen P. Halbrook, The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class? (2021)......................................... 16,21

U.S. Census Bureau, Quick Facts, New York County [Manhattan], New York….23

## APPELLANTS' DISCLOSURE STATEMENT

Pursuant to this Court's L.R. 26.1, Appellants Kimberly LaFave, Glenn M. Taubman, and Robert Holzhauer state that they are individuals without any corporate affiliation.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the Second Amendment and the Fourteenth Amendment's Due Process Clause  of the United States Constitution. The District Court also had jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983, because this action seeks to redress Fairfax County's deprivation, under color of the laws and ordinances, of rights, privileges or immunities secured by the United States Constitution. This Court has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 1291, as the District Court issued its final judgment in this matter via an Opinion & Order issued on August 23, 2024 (JA1758) and final Judgment issued that same day (JA1795), from which a Notice of Appeal was timely filed pursuant to FRAP 4(a)(1)(A) on September 9, 2024. (JA1796).

## STATEMENT OF THE ISSUES

Appellants' case concerns whether the government may ban the possession of firearms by law-abiding individuals in public parks, or in or adjacent to public byways in which people are congregating pursuant to a government permit, or

should have such a permit. Appellants challenged these bans under the Second Amendment and Fourteenth Amendment's Due Process Clause, which presents these issues:

1.  Does the individual right to keep and bear arms protected by the Second Amendment permit the government to ban law abiding individuals from possessing, carrying, or transporting firearms, ammunition, or components thereof in public parks?

2.  Does the individual right to keep and bear arms protected by the Second Amendment permit the government to ban law abiding individuals from possessing, carrying, or transporting firearms, ammunition, or components thereof in any public space where a government-permitted event is occurring, or an event that would otherwise require a permit, or adjacent to such a space?

3.  May the government, consistent with the Fourteenth Amendment's Due Process prohibition on vague laws that fail to provide reasonable notice, permit the government to ban law abiding individuals from possessing, carrying, or transporting firearms, ammunition, or components thereof in any public space where a government-permitted event is occurring, or an event that would otherwise require a permit, or adjacent to such a space?

## STATEMENT OF THE CASE

Fairfax County controls public parks consisting of 23,584 acres, 427 parks, and more than 334 miles of trails.  This equates to over 9.3 percent of the land mass of Fairfax County.  JA13, JA36 (Compl. & Ans. ¶ 22).[1] Seventy-nine percent of Fairfax County's households are park users.[2] *Id.* The parks include vast amounts of wooded acreage, much of it remote and isolated. *Id.*

In 2022 in Fairfax County, the following crimes were reported to law enforcement: 22 homicides; 162 kidnappings/abductions; 374 sex offenses, and 8,918 assaults victims.  *Fairfax County Police Department Statistical Report Calendar Years 2021 & 2022*, at 6-9 (May 2023).[3]

On September 16, 2020, Fairfax County enacted a complete ban on firearms in County parklands, and within or adjacent to any outdoor public event. JA12, JA35 (Compl. & Ans. ¶ 16). In pertinent part, Code § 6-2-1(A) states:

> The possession, carrying, or transportation of any firearms, ammunition, or components or combination thereof is prohibited in the following areas:
>
> . . .

---

[1] Answer ¶ 22 "refer[s] the Court to" the following website, which makes these statements: https://www.fairfaxcounty.gov/budget/sites/budget/files/assets/documents/fy2021/advertised/volume1/51.pdf.

[2] https://www.fairfaxcounty.gov/budget/sites/budget/files/assets/documents/fy2023/advertised/volume1/51.pdf

[3] https://www.fairfaxcounty.gov/police/sites/police/files/assets/images/helpfulinfo/fcpd%20annual%20statistical%20report%20(2021%20&%202022).pdf

2. In any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County. . . .

4. In any public street, road, alley, or sidewalk or public right-of-way or any other place of whatever nature that is open to the public and is being used by or is adjacent to a permitted event or an event that would otherwise require a County permit.

Fairfax County Code § 6-2-1(A) (hereafter, "the Ban"). "Violations of Section 6-2-1(A) shall constitute a Class 1 misdemeanor." *Id*. § 6-2-1(E).

Appellant Kimberly LaFave is a paralegal who also has a dog-walking business. She is a member of the Jewish faith. Prior to the Ordinance's enactment, she frequently attended events held by synagogues and Jewish communal organizations in Fairfax County. Due to safety concerns, and her specific concern about the wave of anti-Semitism in this country, she has stopped attending such events since the Ordinance's enactment, to protect herself and her family. JA25-26 (LaFave Decl. ¶¶ 1, 8). Ms. LaFave has used Fairfax County park trails for several years and continues to do so for recreation, dog walking, and other activities. Many of the trails are in remote areas with few or no people and have no police presence. She is aware that serious crimes have been committed against women on the Fairfax County park trails and regularly carried a concealed handgun, for which she has a permit, for self-defense. JA25 (*Id.* ¶¶ 4-5).

The trails rarely indicate whose property they are on, and Ms. LaFave almost never sees signs indicating who owns the properties during her frequent trail usage.

While both the County and State have parkland in the County, she has no idea where one begins and the other ends. JA1605-1606 (LaFave Decl. ¶ 5). The Ban imposed a dilemma upon Ms. LaFave: If she continued to carry a concealed handgun in Fairfax County parks, she faces the threat of arrest and related injuries, but if she forgoes doing so, she will lose her means of security and will be vulnerable to criminal attack. But for the Ordinance, she would continue lawfully to carry a concealed handgun in Fairfax County parks. Since the Ordinance's enactment, she has continued to carry her handgun, but does not know, and cannot predict, if she is "adjacent" to events that should be or are permitted by the County, or if they are on County property. This uncertainty and unpredictability include walking and driving anywhere in the County, which may be through or adjacent to a park or covered event. JA1606-1607 (*Id.* ¶¶ 6-7, 9-15).

Appellant Glenn M. Taubman is an attorney and Fairfax County resident of approximately 40 years. JA1608 (Taubman Decl. ¶ 1-2). He has had a Virginia concealed carry permit for nearly fifteen years. *Id.* ¶ 3. He is an avid cyclist who regularly uses Fairfax County parks and trails. JA1608-1611 (*Id.* ¶¶ 3, 6, 9, 12, 15). In over 20 years of often visiting remote areas of parks and the trails, often on his bike, Mr. Taubman has never seen a police officer, and rarely even in busier areas where people congregate. While rarely seeing people (such as school classes, Scouts, or other youth groups) on the trails when he rides, Mr. Taubman does see

vagrants, homeless, and individuals engaged in gang-like activities in those areas. The Ordinance deprives him of the ability to defend himself against criminals, even though the County does not provide police to protect the public in these areas. JA 1609 (*Id.* ¶¶ 7-9). There are dozens, if not hundreds, of places where one can access the County trails that Mr. Taubman rides on, but Mr. Taubman has seen only 3 or 4 signs at access points providing notice of the park gun ban. He thus has no idea whether he is subject to arrest on a trail if he carries a concealed weapon. JA1610-1611 (*Id.* ¶ 15).

Mr. Taubman is a member of the Jewish faith and active in various synagogues and Jewish communal organizations that have events in County parks. Despite the wave of anti-Semitic attacks in this country, the Ordinance renders him unable to defend himself and others with his concealed weapon. He also has no idea if events that he wishes to attend are events that are permitted, or should be permitted, that are covered by the Ordinance.  JA1609 (*Id.* ¶ 6). Mr. Taubman testified against the Ordinance that is the subject of this lawsuit at the County Board of Supervisors public hearing on September 15, 2020, in which he explained that he carried a concealed handgun in the parks and added: "Your ordinance will leave us citizens defenseless in the face of gangs and criminals (who I have personally seen in county parks and bike trails)." *Id.* ¶ 4.

Before the Ordinance's enactment, Mr. Taubman possessed, carried, and transported firearms, on his person, in his vehicle, on the public streets, roads, alleys, sidewalks, public rights-of-way, and other places that are open to the public in Fairfax County. He continues doing so even though he is often unaware whether or not such places are being used by, or are adjacent to, a permitted event or an event that would otherwise require a permit. The law and the reality of moving about the County provide no notice or predictability of when he may be adjacent to an event, and he has no way of avoiding breaking the law even en route to another destination. When he becomes aware of such event, he must either not carry or possess a firearm or must endeavor to avoid such locations. JA1608-1610 (*Id.* ¶¶ 5, 11-14).

Appellant Robert Holzhauer, a Fairfax resident since 2004, was a commissioned police officer for eleven years, and a member of the U.S. Army for 27 years, retiring as a Lieutenant Colonel with an honorable discharge and a 100% permanent, total disability. He uses Fairfax County parks 3-4 days a week, and has done sometimes on a daily basis, minus deployment periods in Iraq, Yemen, Libya, and Liberia. JA1612 (Holzhauer Decl. ¶¶ 1-2). Lt. Col. Holzhauer has a concealed carry permit. When hiking in remote areas of the Fairfax County parks, he carried a handgun for protection from potential criminals and wild animals like bears. His disability creates a particular need to carry a handgun for self-defense, as he cannot

otherwise defend himself. *Id.* ¶ 3. When informed of the Ordinance, he discontinued carrying a handgun in the parks for fear of prosecution. But for the Ordinance, he would continue carrying a concealed handgun in the parks. *Id.* ¶ 4.

Because County properties rarely have signs indicating that status, Lt. Col. Holzhauer has no practical way of avoiding such locations when he carries his concealed weapon. He also has no way of knowing when he walks or drives with his weapon whether he is at or adjacent to a permitted event or one that should be permitted. Depriving him of his lawful right to defend himself leaves him defenseless, or subject to arrest if he does carry his concealed weapon, regardless of whether he has any way of knowing or predicting that he is in a gun-prohibited area. JA1612-1614 (*Id.* ¶ 6-13).

For years before the Ban's enactment and continuing through today, Appellants LaFave, Taubman, and Holzhauer have had valid concealed handgun permits issued pursuant to Va. Code § 18.2-308.01 *et seq*. JA1605 (LaFave Decl. ¶ 5); JA1608 (Taubman Decl. ¶ 3); Ex. JA1612 (Holzhauer Decl. ¶ 3). Before the Ban, Plaintiffs regularly used the County public parks, and carried firearms for self-defense when doing so. Since the Ban's enactment, Plaintiffs are forbidden from doing so. But for the Ban, Plaintiffs would again use the County parks while carrying firearms for self-defense. JA1605-06 (LaFave Decl. ¶¶ 5-7); JA1608-09 (Taubman Decl. ¶¶ 3, 5, 8-9); JA1612 (Holzhauer Decl. ¶¶ 3-5).

Notice of the ordinance is required to be posted at all entrances to such places when "being used by or is adjacent to a permitted event or an event that would otherwise require a permit."  § 6-2-1(D)(1).  The County will not know to post such notice for an event that "would otherwise" require a permit.  Plaintiffs will thus risk violating § 6-2-1(A) on a continuing basis merely by using and traveling on public streets and other public places. JA1606-07 (LaFave Decl. ¶¶ 9-10, 12-15); JA1608-11 (Taubman Decl. ¶¶ 5-8, 10-15); JA1612-13 (Holzhauer Decl. ¶¶ 5-7, 9-13).

In contrast to the nearly 24,000 acres of mostly woodland where Fairfax County bans firearms, the Commonwealth itself limits where firearms may not be carried or possessed to only a narrowly-defined list of specific places: courthouses (Va. Code § 18.2-283.1); the Capitol, Capitol Square, the surrounding area, and Commonwealth buildings and offices where its employees work (§ 18.2-283.2(B)) (*excluding "any state park"* (§ 18.2-283.2(E)(v)) (emphasis added); an air carrier airport terminal (§ 18.2-287.01); and schools (§ 18.2-308.1(B)), with an exemption for permittee ingress or egress in a motor vehicle (§ 18.2-308.1(E)(vii)).

Appellants filed their Complaint on November 22, 2023, seeking declaratory and injunctive relief that the Ban violated the Second Amendment and Fourteenth Amendment's due process protection against vague laws that fail to provide reasonable notice.  JA9 (*LaFave v. The Cnty. of Fairfax, Va.*, 1:23-cv-01605

(E.D.Va)). Appellant's request for a preliminary injunction against the Ban was denied on January 24, 2024. JA46. Summary judgment was denied for Appellants, and granted to Appellees, on August 23, 2024.  JA1758-1794 (reported at 2024 WL 3928883)**.**

## SUMMARY OF THE ARGUMENT

This is an action to vindicate the right of residents and visitors in the Fairfax County under the Second Amendment to the United States Constitution, which guarantees that "the right of the people to keep and bear arms, shall not be infringed."  Plaintiffs also seek relief under the Fourteenth Amendment's Due Process Clause from this vaguely-defined offense.

On September 16, 2020, the Fairfax County Board of Supervisors enacted an ordinance banning any member of the public from bearing firearms in County parks, or at permitted events, or adjacent to such events or events that otherwise should be permitted (the "Ban"). This legislation brazenly violates the Second Amendment.

Just over two years ago, the United States Supreme Court held in *New York State Rifle & Pistol Association, Inc. v. Bruen* that "The Second Amendment's plain text [ ] presumptively guarantees … a right to 'bear' arms in public for self-defense."  597 U.S. 1, 33 (2022).  The burden falls on the government to show that a restriction "is consistent with this Nation's historical tradition of firearm

regulation." *Id*. at 34. While firearms may be banned in "sensitive places" like schools and courthouses, sensitive places do not include "all places of public congregation that are not isolated from law enforcement…." *Id*. at 31. *Bruen* confirmed that the constitutional default rule is that law-abiding citizens may bear arms in public spaces. They may be shorn of that right not based on modern political preferences, but only where the government can show a widespread analogous historical restriction from the Founding Era.

Many challenges to firearms restrictions were filed in *Bruen*'s wake, including *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 322-23 (N.D.N.Y. 2022), *rev'd in relevant part* at 89 F.4th 271, 355-63 (2d Cir. 2023) ("*Antonyuk I*"). *Antonyuk I* held that parks and public gatherings were sensitive places from which the government could ban firearms. The County and District Court heavily relied on *Antonyuk I* in the case below. In June 2024, the Supreme Court held in *United States v. Rahimi* that where a judicial finding of dangerousness had been made, an individual could be deprived of his Second Amendment rights. 144 S. Ct. 1889. The Supreme Court granted certiorari to *Antonyuk I,* which it reversed and remanded for reconsideration in light of *Rahimi.* 144 S. Ct. 2709. The Second Circuit then came to the same conclusion as in *Antonyuk I*, upholding park and public assembly bans on firearms. *Antonyuk v. James*, 2023 WL 11963034 (2d Cir. 2024) ("*Antonyuk II*").

Fairfax County bans firearms in its public parks, which consist of 23,632 acres with over 334 miles of trails. The parks include vast amounts of wooded acreage, much of it isolated. Before the Ban's passage, Plaintiffs regularly carried concealed handguns in the parks for self-protection, as lawfully authorized by their Virginia permits. The ordinance making it a crime to do so deprives Plaintiffs of their Second Amendment rights to carry firearms for self-defense. The County also bans firearms on public streets and sidewalks that are adjacent to a permitted event, or an event that would otherwise require a permit. In addition to violating the Second Amendment, this provision is vague and fails to give objectively reasonable notice of what is prohibited, in violation of the Due Process Clause.

Neither the County nor the District Court below produced *any* evidence of firearms prohibitions from the Founding Era against law-abiding citizens for parks, or public congregations in open, undefended spaces. Doing so is impossible, as anyone with even a passing knowledge of 18th Century history knows, firearms were ubiquitous and necessary in America, both before and after the Second Amendment's ratification in 1791. Instead, the County and District Court (1) disregarded *Bruen*'s requirement that the historical analogies must come from the Founding Era; and (2) indulged the fiction that "modern" parks (i.e., parks that banned guns starting in 1858) are somehow a "unique" historical occurrence. In their view, no one in the Founding Era went outside in public, undefended spaces

to recreate, enjoy nature, congregate, protest, learn, or engage in any of the other activities commonplace in modern parks, streets, and sidewalks. The District Court and the County have done precisely what *Bruen* forbade: Labeling virtually the entirety of public space as "sensitive places" in order to deprive the public of its constitutional right to bear arms. Further, the County's prohibition on bearing arms "adjacent" to permitted events puts all firearms possessors in peril of committing a crime simply by using the County's byways, as no one can predict when she will come across a congregation of people on County property. This defies the Due Process protection against vague laws that fail to give meaningful notice.

Plaintiffs seek declaratory judgment holding the Ban unconstitutional under the Second and Fourteenth Amendments, and an order enjoining its enforcement.

## ARGUMENT

### I.   Standard of Review.

Appeals of summary judgment determinations are reviewed *de novo*, *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 173 (4th Cir. 2024), as are challenges to the constitutionality of laws. *United States v. McLean*, 715 F.3d 129, 136 (4th Cir. 2013).

## II.     As In *Bruen*, Appellants Bring A Proper Facial Challenge.

Appellants bring here a proper facial challenge.  *Bruen* held New York's ban on carrying firearms to violate the Second Amendment, 597 U.S. at 71, despite the fact that the ban could be applied in "sensitive places."  *Id*. at 30-31.

"[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."  *Johnson v. United States*, 576 U.S. 591, 602 (2015).  *See also City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality op.) ("[w]hen vagueness permeates the text of [a criminal] law" "that contains no mens rea requirement, . . . and infringes on constitutionally protected rights," "it is subject to facial attack.").

As here, facial challenges are appropriate where a law implicates a constitutional right and imposes criminal penalties, even when the law could conceivably have had some valid application:

> First . . . we permit a facial challenge if a law reaches "a substantial amount of constitutionally protected conduct." Second, where a statute imposes criminal penalties, the standard of certainty is higher. This concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application.

*Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (citation omitted.).

### III. The Park Ban Violates the Second Amendment

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

### A. Firearms Were Ubiquitous in Public in the Founding Era.

The inescapable historical fact is that Americans in the Founding Era had guns everywhere, whether alone or in public congregations, regardless of whether they were in urban or rural areas. The reasons should be familiar to anyone even vaguely familiar with conditions at the time:

> The colonial generation required the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from criminals and pirate raids, to curb slave rebellions, and to be ready for a potential foreign invasion.

*Koons v. Platkin,* 673 F. Supp. 3d 515, 628 (D.N.J. 2023) (citations omitted), appeal filed (3d Cir. May 17, 2023). *Koons* recited the historical record at length:

> Starting in 1619, Virginia's House of Burgesses passed a law requiring "all persons" attending church services on the Sabbath "to beare arms" and bring with them "their pieces, swordes, poulder and shotte." Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606–1625*, at 273 (Charles Scribner's Sons, 1907). Then,

15

in 1632, Virginia's General Assembly enacted a law requiring all men fit to bear arms to bring their weapons "to the church." 1 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 174 (New York, R. & W. & G. Bartow 1823). A decade later, in 1642, Virginia's legislature enacted another law requiring the "masters of every family [to] bring with them to Church on Sundays one fixed and serviceable gun with sufficient shot and powder." *Id.* at 263. Because of the threat posed against the early colonists by Native Americans—a pernicious problem for the settlers—in 1676, Virginia's governor required "all people be enjoined and required to go armed for their greate[r] security ... in going to churches and court in these times of danger." Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class?* (2021) at 125 (quoting An Act for the Safeguard and Defence of the County Against the Indians, 28 Car. II, 2). About a hundred years later, in 1755, Virginia passed another law allowing each county's chief militia officer to order all enlisted militiamen "to go armed to their respective parish churches." 6 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619*, at 534 (Richmond, Franklin Press 1819).

Virginia was not alone. In 1636, Colonial Massachusetts required citizens to attend public assemblies with "their muskets or other peeces [sic] fit for service, furnished with match, powder, and bullets." 1 Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (Boston, William White Press 1853). Rhode Island, in 1639, likewise ordered that no "man shall go two miles from the Towne unarmed, [either] with Gunn or Sword; and that none shall come to any public Meeting without his weapon." 1 John R. Bartlett, *Records of the Colony of Rhode Island and Providence Plantations, in New England* 94 (Providence, A.C. Greene & Bros. 1856). Like the other colonials, Maryland's colonists were familiar with violence from encounters with the Native Americans, and in 1642, Maryland provided that "noe man able to bear arms to goe to church or Chapell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott." 3 William

Hand Browne, *Archives of Maryland: Proceedings of the Council of Maryland 1636–1667*, at 103 (Baltimore, Md. Hist. Soc'y 1885). Connecticut followed step in 1643 by ordering that certain citizens bring muskets, pistols or some "peeces" with powder and shot when attending meetings on the Sabbath or "lecture" days. 1 J. Hammond Trumbell, *The Public Records of the Colony Connecticut, Prior to the Union with New Haven Colony* 95 (Hartford, Brown & Parsons 1850).

Within the decades before the Second Amendment's ratification, South Carolina, in 1740, passed a law requiring "every white male inhabitant of this Province ... who is liable to bear arms in the militia of this Province" who attends "any church or any other public place of divine worship" to "carry with him a gun or a pair of horse pistols ... with at least six charges of gunpowder and ball." 7 David J. McCord, *Statutes at Large of South Carolina* 417–19 (Columbia, A.S. Johnston 1840). This law appears aimed at violence stemming from slave revolts. *See id.* Then, in 1770, Georgia enacted a law requiring "every white male inhabitant of this province ... who is or shall be liable to bear arms in the militia ... and resorting, on any Sunday or other times, to any church, or other place of divine worship" to "carry with him a gun or a pair of pistols." Horatio Marbury & William A. Crawford, *Digest of the Laws of the State of Georgia* 241–42 (Savannah, Seymour, Woolhopter & Stebbins 1802). The law required the churchgoer to bring his weapon "with him to the pew or seat." *Id.*

Given the above, the historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies. *Heller,* 554 U.S. at 606 (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). The colonial generation recognized that citizens attending public gatherings exposed themselves to violent attack. While public assemblies might conjure the notion that there is "strength in numbers," history reveals that the more crowded the gathering, the greater the risk of attack. To abate that risk, American colonists obligated their citizenry to arm themselves for protection.

*Id.* at 628-29.

*Bruen* noted that some sites of public gathering, like public legislative

assemblies, polling places, and courthouses were historically considered "sensitive

places" where weapons could be prohibited. 597 U.S. at 30. Crucial to the sensitive

places analysis, those places were secured, and thus privately-provided defense

was unnecessary.

> History reveals that those places were considered sensitive places
> because either government officials met at those locations to
> perform core government administration (courthouses and
> legislative assemblies), or the location involved a citizen's
> fundamental right to participate in the political process (polling
> places). See generally David Kopel & Joseph Greenlee, *The
> "Sensitive Places" Doctrine,* 13 CHARLESTON L. REV. 205, 206,
> 229–236, 244–247 (2018). The common thread that runs through
> all these "sensitive" locations is that historically the government
> provided security at them, and so the need for armed self-defense
> was reduced. *See Hardaway v. Nigrelli,* 639 F. Supp. 3d 422, 440
> (W.D.N.Y. 2022) (noting that legislative assemblies and
> courthouse "are typically secured locations, where uniform lack of
> firearms is generally a condition of entry").

*Koons*, 673 F. Supp. 3d at 635.

Here, the District Court's "sensitive places" labeling utterly lacks the key

feature that made Founding-era firearms prohibitions permissible: Government-

provided security.  *See Bruen,* 597 U.S. at 31 ("[E]xpanding the category of

'sensitive places' simply to all places of public congregation that are not isolated

from law enforcement defines the category of 'sensitive places' far too

18

broadly.").[4]  Precisely because it has no Founding-era analogues allowing the general prohibition of firearms where the government does not provide security, the County  relies upon administrative restrictions not passed by voters from the late 19th Century to claim that parks are sensitive places. As discussed, *infra, Bruen* forbids relying on such analogies that cannot be tied to the Founding Era.

**B. Restrictions on the Presumptive Right to Bear Arms in Public Places Must Be Analyzed Under *Bruen*'s Text-History Test.**

The Second Amendment guarantees that "the right of the people to keep and *bear arms*, *shall not be infringed*." (emphasis added). By contrast, Section 6-2-1(A)(2) of the Ordinance states: "The *possession, carrying, or transportation* of any *firearms*, ammunition, or components or combination thereof *is prohibited* in … any public park …."  (emphasis added). As applied to the entire 23,632 acres of Fairfax County public parks, the Ban infringes on the right to bear arms.

"[T]he plain text of the Second Amendment protects … carrying handguns publicly for self-defense."  *Bruen*, 597 U.S. at 32. It "presumptively guarantees …

---

[4] The County has posited that Plaintiffs could avoid any problems by just not going to the "narrow areas" where the County has chosen to ban guns. By "narrow," the County means all of its parks (10% of the entire County landmass), any event on County property, or any street or sidewalk that happens to be adjacent to such an event.  The County does not indicate whether it believes that same restriction might permissibly apply to the rights of free speech, religious exercise, assembly, and petitioning the government in those "narrow pieces of property." The County has determined that the Second Amendment is not a second-class right, but no right at all.

a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33. On this prong, the District Court was correct, finding that the Second Amendment's text presumptively guarantees Appellants' "right to bear arms in County Parks and in or near County-permitted events for self-defense." JA1774.

Given that presumption, the burden falls on the County to show that a restriction "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The County must meet its burden through analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.*" *Bruen*, 597 U.S. at 30 (emphasis in original). Because the parks ban addresses a general historical problem that existed since the founding (firearms violence in public—the same problem at issue in *Heller* and *Bruen*, *Bruen*, 597 U.S. at 27) the historical analogue must be "distinctly similar" to the modern regulation. *Id.* at 26. The analogue's similarity is measured by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. Courts may not apply intermediate scrutiny or "means-end scrutiny in the Second Amendment context." *Id.* at 19.

But "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Id.* at 34, (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008) (emphasis

added)).  The Second Amendment was adopted in 1791, and "to the extent later

history contradicts what the text says, the text controls. … Thus, post-ratification

adoption or acceptance of laws that are *inconsistent* with the original meaning of

the constitutional text obviously cannot overcome or alter that text.'"  *Id*. at 36

(citation omitted); *see also Bruen*, 597 U.S. at 66-68 (reliance on territorial laws

from 1868-1890 had "several serious flaws even beyond their temporal distance

from the founding.").

　　*Bruen* does recognize limited places and circumstances where firearms may

be prohibited, referencing longstanding "laws forbidding the carrying of firearms

in sensitive places such as schools and government buildings." *Id.* at 30 (quoting

*Heller*, 554 U.S. at 626).  *Bruen* also observed a handful of other "sensitive places"

from the 18th and 19th centuries where weapons were altogether prohibited, noting

legislative assemblies, polling places, and courthouses.  *Bruen*, 597 U.S. at 30

(citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON

L. REV. 205, 229–236, 244–247 (2018)).

　　All of the places *Bruen* listed as "sensitive" are buildings, except that

"schools" include both school buildings and school yards, including playgrounds

and athletic fields.  Further, as the *Sensitive Places* article endorsed in *Bruen* points

out, the provision of enhanced security demarks a location as sensitive:

> The government's behavior can demonstrate the true importance of the
> alleged government interest. Passing a statute declaring some place to

> be a "gun free zone" does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive.

Kopel & Greenlee, 13 CHARLESTON L. REV. at 290.

By contrast, Fairfax County's ban is not limited to buildings, playgrounds, or athletic fields. Instead, it bans the exercise of the right to bear arms for self-defense throughout the 23,632 acres of primarily wooded areas with the least population density in the County, as well as public byways that traverse gatherings that should be permitted. But "*Public parks are not sensitive places*. They are not buildings. There is no practical means of preventing armed criminals from entering. They are similar to the vast majority of land in the United States, which is outdoors, not indoors." *Id.* at 291 (emphasis in original).

Merely being a place where people congregate does not suffice. "Expanding the category of 'sensitive places' to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31. That test "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense …." *Id*.

*Bruen* further held that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and

protected generally by the New York City Police Department." *Id.* The island of Manhattan, one of the most densely-populated cities in the world, consists of 14,502.4 acres of land.[5] Fairfax County public parks, which are not densely populated, consist of 23,632 acres of land. And if firearms may not be banned in every public space in a city (which makes Fairfax's ban on firearms on public byways patently unconstitutional), they plainly may not be banned in vast, mostly wooded lands.

### C. The District Court Erred in Relying on Post-1850 Park Firearm Bans, Defying *Bruen's* Admonition that Late 19th Century Firearms Restrictions Without Founding Era Analogues Cannot Support Restricting the Presumptive Right to Bear Arms in Public.

The District Court believed that even though the County could point to no Founding Era laws banning firearms by law-abiding citizens in open, unprotected public spaces, it could nonetheless ignore that history and look to regulations (not laws passed by voters) from after 1850 to seek out analogies for the County's park ban. JA1771-1773, JA1776-1782. This was error. *Bruen* does not countenance restrictions from the time of the Fourteenth Amendment's 1868 adoption that lack any Founding-era analogue to justify modern definitions of "sensitive places." *Bruen* flatly states that "individual rights enumerated in the Bill of Rights and

---

[5] U.S. Census Bureau, Quick Facts, New York County [Manhattan], New York, showing land area as 22.66 sq. miles (14,502.4 acres). https://www.census.gov/quickfacts/fact/table/newyorkcountynewyork/PST045221.

made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," and that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37.

*Bruen* did note "an ongoing scholarly debate" on whether the understanding in 1868 defined the scope of the right but stated that it "need not address this issue" because the understanding was the same in 1791 and 1868. *Bruen*, 597 U.S. at 38. The District Court's observation that *Bruen* "analyzed both Founding Era and Reconstruction Era history and tradition" misses the crucial point: *Bruen rejected* reliance on Reconstruction Era history that lacked Founding Era precedents. *Rahimi*, as well, relied on "laws at the founding," 144 S. Ct. 1889, 1898 (2024), and eschewed any dependance on laws after the Founding Era. *See id.* at 1899-1901. Like the District Count below, the Second Circuit's *Antonyuk II* opinion similarly alters *Bruen*'s holding, and instead incorrectly asserts that *Bruen* "expressly declined to decide" whether courts should rely on the understanding in 1868. *Antonyuk II*, 2023 WL 11963034, at *7.

But, as set forth *supra*, while *Bruen* acknowledged the academic debate, it *decided* that the Founding Era is controlling. As Justice Barrett's concurrence elaborated: "But if 1791 is the benchmark, then New York's appeals to

Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little)." 597 U.S. at 82 (Barrett, J., concurring). Similarly, a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" to inform the meaning of the First Amendment. *Id*. (quoting *Espinoza* v. *Montana Dept. of Revenue*, 591 U.S. 464, 482 (2020). *Bruen* thus does not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.*[6]

*Antonyuk II* also thought it "incongruous" to recognize the arms right "applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk II*, 2023 WL 11963034, at*18. But no such incongruity exists. That is exactly how the Supreme Court interprets the scope of other incorporated provisions of the Bill of Rights: By relying on Founding-era understandings to construe, among others, the First,[7]

---

[6] *See* Mark Smith, "Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868," HARV. J.L. & PUB. POL'Y, No. 31, 1 (Fall 2022).

[7] *E.g.*, *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 182-84 (2012) (Establishment Clause and Free Exercise Clause); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-125 (2011) (freedom of speech); *Near v. Minnesota*, 283 U.S. 697, 713-17 (1931) (freedom of the press).

Fourth,[8] Fifth,[9] Sixth,[10] and Eighth Amendments.[11]

### D. The District Court's Conclusion that Parks are a Unique Modern Circumstance Defies History And Logic.

A primary premise of the District Court's analysis was to accept the County's urging that that "public parks emerged as communal spaces for repose and relaxation in the nineteenth century," as if there were no open public spaces before then, and as if firearms had at some point been banned in all "communal spaces for repose and relaxation." JA1763-1764, 1771-1773, 1776-1786.

The claim that parks did not exist in the Founding Era is counterfactual. Notwithstanding the District Court's contrary assertion, numerous municipalities had parks prior to 1791, from Boston Common in 1634 through the National Mall in 1790, and firearms were not banned in any of them. The Trust for Public Land lists the "Oldest City Parks," including fifteen that predate 1791, from Boston Common in 1634 and Washington/Marion Squares in Charleston, South Carolina in 1680, through Johnson Square in Savannah, Georgia, in 1733, and the National

---

[8] *E.g.*, *Virginia v. Moore*, 553 U.S. 164, 168-169 (2008).

[9] *Gamble v. United States*, 587 U.S. 678, 684 (2019) (Double Jeopardy Clause).

[10] *E.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 89-92 (2020) (Jury Trial Clause); *Klopfer v. North Carolina*, 386 U.S. 213, 223-25 (1967) (right to speedy trial).

[11] *E.g.*, *Timbs v. Indiana*, 586 U.S. 146, 149-70 (2019) (Excessive Fines Clause).

Mall in 1790.[12]

"Before parks, seventeenth- and eighteenth-century Boston, New York, and Philadelphia had public urban landscapes with many characteristics of parks…." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 2 (2021).[13] Residents "found opportunities to gather in taverns, the common, markets, and streets." *Id*. at 3. No restrictions on the peaceable carrying of firearms existed in such places. As described below, these venues played similar social roles as the Fairfax County parks today.

"The Boston Common, designated as a public open space in 1634, is considered the nation's first city park." Margaret Walls, *Parks & Recreation in the U.S.: Local Park Systems*, RESOURCES FOR THE FUTURE 1 (June 2009);[14] *accord* Koons, 673 F. Supp. 3d at 640. Indeed, "the Common was a place for recreation as early as the 1660s." *Boston Common*, National Park Service (visitor's description

---

[12] Trust for Public Land, *The Oldest City Parks*, at 5, https://www.tpl.org/wp-content/uploads/2013/12/ccpe-largest-oldest-most-visited-parks-4-2011-update.pdf.

[13] https://lj.uwpress.org/content/40/2/1.abstract?cited-by=yes&legid=wplj;40/2/1&related-urls=yes&legid=wplj;40/2/1.

[14] https://media.rff.org/archive/files/sharepoint/WorkImages/Download/RFF-BCK-ORRG_Local%20Parks.pdf.

"about men and women of Boston enjoying evening strolls on the Common").[15]  It

was also a place for children to play and for political meetings to be held:

> Children enjoyed the Common, too, wading in the Frog Pond in
> summer, and skating and sledding in the winter. Gradually
> recreational activities began to dominate the Common. The changes in
> land use mirrored changes in landscape design. The first wide, tree-
> lined mall added along Tremont Street in 1722 is one reflection of
> these changes....
>
> Since its inception, activities held on the Common stretched beyond
> relaxation and recreation to include public assembly. George
> Washington, John Adams, and General Lafayette celebrated our
> nation's independence in this space.

*Id.*

The Boston Common was no "gun-free zone" – it was used for militia

purposes, including training with firearms.  Beamish, *Before Parks* at 3-6. And

"[t]he Common also served as a site for informal socializing and recreation"

including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment,"

and "raucous celebrations." *Id.*; *see Lowell v. City of Boston*, 79 N.E.2d 713, 724

(1948) ("for about three centuries the inhabitants … have sought and found rest,

recreation, edification and inspiration on the Common").

In New York, the Bowling Green was "used for informal ball games,

including lawn bowling, paille-maille, bowls, skittles, and ninepins…." *Before

Parks* at 8.  It was also a place of celebration, such as, in 1713, to "commemorate

---

[15] https://www.nps.gov/places/boston-common-ma.htm.

the new peace treaty between Great Britain and France…." *Id*.  In 1733, "the city decided to turn the site into a place for genteel strolling…." *Id*.  "Although the Bowling Green was intended as a place of leisure and to beautify the neighborhood, it was also used for political demonstrations." *Id*.

In Philadelphia, there were "private pleasure gardens" that "were notable for their lush plantings, plentiful refreshments, extravagant entertainment, and most of all, the mixing of classes…." *Id*. at 10.  The public State House Garden was created in the mid-1780s.  *Id*. at 10-11.  At the end of the eighteenth century, Centre Square—which previously had been used for activities like horse racing and military training—became a public pleasure garden.  *Id*. at 11.

Despite Boston Common and other "green spaces" being places where people gathered, like the Fairfax parks here, the opinion below provides no evidence for the notion that "communal spaces for repose and relaxation" were invented only in the mid-to-late 19th century. The opinion below mentions "fairs[16] and markets,"[17] which were crowded places recited both in the 1328 Statute of

---

[16] "Fair.  A stated market in a particular town or city; a stated meeting of buyers and sellers for trade. A fair is annual or more frequent. The privilege of holding fairs is granted by the king or supreme power."  Noah Webster, *An American Dictionary of the English Language* (1828) ("fair").

[17] "Market.  1. A public place in a city or town, where provisions or cattle are exposed to sale; an appointed place for selling and buying at private sale…. 2. A public building in which provisions are exposed to sale; a market-house."  *Id*. ("market").

Northampton (which applied to the affray of going armed "to the Terror of the People," not simply arming oneself peaceably), *see Rahimi*, 144 S. Ct. 1889, 1901 (2024), and from statutes in the Founding period. JA1782-1784. Yet neither the opinion below nor the County cite any Founding-era restrictions on the peaceable carrying of arms for any of these and other "crowded spaces."

Though *Bruen* speaks in terms of "regulations" of firearms, its discussion of the relevant history in America refers only to the common law and legislation voted on by the people as being relevant to that determination; nowhere does *Bruen* consider rules issued by unelected administrators relevant to the public understand of the right to bear arms. *See Bruen*, 597 U.S. at 34, 45-70 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.") (internal citation omitted) (emphasis added).

The first ever American restriction on the carrying of firearms in parks cited by the opinion below is that of Central Park, adopted in 1858. JA1763-1764, 1777. As the opinion below notes, the park's rules were adopted by a vote of the park commissioners, not by a legislative body.[18] JA1777; JA116-18 (*Minutes of*

---

[18] The opinion below does not address at all whether the park commissioners were elected officials, and thus a purported source of the public's understanding of firearms rights. It appears that City commissioners were simply mayoral appointees. *See In re Dept. of Public Parks,* 85 N.Y. 459, 461 (1881) (Central Park Commissioners act on the mayor's behalf); *People ex rel. Houghton v.*

*Proceedings … Central Park* 166 (1858)). The rules also forbade persons "To enter or leave the park except by the gateways." *Id*. "The Superintendent may direct that any of the entrances to the Park be closed at any time…." JA122, 126 (*Fourth Annual Report* 108 (1861)). The park was thus enclosed, and it was policed by "a force of Park Keepers." JA76-77 (Young Expert Report ¶ 30).

Even if a post-Founding-era park like Central Park were historically relevant, the County's own evidence suggests that New York treated it like a sensitive place by both restricting entry and providing security. JA116-118 (Central Park Bd. of Commissioners Mtg. Minutes, April 30, 1858). That was quite unlike the County's extensive unenclosed and unpoliced spaces here, ranging in size from small playgrounds to vast wooded tracts, all of which the County refuses to protect. Indeed, the County points to not a single one of its parks that is secured to protect the occupants, as was Central Park, rendering the comparison entirely inapposite.

Parks in Brooklyn, Philadelphia, and elsewhere followed patterns similar to Central Park. JA129-138. But these, like the park firearm bans cited by the District Court and County were enacted mostly in the late 19th and early 20th centuries, JA1777-1779, too late to count under *Bruen* in the absence of a

---

*Andrews*, 104 N.Y. 570, 574 (1887) (excise commissioners appointed by mayor, approved by city council).

Founding-era analogue.  Indeed, of the 115 park bans cited by the County, 106 are

from between 1880 and 1936. JA1037-1057. The remaining nine are from 1858-

1878.  JA 1037-38.  The County offers not a single firearms ban in parks from

anywhere in America from the colonial period, the Founding Era, or from the first

82 years of the Nation's existence.

The opinion below also invoked rules in the National Parks from periods

nowhere near the Founding Era that are thus irrelevant under *Bruen*, and

additionally (though the opinion fails to note it), were also not outright bans.

JA1778.  For instance, Yellowstone rules (1894) and National Park Service rules

(1936), respectively, allowed possession of firearms with the superintendent's

permission.  JA573-76 (*Report of the Sec'y of the Interior* 662 (1894); JA672, 675

(*Fed. Reg.* June 27, 1936). Moreover, like the urban park ordinances, they were

administrative rules not voted on by the people's representatives, and not

legislation demonstrative of the public's understanding. (And when the people's

elected congressional representatives did speak on the issue of firearms in national

parks, they declared firearms to be legal: "Federal laws should make it clear that

the 2d amendment rights of an individual at a [Park] System unit should not be

infringed."  54 U.S.C. § 104906(a)(7). In 2009, Congress barred "any regulation

that prohibits an individual from possessing a firearm ... in any System unit."  54

U.S.C. § 104906(a)(7), (b).).

The District Court and County assert that the American parks from before 1858 that did not prohibit firearms were not "modern-style parks." As set forth *supra*, however, they were every bit as much "communal spaces for repose and relaxation" as later parks. Even more to the point, the "park" label is irrelevant. Publicly-owned, undefended spaces open to public use were even more ubiquitous in colonial and Founding Era America than they are today. Whether a wooded area, a communal green or a riding path has as its proprietor King George III, the city of Boston, or the County of Fairfax, are distinctions of no moment. Nor does it matter whether a public space is surrounded by lots of buildings (urban), spaced out buildings (suburban), or more space (rural). Neither the opinion below or the County ever explain why the right to self-defense somehow disappears based on the population density surrounding whatever space they deign to label a "park." Constitutional analysis does not rest on this kind of semantic gymnastics. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991); *Carson as next friend of O.C. v. Makin*, 521 U.S. 793, 804 (2022); *Vacco v. Quill*, 521 U.S. 793, 804 (1997); *Quill Corp. v. North Dakota by and through Heitkamp*, 504 U.S. 298, 310 (1992). The Supreme Court has been crystal clear that population density and congestion have no bearing on where the right to bear arms may be exercised. *Bruen*, 597 U.S. at 29-31.

Based on the inaccurate premise that "modern" parks did not exist before the second half of the nineteenth century, the District Court ignored *Bruen*'s holding that later restrictions inconsistent with Founding-era practices cannot justify current restrictions. The District Court posited sundry rationales offered by the County for banning firearms in parks: Relaxation, repose, recreation, education, havens from modern life, protests, etc. JA1778-1779. These are all desirable social goods. But invoking them as justifying a firearms ban to prevent violence is a *non sequitur.* Law abiding citizens possessing firearms in public does not impede any of those goals. Moreover, worthy though all those goals might be, none are fixtures in the Bill of Rights. Indeed, as is the Second Amendment's purpose, the law-abiding presence of firearms makes all of those functions more possible by deterring criminal and anti-social activity. *Bruen* makes plain that the claimed objective of preventing gun violence cannot by itself sustain firearms bans, because gun violence is "a general societal problem that has persisted since the 18th century," and "when a challenged regulation addresses the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. The District Court's decision provides not a single example of a firearms ban in parks—or anything like a park—from the Founding Era.

**E. The Second Circuit's *Antonyuk II* Decision Upholding New York's Firearms Ban in Parks & Public Gatherings is Untenable Because It Ignores *Bruen*'s Plain Language, Makes Significant Historical Errors About Firearms Law in the Founding Era, and Applies Inapplicable Historical Analogues that Bruen Has Already Rejected.**

Both the District Court's opinion and the County rely heavily on the Second Circuit's opinion in *Antonyuk I,* which *Antonyuk II* repeats almost verbatim. *Antonyuk II* upheld New York's park ban "at least insofar as the regulation prohibits firearms in *urban* parks, though not necessarily as to *rural* parks," despite "doubt that there is historical support for the regulation of firearms in wilderness parks, forests, and reserves." 2023 WL 11963034, at *55.[19] The court also upheld firearms bans in crowded public spaces. *Id*. at *60. *Antonyuk II*, however, made critical errors conflicting with *Bruen*'s instructions, as well as other analytical failures, rendering its conclusion untenable.

**1. The British Statute of Northampton Remains Irrelevant to Interpreting America's Second Amendment.**

In support of its finding that firearms could be banned in parks and public gatherings, *Antonyuk II* repeatedly relied on the British Statute of Northampton of 1328. *Id*. at *54, 55 n.82, 71, & 72 n.115. That reliance directly contravenes the Supreme Court's instructions in *Bruen. Bruen* determined that the Statute "has

---

[19] As shown herein, the urban-rural parks distinction is not one supported by Founding Era practice. Firearms carried peacefully were permitted in public places as a matter of general right.

little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41.  The

Statute provided that English subjects could not "come before the King's Justices,

or other of the King's Ministers doing their office, with force and arms, nor bring

no force in affray of the peace, nor to go nor ride armed by night nor by day, in

Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part

elsewhere…."  *Id*. at 40 (quoting 2 Edw. 3 c. 3 (1328)).  In the 17th and 18th

centuries, the Statute was construed as applying only to going armed with evil

intent in a manner to terrify others.  *Bruen*, 597 U.S. at 44-45.  Indeed, "going

armed" referred not to handguns—which would not be invented for another 200

years—but to the wearing of armor (or perhaps carrying lances).  *Id.* at 41.

*Antonyuk II* claims that *Bruen* did not address "the more specific

prohibitions in the statute such as carriage in fairs and markets," today's

"quintessentially crowded places" where firearms supposedly may be banned

without regard to conduct.  *Antonyuk II*, 2023 WL 11963034, at *55 n.82.  But

*Bruen* recognized no such reading of the Statute that excluded fairs and markets

from the places where arms could be carried.

### 2. Both Virginia's and North Carolina's "Going Armed" Laws Included a "Terror" Element, Contrary to Antonyuk's Conclusion That Those States Had General Bans on Public Firearms in the Founding Era.

*Antonyuk II* claims that "at least two states—Virginia and North Carolina—

passed statutes at the Founding that replicated the medieval English law

prohibiting firearms in fairs and markets, i.e., the traditional, crowded public forum." 2023 WL 11963034, at *55. This is false. While some colonies made it an offense to "ride or go armed Offensively," the term "Offensively," as *Bruen* noted, "merely codified the existing common-law offense of bearing arms to terrorize the people…." 597 U.S. at 47. For instance, a 1786 Virginia statute provided that no person shall "go nor ride armed … in fairs or markets, or in other places, in terror of the Country." *Id.* at 49 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)). Indeed, *Antonyuk II* reluctantly acknowledges that crucial qualification; that "the Virginia statute" "*prohibited **conduct** and not simply carriage*, i.e., bearing arms in 'terror' of the county [*sic*]...." 2023 WL 11963034, at *55 n.82 (emphasis added).

*Antonyuk II*'s claim that North Carolina generally banned firearms in public is also entirely incorrect. *Id*. As of 1791, the year the Second Amendment was ratified, North Carolina had two "going armed" laws, both originally passed in 1741. Taken together, those laws permitted free individuals to bear arms for self-defense.

*Rahimi* took notice of one of those laws. Reaffirming that affrays encompassed "the offense of 'arm[ing]' oneself 'to the Terror of the People,'" *Rahimi* noted that North Carolina "expressly codified prohibitions on going armed." 144 S. Ct. 1889, 1901 (2024) (citing Collection of All of the Public Acts

37

of Assembly, of the Province of North-Carolina: Now in Force and Use 131 (1751)

(1741 statute)).  The 1741 statute provided that constables "shall arrest all such

Persons as in your Sight, shall ride or go armed offensively, or shall commit or

make any Riot, Affray, or other Breach of his Majesty's Peace…." *Id*.[20] The 1741

statute still appeared in the laws of 1791.  James Iredell, Laws of the State of

North-Carolina 70 (1791).  JA1615-1619.

While it was an offense for a free person to go armed only if done so

"offensively," the 1741 statute also provided that "no Slave shall go armed with

Gun, Sword, Club or other Weapon" at all. JA1617. In other words, it was an

offense for a free person to "go armed offensively" (which looked to a person's

*conduct* bearing arms), while a slave could not "go armed" at all.  Nothing in North

Carolina law then or later prohibited a free person from peaceably going armed in

places like fairs or markets.

### 3. Contrary to Antonyuk II, the Statute of Northampton Reprinted in Martin's Collection Was Not a "Law" Enacted by North Carolina.

Ignoring the actual state law, *Antonyuk II* purported to have found a "North

Carolina statute" that "did not ban firearms based on terroristic conduct, it banned

*all* carriage in fairs and markets."  2023 WL 11963034, at *72 n.114  (citing

JA1620-1622 (*Collection of Statutes of the Parliament of England in Force in the*

---

[20] https://archive.org/details/collectionofallp1751nort/page/n5/mode/2up?q=armed

*State of North Carolina*, pp. 60–61, ch. 3 (F. Martin Ed. 1792))).  In fact, the North

Carolina General Assembly did not enact this privately-published book as a law,

either in whole, or in any of its individual parts.

The only reference to Martin's *Collection* in an official North Carolina code

found it to be "utterly unworthy of the talents and industry of the distinguished

compiler, omitting many statutes, always in force, and inserting many others,

which never were, and never could have been in force, either in the Province, or in

("Preface of the Commissioners of 1838," *Revised Code of North Carolina*, xiii

(1855) JA1623, 1631  The Martin *Collection* simply reprinted the Statute of

Northampton verbatim.  JA1620-1622. This is a dead giveaway that it was not a

statute passed by North Carolina's legislature, given its multiple references to "the

King."  Avoiding that obvious indicator, *Antonyuk II*'s only quotation from Martin

is its incomplete reference to the "North Carolina law prohibiting 'to go nor ride

armed by night nor by day, in fairs, markets'…." 2023 WL 11963034, at *55.  No

such North Carolina law existed; *Antonyuk II* mistakenly ascribes the Statute of

Northampton to the North Carolina legislature, which never enacted it.

### 4. Antonyuk II Disregards North Carolina Judicial Precedents Requiring the "Terror" Element to Render Bearing Arms in Public Illegal.

North Carolina's judicial precedents demonstrate in detail that there was no

general ban on bearing firearms in public, only using them in a manner to create

"terror." *Antonyuk II* disregards these as well. For instance, *State v. Huntly* stated

that the Statute of Northampton "did not create this offence" of "riding or going

about armed with unusual and dangerous weapons, to the terror of the people,"

"but provided only special penalties and modes of proceeding for its more effectual

suppression…." 25 N.C. (3 Ired.) 418, 420 (1843). *Huntly* recognized that an

affray included "where a man arms himself with dangerous and unusual weapons

in such a manner, as will naturally cause a terror to the people…." *Id.* at 421

(quoting Hawkins, *Pleas of the Crown*, B. 1, ch. 28, sect. 1).

Huntly observed the North Carolina Bill of Rights' guarantee that "the

people have a right to bear arms for the defence of the State," adding that "the

carrying of a gun *per se* constitutes no offence. For any lawful purpose – either of

business or amusement – the citizen is at perfect liberty to carry his gun." *Id*. at

422–23. However, he may not carry a weapon "to terrify and alarm, and in such

manner as naturally will terrify and alarm, a peaceful people." *Id*. at 423.

*Huntly* has been consistently reaffirmed. *See State v. Dawson,* 272 N.C.

535, 542 (1968). Most recently, *State v. Lancaster* held that "the elements of the

common law crime of going armed to the terror of the public" including going

armed in a public place "for the purpose of terrifying and alarming the peaceful

people," and "in a manner which would naturally terrify and alarm the peaceful

people." 895 S.E.2d 337, 343 (N.C. 2023).  No North Carolina law or precedent suggested that arms may be banned in fairs and markets.

*Antonyuk II* is thus mistaken when it states that "the Founding-era North Carolina statute prohibited firearms in fairs and markets with no reference to terroristic conduct." 2023 WL 11963034, at *72.  *Antonyuk II* erroneously claims this tradition supposedly "evolved over the years between the Founding and Reconstruction toward the North Carolina model…. Thus, in the context of regulating firearms in discrete, crowded places, the Virginia law's 'terroristic' conduct requirement is the outlier among the national tradition."  *Id*.  To the contrary, the terror element was the norm.  In short, *Antonyuk II* cites to no Founding Era history that would support the general banning of firearms in parks and public gatherings.

### 5. Antonyuk II's Reliance on Late-19th Century Restrictions on Firearms in "Crowded Places" Misrepresents Those Cases, and/or Defies the Supreme Court's Rejection of Such Analogues in Bruen.

*Antonyuk II* refers to gun bans at certain confined places of public assembly in three states from statutes passed from 1869 to 1883, and claims that courts upheld them as constitutional.  *Id.* at *56.  With one irrelevant exception, the places of assembly were not even issues in the cited cases.  *Andrews v. State* upheld a ban on carrying small pistols, but held the law unconstitutional as applied to an army-type revolver. 50 Tenn. 165, 186-87 (1871).  *English v. State* upheld

convictions for wearing a pistol while intoxicated and for carrying a butcher knife in a religious assembly, also holding such knife not to be a constitutionally-protected "arm." 35 Tex. 473, 475 (1872). *State v. Shelby* addressed carrying concealed arms and carrying while intoxicated. 2 S.W. 468 (Mo. 1886).

*Antonyuk II* further relies on territorial laws from Arizona (1889) and Oklahoma (1890). 2023 WL 11963034, at *56. It also points to mostly-late 19th century restrictions on firearms in urban parks. *Id*. at *57. But *Bruen* discounted reliance on such laws, explaining that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66.

### F.  Unsecured Parks Open to the Public Are Not Sensitive Places.

#### 1.  Post-Bruen Courts Have Found Park Bans Unconstitutional.

Three post-*Bruen* federal district courts have held public parks are not "sensitive places," and preliminarily enjoined the enforcement of laws banning firearms therein.  The decisions extensively detail that Founding Era history provides no sensitive place analogues for parks.

First, *Antonyuk v. Hochul* found that plaintiffs were likely to prevail on their claim that public parks are not "sensitive places" and preliminarily enjoined New York state's ban on firearms in public parks.  639 F. Supp. 3d 232, 322-23 (N.D.N.Y. 2022), *rev'd in relevant part* at 89 F.4th 271, 355-63 (2d Cir. 2023)

("*Antonyuk I*"). As detailed *supra*, the Second Circuit severely erred in reversing that decision and upholding the ban.

*Koons v. Platkin* preliminarily enjoined enforcement of New Jersey's ban on firearms in public parks.  673 F. Supp. 3d 515, 642 (D.N.J. 2023), appeal filed (3d Cir. June 9, 2023).  Its lengthy analysis found that "laws arising in the mid- to late-19th century do not establish a historical tradition of banning firearms at parks especially since the modern equivalent of parks existed during this nation's founding."  *Id*. at 639-42.  That is what *Bruen* referred to as a "fairly straightforward": "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Bruen*, 597 U.S. at 26.

Similarly, *Wolford v. Lopez* found that plaintiffs were likely to succeed on the merits, and issued a temporary restraining order against enforcement of Hawaii's ban on firearms in public parks. 686 F. Supp. 3d 1034, 1067-68 (D. Haw. 2023), *rev'd in relevant part*, 116 F.4th 959, 983-85 (9th Cir. 2024).  The *Wolford* district court analyzed the historical record in detail, finding that the ban is inconsistent with the Nation's historical tradition of gun regulation.  *Id*. at 1059-68.

Relying on the flawed decision in *Antonyuk I*, the Ninth Circuit reversed, finding that modern parks are "outdoor gathering places where people engage in social, political, and recreational activities," but that plaintiffs failed to show "that the public green spaces that existed in 1791 were akin to a modern park." *Wolford*, 116 F.4th at 982. But that was inconsistent with its further holding that plaintiffs were likely to prevail in their challenge to a ban on firearms at permitted public gatherings: "Public gatherings have existed since before the Founding" and there was no "prohibition on the carry of firearms in public gatherings until after the ratification of the Fourteenth Amendment." *Id*. at 998.

> **2. Using The Analytical Framework Later Adopted in Bruen, Pre-Bruen Courts Found Park Bans Unconstitutional Under Heller's <u>Standard.</u>**

Following the Supreme Court's 2008 decision in *Heller*, and using the mode of analysis later adopted in *Bruen,* several state and federal courts found that park gun bans violate the right to bear arms.

While decided under the state of Delaware's own constitutional guarantee, *Bridgeville Rifle & Pistol Club v. Small*, likewise concurred with *Heller,* holding that "the core right to bear arms for self-defense is a traditional or pre-existing right—i.e., a right that existed even before being codified." 176 A.3d 632, 650 (Del. 2017). *Bridgeville* held a ban on firearms in public parks with acreage almost identical to that of Fairfax County to be unconstitutional, observing:

> Nor is [the parks gun ban] limited to what might legitimately be characterized as a "sensitive" place supported by evidence buttressing the designation of certain areas as such places. Rather, this ban applies to *all* 23,000 acres of Parks and 18,000 acres of Forests – spanning an area almost the size of the entire District of Columbia at issue in *Heller* and four times the size of the City of Wilmington – and to every segment of the population.

*Id*. at 654.

Similarly, in *DiGiacinto v. Rector & Visitors of George Mason University*, the Virginia Supreme Court found the Virginia Constitution's arms guarantee "co-extensive with the rights provided by the Second Amendment" as explained in *Heller*. 281 Va. 127, 133 (2011). "*Unlike a public street or park*, a university traditionally has not been open to the general public," and the restriction at issue "is tailored, *restricting weapons only in those places where people congregate and are most vulnerable* – inside campus buildings and at campus events. *Individuals may still carry or possess weapons on the open grounds* …." *Id*. at 136 (emphasis added).

*Solomon v. Cook County Board of Commissioners* held a ban on carrying firearms by gun permit holders on the 70,000 acres of the Forest Preserve District of Cook County ("FPDCC") to be constitutionally overbroad. 559 F. Supp. 3d 675, 679 (N.D. Ill. 2021). The government defendants could not show that the 70,000 acres, which was more than 11% of the land in the county, was a "sensitive place." *Id*. at 693. In rejecting the government's purported safety rational for the ban, the

*Solomon* court further noted, "the government has shown little threat to public safety in the FPDCC, and even less involving concealed firearms, and none by CCL [concealed carry license] holders." *Id*. at 702-03.

Similarly, in *Morris v. U.S. Army Corps of Engineers*, the court invalidated a gun ban in recreation areas administered by the Army Corps of Engineers as violating of the right to bear arms. 60 F. Supp. 3d 1120, 1123 (D. Idaho 2014). Unlike the "sensitive place" analysis for "facilities like 'schools and government buildings,'" the ban imposed by the Corps applies to outdoor parks," rendering the ban unconstitutional. *Id*. at 1124.

The entire 23,632 acres of Fairfax County public parks do not constitute a "sensitive place" where firearms may be banned. That is particularly true given that open carry of firearms and concealed carry of firearms with a permit are permitted in Virginia's crowded urban areas under the Commonwealth's regulatory scheme, which allowance the Second Amendment requires, as *Bruen* noted with respect to bearing arms in Manhattan.

### G. The Government Is Free to Restrict Firearms from Being Used in Criminal Conduct & Can Deprive Individuals of the Right to Bear Arms Through Judicial Adjudications of Illegal Conduct.

As discussed, *supra*, governments have always maintained the ability to criminalize using firearms to induce "terror," such as the Virginia and North Carolina laws of the Founding Era. *Bruen* discusses "affrays" and other criminal

*conduct* involving threatening behavior by people with weapons. 597 U.S. at 40-49. Inducing terror with firearms, for instance is explicitly illegal in the Commonwealth. Virginia has multiple statutes criminalizing the threatening use of firearms in public places. *See, e.g.*, Va. Code §§ 18.2-53.1 ("Use or display of a firearm in committing a felony"); 18.2-56.1A, A1 ("Reckless handling of firearms); 18.2-57 ("Assault") (*see also Carter v. Commonwealth*, 269 Va. 44, 47 (2005) ("one would be guilty of assault if he menacingly points at another with a gun, apparently loaded, yet not in fact because a well-founded apprehension was created) (cleaned up); 18.2-280 ("Willfully discharging firearms in public places"); 18.2-282 ("Pointing, holding, or brandishing firearm").

The Supreme Court drove home this point in *Rahimi. Rahimi* addressed the question of whether the Second Amendment permits individuals subject to a domestic violence restraining order to be deprived of the right to possess firearms if that order includes a judicial finding that he "represents a credible threat to the physical safety of [an] intimate partner." 144 S. Ct. 1889, 1894 (2024). Consistent with its earlier holdings in *Heller* and *Bruen*, the Court held that the Government may curtail an individual's right to bear arms based on the individual's unlawful conduct. *Id.* at 1897, 1899-1901. "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

"[T]he Second Amendment permits the disarmament of *individuals who pose a credible threat to the physical safety of others*." *Id.* at 1898 (emphasis added). As the Court observed, the domestic violence restraining order at issue was designed to "mitigate demonstrated threats of physical violence." *Id.* at 1901. "Unlike the regulation struck down in *Bruen*," the Court held, such restraining orders "[do] not broadly restrict arms use by the public generally." *Id.* Prohibitions on firearm possession by individuals like felons and the mentally ill are entirely lawful exceptions to the general constitutional right to keep and bear arms. *Id.* at 1902. *Rahimi*'s holding is a straightforward and common sense one consistent with other abridgements of constitutional rights: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. at 1903. Nothing in *Rahimi* suggests that general bans upon law-abiding citizens are permissible. Indeed, as set forth above, the opposite is true. Individuals have the right to bear arms in public unless there has been an individualized adjudication depriving them of that right.

## IV. The County's Ban On Possession Of A Firearm At An Event That Would Otherwise Require A Permit Or Adjacent Area Thereto Violates The Second Amendment.

The Ordinance bans firearms at "an event that would otherwise require a permit" or adjacent area thereto. § 6-2-1(A)(4). The Second Amendment "presumptively guarantees … a right to 'bear' arms in public for self-defense."

*Bruen*, 597 U.S. at 33.  The County cannot show that its restriction "is consistent with this Nation's historical tradition of firearm regulation."  *Id*. at 33-34.

No way exists for an individual to know that an activity requires a permit but has none, which presumably only the County could determine after the fact.  The ban chills Plaintiffs' exercise of the right to bear arms and leaves them vulnerable to arrest for inadvertent violations.

The Ninth Circuit's *Wolford* struck down a ban similar to the County's here for "public gathering[s] or special event[s] conducted on property open to the public that requires the issuance of a permit" from a government and at a "sidewalk or street immediately adjacent to the public gathering or special event ...."  *Wolford*, 116 F.4th at 997-98.  The court reasoned:

> Public gatherings have existed since before the Founding, so Defendant must show an enduring national tradition with respect to public gatherings.... Defendant cannot point to a single regulation of public gatherings until after the ratification of the Fourteenth Amendment. Shortly after 1868, several States and territories prohibited the carry of firearms at public gatherings....  [W]e conclude that Plaintiffs are likely to succeed because of the lack of any prohibition on the carry of firearms in public gatherings until after the ratification of the Fourteenth Amendment.

*Id*. at 998.

*Wolford* rejected the claimed historical analogues of "colonial laws in Virginia and North Carolina that were successors to the Statute of Northampton. But the Supreme Court has explained that those laws prohibited the carry of

49

firearms only to the 'terror' of the people or for a 'wicked purpose'; lawful carry

was permitted." *Id*. at 998 n.12 (citing *Bruen*, 597 U.S. at 49–51; *Rahimi*, 144 S.

Ct. at 1901).  These are the same two "laws" upon which *Antonyuk II* erroneously

relies in upholding a park ban. 2023 WL 11963034, at *55.

Finally, *Wolford*'s conclusion "is buttressed in part by the Supreme Court's

admonition not to interpret the "sensitive places" doctrine too broadly." *Id*.

(quoting *Bruen*, 597 U.S. at 31 (rejecting as "far too broad[ ]" the notion that "all

places of public congregation that are not isolated from law enforcement" could

qualify as "sensitive")).

Rejecting the very kind of "adjacency" gun prohibition like that Fairfax

enacted here, the Illinois Supreme Court held that a ban on possession of a firearm

within 1000 feet of a public park violates the right to bear arms, and explained

further:

> Aside from the sheer number of locations and public areas that would
> qualify under the law, . . . the most troubling aspect is the lack of any
> notification where the 1000–foot restriction zone starts and where it
> would end. Innocent behavior could swiftly be transformed into
> culpable conduct if an individual unknowingly crosses into a firearm
> restriction zone. The result could create a chilling effect on the Second
> Amendment when an otherwise law-abiding individual may
> inadvertently violate the 1000–foot firearm-restricted zones by just
> turning a street corner.

*People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill. 2018). A similar threat faces Plaintiffs here, who would have no notice of "an event that would otherwise require a permit" or an adjacent area thereto.

**V.    The Ban On Possessing A Firearm At An Event That Would Otherwise Require A Permit, Or At An Adjacent Area Is Vague, & Violates Due Process.**

Section 6-2-1(A) prohibits firearm possession at "an event that would otherwise require a permit" or an "adjacent" area, which, as a practical matter, is too vague to withstand the Fourteenth Amendment's due process requirement. "To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc). "The question of a statute's vagueness is a purely legal issue that does not require additional fact-finding." *Id*. at 272. That is the case here.

Individuals have no way to know whether an event requires a permit but has none. Presumably, the County would not know either and, if the event is brought to its attention, would have to determine whether it needs a permit after the fact. It would thus not be able to erect signs in advance. These scenarios render § 6-2-1(A)(4) unconstitutionally vague. Such undefined an standard allows arbitrary and discriminatory enforcement. Police have no expertise in determining that

something is "an event that would otherwise require a permit" or adjacent area thereto and would be expected to enforce the ordinance without any guiding standards. Nor could anyone walking, driving, biking along County byways know in advance whether she is "adjacent to" a qualified event. Anyone making normal movements through the County is at risk of unknowingly committing a crime.

Finally, the provision has no scienter requirement, and "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*...." *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) (quoting *Colautti v. Franklin*, 439 U.S. 379, 395 & n.13 (1979) (abrogated on other grounds). The provision is thus "a trap for those who act in good faith." *Colautti*, 439 U.S. at 395. As such, § 6-2-1(A)(4) is unconstitutionally vague.

## CONCLUSION

This Court should reverse the district court's judgment, declare Fairfax County Code § 6-2-1(A)(2) & (4) violative of the Second and Fourteenth Amendments to the United States Constitution, and enjoin enforcement of those Code provisions.

Respectfully Submitted,

Kimberly LaFave
Glenn M. Taubman
Robert Holzhauer,
    Plaintiffs

52

By Counsel

_____/s/_____

Stephen P. Halbrook
protell@aol.com
Va. Bar No. 18075
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276


_____/s/_____

Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Va. Bar No. 41691
10521 Judicial Drive, Suite 200
Fairfax, VA 22030
(703) 268-5600


## Certificate of Service

I certify that the foregoing was served via ECF on all registered counsel in this case on  November 14, 2024.


_____/s/_____

Trey Mayfield