No. 24-1886

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

KIMBERLY LaFAVE, ET AL.,

*Plaintiffs-Appellants*,

v.

THE COUNTY OF FAIRFAX, VIRGINIA, AND KEVIN DAVIS, IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Virginia
(No. 1:23-cv-01605) (Hon. William B. Porter)

## BRIEF OF DEFENDANTS-APPELLEES

Elizabeth D. Teare
Daniel Robinson
John W. Burton
Office of the County Attorney
12000 Government Center
   Parkway, Ste 549
Fairfax, VA 22035

Douglas R. Kay
Thomas W. Repczynski
Anders T. Sleight
Offit Kurman, P.C.
8000 Towers Crescent Drive,
   Ste 1400
Tysons Corner, VA 22182

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue,
   P.O. Box 4184
New York, NY 10163
Telephone: (646) 324-8174
jcarter@everytown.org

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, DC 20044

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _24-1886_      Caption: _Kimberly LaFave v. The County of Fairfax, Virginia_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_The County of Fairfax, Virginia_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Douglas R. Kay                    Date:   September 24, 2024

Counsel for: The County of Fairfax, Virginia

**Print to PDF for Filing**

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1886__      Caption: __Kimberly LaFave v. The County of Fairfax, Virginia__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kevin Davis, in his official capacity as Chief of Police__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Douglas R. Kay                    Date:   September 24, 2024

Counsel for: Kevin Davis, in his official capacity

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................ 1

ISSUES PRESENTED FOR REVIEW ................................... 1

STATEMENT OF THE CASE ................................................ 2

   A.  The Ordinance ................................................................. 2

   B.  Fairfax County and its parks ........................................ 5

   C.  Plaintiffs' challenges ...................................................... 6

   D.  Undisputed expert evidence ......................................... 7

      a.  Undisputed parks evidence ...................................... 8

      b.  Undisputed survey evidence .................................... 9

   E.  District court decision ................................................ 10

SUMMARY OF ARGUMENT ............................................... 13

ARGUMENT ........................................................................... 15

   I.  Standard of Review ...................................................... 15

   II.  The Parks Restriction is Constitutional ................... 16

     A.  The *Bruen-Rahimi* framework ................................. 16

       1.  *Bruen* and *Rahimi* direct this Court to look to text, history, and tradition to identify the principles underlying this nation's regulatory tradition ................................. 16

       2.  Facial Second Amendment challenges like Plaintiffs' must surmount a very high bar .................................... 20

     B.  Plaintiffs have not carried their burden at the text step ........ 20

     C.  The Parks Restriction is consistent with a longstanding historical tradition of restricting firearms in parks and analogous places ...................... 21

       1.  There is a robust tradition of prohibiting firearms in parks ........................................................................... 22

       2.  Founding-era and earlier regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction ......................................................... 25

D. Plaintiffs fail to overcome the historical evidence establishing the Parks Restriction's constitutionality ................................... 30

   1. Plaintiffs cannot satisfy the facial-challenge standard ...... 30

   2. Plaintiffs are wrong about the time period courts should consider .................................................. 33

   3. Even if Plaintiffs were correct that only founding-era history counts, their case would still fail ........................................ 41

   4. Plaintiffs are wrong about historical silence ....................... 46

   5. Historical evidence need not be legislation to be relevant . 50

   6. Sensitive places are not limited to locations with government-provided security .............................................. 51

   7. Plaintiffs' remaining attacks on the Parks Restriction are meritless .................................................................................. 52

III. Plaintiffs Failed to Establish Standing to Challenge the Events Restriction ............................................................................... 54

IV. The Events Restriction is Constitutional ................................... 58

   A. The Events Restriction does not violate the Second Amendment ................................................................................ 58

   B. The Events Restriction does not violate due process ............... 63

CONCLUSION ......................................................................................... 66

# TABLE OF AUTHORITIES

**Cases**

*Alger v. Commonwealth,*
  590 S.E.2d 563 (Va. 2004)........................................................ 44

*Antonyuk v. Hochul,*
  639 F. Supp. 3d 232 (N.D.N.Y. 2022), *rev'd on other grounds*, 120
  F.4th 941 (2d Cir. 2024)........................................................ 42

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024)........................................... *passim*

*Bianchi v. Brown,*
  111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub*
  *nom. Snope v. Brown*, No. 24-203 (Aug. 23, 2024) ...................... *passim*

*Boardley v. U.S. Dep't of Interior,*
  615 F.3d 508 (D.C. Cir. 2010) ................................................ 51

*Bonidy v. U.S. Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015)............................................. 52

*Bostic v. Schaefer,*
  760 F.3d 352 (4th Cir. 2014)............................................... 15

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)......................................................... 57

*DiGiacinto v. Rector & Visitors of George Mason University,*
  704 S.E.2d 365 (Va. 2011)................................................... 53

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................... *passim*

*Dobbs v. Jackson Women's Health Organization,*
  597 U.S. 215 (2022) ..................................................... 49, 50

*Doe v. Meron,*
  929 F.3d 153 (4th Cir. 2019)............................................... 48

*FDA. v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................ 55

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ................................................. 49

*Goldstein v. Hochul*,
   680 F. Supp. 3d 370 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d
   Cir. July 6, 2023) .................................................................. 54

*Grayson O Co. v. Agadir Int'l LLC*,
   856 F.3d 307 (4th Cir. 2017) .......................................... 42, 43

*Hadeed v. Abraham*,
   265 F. Supp. 2d 614 (E.D. Va. 2003) *aff'd*, 103 F. App'x 706 (4th Cir.
   2004) ...................................................................................... 48

*Hicks v. Ferreyra*,
   965 F.3d 302 (4th Cir. 2020) ................................................ 60

*In re Revel AC, Inc.*,
   802 F.3d 558 (3d Cir. 2015) ................................................. 52

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
   78 F.4th 622 (4th Cir. 2023) ................................................. 55

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) (en banc) ................................ 65

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023), *appeal docketed*, No. 23-1900 (3d
   Cir. May 17, 2023)...................................................... 42, 51, 54

*LaFave v. Cnty. of Fairfax*,
   No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (June 23, 2023)....... 6, 47

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................... 55, 58

*Lumumba v. Kiser*,
   116 F.4th 269 (4th Cir. 2024) ............................................... 64

*Martin v. Lloyd*,
   700 F.3d 132 (2012)............................................................... 65

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .............................................................. 18

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) .............................................................. 49

*Md. Shall Issue, Inc. v. Hogan,*
   971 F.3d 199 (4th Cir. 2020)..........................................55, 56

*Md. Shall Issue, Inc. v. Moore,*
   116 F.4th 211 (4th Cir. 2024) (en banc), *petition for cert. filed*, No. 24-373 (Oct. 2, 2024) ............................................ 15, 16, 20, 21

*Moore v. Madigan,*
   702 F.3d 933 (7th Cir. 2012)..............................................21

*National Rifle Ass'n v. Bondi,*
   61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) ......................................39, 40, 54

*Nev. Comm'n on Ethics v. Carrigan,*
   564 U.S. 117 (2011)......................................................38, 41

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) .......................................................... *passim*

*People v. Chairez,*
   104 N.E.3d 1158 (Ill. 2018)..................................................63

*Schleifer v. City of Charlottesville,*
   159 F.3d 843 (4th Cir. 1998)................................................66

*Sims' Lessee v. Irvine,*
   3 U.S. 425 (1799)..............................................................44

*State v. Huntly,*
   25 N.C. 418 (1843)............................................................46

*U.S. ex rel. Ubl v. IIF Data Sols.,*
   650 F.3d 445 (4th Cir. 2011)................................................43

*United States v. Class,*
   930 F.3d 460 (D.C. Cir. 2019).......................................21, 52

*United States v. Diaz,*
   116 F.4th 458 (5th Cir. 2024) ..........................................18, 19

*United States v. Hager,*
   721 F.3d 167 (4th Cir. 2013)................................................64

*United States v. Perez-Garcia,*
   96 F.4th 1166 (9th Cir. 2024) ..............................................19

*United States v. Rahimi,*
   602 U.S. 680 (2024) .................................................................... *passim*

*United States v. Salerno,*
   481 U.S. 739 (1987) .................................................. 20, 31

*United States v. Silva,*
   745 F.2d 840 (4th Cir. 1984) ............................................ 29

*Wolford v. Lopez,*
   116 F.4th 959 (9th Cir. 2024) .................................... *passim*

**Statutes**

1786 Va. Acts 35, ch. 49 ............................................................ 27

18 U.S.C. § 636(c) ...................................................................... 10

1869-70 Tenn. Pub. Acts 23-24, ch. 22 .................................. 27

1870 Tex. Gen. Laws 63, ch. 46 ............................................... 27

1883 Mo. Sess. Laws 76 ............................................................. 27

2 Edw. 3, 258, ch. 3 (1328) ..................................... 26, 45, 46

*Collection of Statutes of the Parliament of England in Force in the State
   of North Carolina,* ch. 3 (F. Martin Ed. 1792) ..................... 27

E.D. Va. Local Civ. R. 56(B) .......................................... 10, 47

Fairfax County Code § 6-2-1 .......................................... *passim*

Fed. R. Civ. P. 56(e) .................................................................. 10

Fed. R. Evid. 802 ........................................................................ 48

Fed. R. Evid. 803(18) ................................................................. 48

R.H. Clark, *The Code of the State of Georgia* (1873) ............. 27

Va. Stat. § 15.2-915(E)-(F) ........................................................ 3

W.A. McCartney et al., *Statutes of Oklahoma, 1893* (1893) ................... 27

**Other Authorities**

1 James Kent, *Commentaries on American Law* (3d ed. 1836) .............. 45

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and
   Eighteenth-Century Boston, New York, and Philadelphia,* 40
   Landscape J. 1 (2021) ......................................................... 48

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.)........................................... 34

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .................................................. 34, 54

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. Plaintiffs lack standing to challenge the County's restriction on firearms at certain events, *see infra* Part III, and that deprives the courts of jurisdiction over the corresponding claims.

## ISSUES PRESENTED FOR REVIEW

1. Whether Fairfax County parks are "sensitive places" where the government may prohibit guns in light of the robust historical tradition of banning firearms in parks and analogous places.

2. Whether Plaintiffs have standing to challenge the prohibition on firearms at or adjacent to public events that have or should have a County-issued permit; and if so, whether that prohibition:

   a. violates the Second Amendment, given the robust tradition of banning firearms at public gatherings and analogous places and around sensitive places; or

   b. violates due process, given the notice prerequisites to enforcement.

## STATEMENT OF THE CASE

### A. The Ordinance

On September 16, 2020, the Fairfax County Board of Supervisors adopted Fairfax County Code § 6-2-1 (the "Ordinance"), regulating possession and carrying of firearms at certain sensitive public locations. JA990-993; *see generally* JA50-60.[1] The Ordinance restricts firearms in "any public park owned or operated by the County, or by any authority or local government entity created or controlled by the County," § 6-2-1(A)(2) (the "Parks Restriction"), and in any public place "that is open to the public and is being used by or is adjacent to a County-permitted event or an event that would otherwise require a County permit," § 6-2-1(A)(4) (the "Events Restriction"). JA990. The County passed the Ordinance under a 2020 Virginia law that enabled localities to regulate firearms in any of several specific sensitive locations. *See* Va. Stat.

---

[1] As explained further below, Plaintiffs did not dispute any part of the County's statement of undisputed material facts, JA50-60, and thereby "concede[d]" the County's statement. JA1759 (district court opinion). Plaintiffs ignore this and instead set out their own version of facts, which the County largely disputed. *Compare* Opening Brief of Plaintiffs-Appellants ("Br.") 3-9 *with* Pls. Mem. in Supp. 3-8, Dkt. 53 (Apr. 26, 2024) *and* County Mem. in Opp. 1-7, Dkt. 58 (May 10, 2024). For the Court's convenience, we primarily cite directly to the underlying evidence detailed in the County's undisputed statement.

§ 15.2-915(E)-(F). The Ordinance tracks the statute's language, prohibiting guns in each location it allowed. *Compare id.* *with* Fairfax County Code § 6-2-1.[2] There is one difference material here: for an "event" to fall under the Ordinance's prohibition, it must have or require a *County* permit. *See id.* § 6-2-1 (A)(4).

Documents and testimony presented to the Board of Supervisors carefully addressed the issue of notice. The board package explained that "[a]ppropriate signage must be posted in order to enforce the prohibition." JA1129. Deputy County Executive David Rohrer emphasized that "any prohibition and enforcement must be within the posted signs for a building, an area, or a permitted event, so that there is reasonable warning to persons." JA50 ¶4. Consistent with these statements, the Ordinance requires that "[n]otice of this ordinance shall be posted" at entrances to the places it applies, including public parks and places being used by or adjacent to a covered event. *See* § 6-2-1(D)(1). The enabling statute contains the same requirement. *See* Va. Stat. § 15.2-915(F).

---

[2] Given this statutory authorization, Plaintiffs are wrong to suggest (Br. 9) that the Ordinance stands in "contrast" to state law.

Official enforcement policy also mandates no enforcement without notice. The Fairfax County Police Department initially communicated this "no sign, no enforcement" policy to officers in a training video. JA1541 ¶10, JA1545. The video instructed officers to confirm "proper signage of the [O]rdinance at the site," and to "seek voluntary compliance" before "initiating any citation or arrest." JA1541 ¶15.

The police department subsequently issued a Command Staff Memorandum with the official enforcement policy. JA1542 ¶16, JA1553-1554. The memorandum sets out signage requirements. JA1553-1554. It also states that "[o]fficers may <u>not</u> enforce the provisions of this ordinance unless first confirming that signs providing this notification are properly posted. Whenever possible, officers should attempt to educate suspected violators about the ordinance and seek voluntary compliance prior to placing charges." JA1553; *see also* JA1542 ¶24.

Events taking place on property not controlled or owned by Fairfax County are not subject to the Ordinance. JA1543 ¶25. This includes public roadways, which are instead controlled by the Virginia Department of Transportation. JA1543 ¶25; *see also* JA1543 ¶26

(explaining, for example, that 5K race on public roadway would not be subject to Ordinance). The County has a website with links for permits for events subject to the Ordinance. JA52 ¶12.

## B. Fairfax County and its parks

Fairfax County is an urban-suburban area, JA52 ¶13, and its parks are popular and busy, particularly with children and families. Children make up about a quarter of County parks' 12 to 16 million annual visitors. JA1556 ¶5. Over 100,000 under-18s participated in registered events in County parks in fiscal year 2022, as did over 83,000 in 2023, including making up most of the 43,000 registrants for 1,372 summer camps. JA1557 ¶¶11-12. Over 47,000 students participated in 830 school trips to parks the same year, and schools separately used the parks for youth activities like sports. JA1559 ¶¶19-20. Scouts use the parks for their programs, including camping, hiking, and volunteering. JA1558 ¶18.

Large gatherings take place in County parks, including an Earth Day celebration (5,000-8,000 attendees), a 4-H Fair (over 10,000 attendees), and—among many others—youth and adult sports events, church services, fundraising events, preschool performances, protests,

and election-related activities. JA1558 ¶16. The Fairfax County Parks Authority runs three preschools on its property, JA1559 ¶22, and offers popular amusements enjoyed by thousands of families and children, including minigolf, a carousel, and train rides, JA1556 ¶7.

## C. Plaintiffs' challenges

In January 2021, Plaintiffs sued in state court, alleging that the Ordinance violated the Virginia Constitution. JA995, 1004-1007. The court denied Plaintiffs' motions for summary judgment, JA1011, and a preliminary injunction, *see LaFave v. Cnty. of Fairfax*, No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (June 23, 2023), where it discussed *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and ruled that "ample historical basis exists for the prohibition of firearms in public parks and at public events." *Id.* at *17. Plaintiffs nonsuited their case days before trial. JA1033.

Plaintiffs then filed this federal case, challenging the Ordinance on its face. JA9-22. They allege that the Parks Restriction infringes their right to bear arms under the Second Amendment, that the Events Restriction infringes the Second Amendment to the extent it prohibits weapons in an area "adjacent to" a covered event, and that the terms "is

adjacent to" and "an event that would otherwise require a permit" are unconstitutionally vague. JA17-20 ¶¶42-59.

Plaintiffs moved for a preliminary injunction. The district court (Hilton, J.) denied the motion from the bench. JA46-48. The court noted that Plaintiffs had already spent years litigating their challenges, and that the challenged provisions apply "to very narrow pieces of property" and "otherwise, [Plaintiffs' rights] [a]re not being affected." JA48 (27:5-22).

## D. Undisputed expert evidence

The parties then cross-moved for summary judgment. With their motion, the County presented three expert declarations. Professor Terence Young, professor emeritus of geography at California State Polytechnic University, Pomona, is an expert in the history of the development of parks in the United States. JA109. Professor Alexandra Filindra is a professor of political science and psychology at the University of Illinois Chicago and an expert in survey methodology and analysis. JA1158. Professor Filindra designed and analyzed a survey regarding attitudes to the presence of firearms in certain locations in Fairfax County: the Fairfax Community Survey 2022 (the "Survey").

JA1141, JA1176. Kara Fitzgibbon, PhD, as Director of the Center for Survey Research at the University of Virginia, oversaw administration of the Survey. JA1314 ¶¶12-13, JA 1324.

Plaintiffs did not present any experts and did not depose the County's experts.

### a. Undisputed parks evidence

Professor Young's unrebutted report explained that America's tradition of public parks began in the 1850s in response to the Romantic idea that contemplating parks' natural scenery could improve viewers' lives, and, ultimately, society. JA65 ¶8, JA72-75 ¶¶24-27. Urban parks appeared first, followed in the late nineteenth and early twentieth centuries by national and state parks. JA66 ¶¶10-11. Before parks emerged, early green spaces were multi-purpose utilitarian spaces, serving functions such as livestock grazing, burial, and militia training. JA66-67 ¶13. They were not analogues to today's public parks nor were they their predecessors except in the sense that some of these utilitarian spaces, most famously Boston Common, survived long enough to be adaptively re-used as community parks. JA68 ¶15.

America's large urban parks embraced firearms prohibitions at or soon after their creation. New York's Central Park prohibited guns in 1858, and similar rules appeared in other cities as parks opened across the country. JA72 ¶23, JA76-79 ¶¶30-31. Research as of mid-2024 had revealed well over 100 historical laws prohibiting firearms in federal, state, and local parks. JA115-981 (text of laws), JA1037-1057 (summary table), JA76-90 ¶¶30-31, 33, 38-40, 43, 52-53 (Young Report). Historical evidence does not support the carrying of firearms for self-defense in urban, national, or state parks. JA82 ¶35, JA88 ¶46, JA91 ¶55.

**b. Undisputed survey evidence**

Professor Filindra's and Dr. Fitzgibbon's unrebutted expert reports explained that the Survey yielded conclusions that are statistically valid and reliable and can be extended to the general population of the Fairfax County area. JA1145 ¶23, JA1322 ¶46; *see* JA1180. The Survey found that the potential presence of guns in parks and open-air markets makes most people in the local population feel "less safe," and may drive people to visit such spaces less frequently. JA1146 ¶23b, JA1180. That result was not confined to people in non-gun-owning households, although it was stronger in that group. JA1146

¶23d, JA1180. The Survey also found, based on four survey experiments focused on the presence of firearms in public parks, at open-air markets, and at political protests in Fairfax County, that each would produce "chilling effects," *i.e.*, a decline in the use of these resources. JA1152-1153 ¶¶25-28, JA1183-1184.

### E. District court decision

After cross-briefing, supplemental briefing on the impact of *United States v. Rahimi*, 602 U.S. 680 (2024), and oral argument, the district court (Porter, M.J., acting under 18 U.S.C. § 636(c)) granted the County's motion for summary judgment and denied Plaintiffs' motion. JA1758. At the outset, the court explained that Plaintiffs had "concede[d] to [the County's] statement of undisputed material facts." JA1759 n.2. Federal and local rules require responses to motions for summary judgment to "include a 'specifically captioned section listing all material facts as to which it is contended that there exist[s] a genuine issue necessary to be litigated[,]' without which the Court may consider facts undisputed." JA1759 n.2 (citing E.D. Va. Local Civ. R. 56(B), Fed. R. Civ. P. 56(e)). Because Plaintiffs did not follow that rule, "in determining the parties' cross-motions for summary judgment, the

[district court] assume[d] [that] Plaintiffs admit the County's facts." JA1787.

The court then held that the Parks and Events Restrictions are facially constitutional. To start, the court recognized that Plaintiffs repeatedly "mischaracterize[d]" the scope of the Ordinance, which, by its own terms and as confirmed by the record, is "narrow." JA1775-76 & n.8; *see* JA1786-1787 & n.15. The Ordinance thus "bears little resemblance" to firearms regulations invalidated by the Supreme Court, like the broad public-carry restriction in *Bruen*. JA1775-76 & n.8; *see* JA1782, JA1784-1785, JA1787-1788.

The court then determined that the restrictions are permissible limitations on the Second Amendment right. JA1773-1777, JA1787-1789. Specifically, the court explained, the Parks Restriction is constitutional for three separate reasons. *First*, it follows a longstanding tradition of more than 100 prohibitions on firearms in parks that began to proliferate during the Reconstruction Era—when, per Professor Young's unrebutted expert testimony, modern-day parks first emerged. JA1777-1780; *see* JA1763-1765. *Second*, the Parks Restriction is relevantly similar to founding-era restrictions on firearms in places of

public gathering and prohibitions on going armed in public with the effect of terrifying others. JA1780-1784. *Third*, parks are analogous to other sensitive places recognized by the Supreme Court, particularly schools, because County parks are used as spaces to educate, socialize, and protect children. JA1784-1786. The court's conclusions are consistent with the only two courts of appeals to have addressed the issue to date. *See Antonyuk v. James*, 120 F.4th 941, 1016-26 (2d Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 982-85 (9th Cir. 2024).

The district court also concluded that the Events Restriction is constitutional under the Second Amendment. It reasoned that this "limited restriction fits neatly" within the founding-era tradition of prohibiting firearms in public gathering places and prohibiting the act of going armed with the effect of terrifying others, and noted that the County has also identified a "robust tradition" of prohibiting firearms in areas adjacent to sensitive places. JA1788-1789.

Finally, the court determined that Plaintiffs had standing to bring their due process claim but rejected that claim on the merits. JA1789-1793. The court concluded that the restriction is not unconstitutionally vague because "Plaintiffs and other ordinary citizens will know with

complete certainty" when this restriction applies and there are no concerns of arbitrary enforcement. JA1793. In support, the court pointed to the Ordinance's requirement that notice be posted wherever its restrictions apply; County policy and training that require notice before enforcement; and the County's public guidance on when and where permits are required. JA1791-1793.

## SUMMARY OF ARGUMENT

The district court was correct to grant summary judgment to the County on all of Plaintiffs' claims. Under the text, history, and tradition framework set out in *Bruen* and *Rahimi*, Plaintiffs are first required to establish that the specific conduct in which they wish to engage falls within the protection of the Second Amendment's text, and they have failed to meet their burden to do so. If this Court looks past that failure, the County's overwhelming historical record establishes that both the Parks and Events Restrictions are consistent with this nation's historical tradition of firearm regulation and the principles underlying that tradition.

As to the Parks Restriction, historical regulations from the founding era to Reconstruction and beyond establish that prohibiting

guns in parks is constitutional—including well over one hundred laws *specifically* prohibiting guns in parks, starting in 1858 in New York and proliferating across the country. In arguing that those parks-specific laws are irrelevant because they are not from the founding era, Plaintiffs misread Supreme Court cases and ignore undisputed evidence showing that public parks first emerged in the mid-19th century. Plaintiffs also ignore almost all of the County's analogous founding-era laws.

Regardless, Plaintiffs concede the well-established principle that guns may be banned in schools, and that principle alone is enough to resolve this case. A facial challenge fails if the challenged law "is constitutional in some of its applications," *Rahimi*, 602 U.S. at 693, and the obvious analogy between schools and the County's small playground parks provides ample ground to affirm.

As to the Events Restriction, Plaintiffs have not established the injury-in-fact necessary for standing to challenge that restriction. But even if they had, founding-era and Reconstruction-era laws and the undisputed factual record establish that prohibiting firearms is constitutional both in and adjacent to the events the restriction covers.

Moreover, the text of the Ordinance and the County's official "no sign, no enforcement" policy defeat any possible claim of vagueness. This Court should affirm the district court's judgment.

## ARGUMENT

### I.  Standard of Review

This Court reviews rulings on cross-motions for summary judgment de novo, asking whether undisputed facts entitle either party to judgment as a matter of law. *See, e.g.*, *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). It may affirm on any basis supported by the record. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 n.7 (4th Cir. 2024) (en banc), *petition for cert. filed*, No. 24-373 (Oct. 2, 2024).

Plaintiffs did not contest the County's statement of undisputed material facts, and the district court correctly treated that statement as "admit[ted]," "undisputed," and "concede[d]." JA1759 n.2, JA1787. Accordingly, the question for this Court is whether those undisputed facts, JA50-60, entitle the County to judgment as a matter of law.

## II.  The Parks Restriction is Constitutional

### A.  The *Bruen-Rahimi* framework

#### 1. *Bruen* and *Rahimi* direct this Court to look to text, history, and tradition to identify the principles underlying this nation's regulatory tradition

*Bruen* and *Rahimi* established a two-step analysis for Second Amendment claims. First, plaintiffs must show that their challenge falls within the Second Amendment's plain text. *See Bruen*, 597 U.S. at 24; *Md. Shall Issue*, 116 F.4th at 229. If they succeed, the burden shifts to the government to establish that its law is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24, or "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692; *see also Md. Shall Issue*, 116 F.4th at 219.

This analysis requires courts to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). A modern firearms regulation need not be a "'dead ringer' or a 'historical twin'" for "historical precursors." *Id.* (quoting *Bruen*, 597 U.S. at 30). Instead, courts should uphold a modern law if, in comparison to historical regulations, the law imposes a "comparable burden on the right of

armed self-defense" and the burden is "comparably justified." *Bruen*,

597 U.S. at 29. In other words, courts should consider "how and why" a

regulation burdens the right to self-defense. *Id.*; *see also Rahimi*, 602

U.S. at 692.

One well-established principle is that firearms may be banned in

sensitive places. *See District of Columbia v. Heller*, 554 U.S. 570, 626

(2008); *see also Bianchi v. Brown*, 111 F.4th 438, 464 (4th Cir. 2024) (en

banc) (explaining that, as *Heller* made clear, governments may limit

"*where* arms can be carried"), *petition for cert. filed sub nom. Snope v.*

*Brown*, No. 24-203 (Aug. 23, 2024). *Bruen* also instructs courts to "use

analogies to … historical regulations of 'sensitive places' to determine

that modern regulations prohibiting the carry of firearms in *new* and

analogous sensitive places are constitutionally permissible." 597 U.S. at

30.

*Bruen* recognized that "cases implicating unprecedented societal

concerns … may require a more nuanced approach" to history. *Id.* at 27.

As the district court explained, "[i]f a societal condition did not exist in

the relevant period a court is examining, then self-evidently there will

be no historical firearms laws addressing that condition in that period—

making the consideration of later history particularly crucial." JA1771;
*see also McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("'States adopt
laws to address problems that confront them.'" (citation omitted)). Thus,
firearms prohibitions concerning societal conditions that did not exist at
the founding—such as public parks, *see infra* Part II.D.4; JA57 ¶¶36,
38—demand a more expansive approach to historical analogy. *See
Antonyuk*, 120 F.4th at 1022 n.86 (applying *Bruen*'s "more nuanced
approach" and explaining that "[t]hough the historical analogues here
are 'relatively simple to draw,' the relative novelty of public parks as
institutions also justifies a flexible approach under *Bruen*").

Even as to societal conditions that *have* existed since the founding,
however, *Rahimi* makes clear that courts must analogize to historical
principles. Domestic abuse existed before the founding, but *Rahimi* still
drew broad analogies to historical sureties and going-armed laws to
identify principles supporting the challenged restraining-order
prohibitor. *See* 602 U.S. at 695-700. As the Fifth Circuit recognized in
*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), by relying on these
broad analogies "despite the fact that domestic violence is not a new
phenomenon," *Rahimi* rejected a "bifurcated" approach to the historical

inquiry under which only "directly similar historical analogues should be considered" if the problem existed at the founding. *Id.* at 471. Plaintiffs are thus wrong to claim that any historical analogue must be "distinctly similar" to the modern regulation if it addresses such a problem. Br. 20 (quoting *Bruen*, 597 U.S. at 26).[3]

In addition, historical evidence should be "[t]aken together," *Rahimi*, 602 U.S. at 698, or examined "as a whole," to ascertain "whether it establishes a tradition of permissible regulation," *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024); *see Bianchi*, 111 F.4th at 464 (examining entire "historical record" to "deduce" principle). A contrary "divide-and-conquer approach"—one that "isolate[s] each historical precursor and ask[s] if it differs from the challenged regulation"—would contravene the Supreme Court's admonition that the government need not "identify a 'historical twin.'" *Perez-Garcia*, 96 F.4th at 1191 (citation omitted).

---

[3] *Bruen* said only that the lack of a distinctly similar regulation would be "relevant evidence," 597 U.S. at 27, and *Rahimi*'s reliance on broad analogies further confirms that "distinctly similar" analogues are not required. *See Diaz*, 116 F.4th at 471.

### 2. Facial Second Amendment challenges like Plaintiffs' must surmount a very high bar

*Rahimi* explained that a facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a [challenger] to 'establish that no set of circumstances exists under which the Act would be valid.'" 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Bianchi*, 111 F.4th at 452 (explaining why facial challenges are disfavored). Accordingly, a government "need only demonstrate" that the challenged law "is constitutional in *some* of its applications." *Rahimi*, 602 U.S. at 693 (emphasis added).

### B. Plaintiffs have not carried their burden at the text step

To satisfy their textual burden, Plaintiffs must establish that the Ordinance implicates bearing arms in such a way as to "infringe[]" their right to do so. *See Md. Shall Issue*, 116 F.4th at 220; *see also Bianchi*, 111 F.4th at 450 (recognizing that Second Amendment's scope includes limitations on "*where* arms can be carried"). They failed to do so. All they attempted to establish was a right to bear arms in public *generally*. *See* Br. 19-20. They have not shown that to prohibit carrying only in the "narrow" areas to which the Ordinance applies, *see, e.g.*, JA1776,

amounts to infringing—or "effectively den[ying]," *Md. Shall Issue*, 116 F.4th at 225—the right. *See, e.g., Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places[.]"); *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (quoting same).

**C.   The Parks Restriction is consistent with a longstanding historical tradition of restricting firearms in parks and analogous places**

Even if Plaintiffs had satisfied their textual burden, history from the founding era to the Reconstruction era and beyond demonstrates that the Ordinance is consistent with the principles underlying this nation's tradition of firearms regulation. The Ordinance accords with the overarching "'sensitive places' principle that limits the right to public carry," *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring), as well as with more granular principles, such as that "locations where vulnerable populations congregate," including "places heavily trafficked by children," are sensitive, *Antonyuk*, 120 F.4th at 1012, 1027. Over the centuries, these principles have manifested in—among others— prohibitions on guns in schools, prohibitions in "fairs and markets,"

and, beginning with the emergence of modern-style parks in 1858 and continuing into the 20th century, well over 100 laws barring guns from local, national, and state parks. We begin by setting out these parks-specific laws before turning to founding-era regulatory traditions.

### 1. There is a robust tradition of prohibiting firearms in parks

"As soon as green spaces began to take the shape of a modern park, in the middle of the 19th century," governments "imposed bans on carrying firearms into the parks." *Wolford*, 116 F.4th at 982. These restrictions proliferated as parks emerged across the country. The Parks Restriction sits comfortably within this longstanding and unchallenged tradition. JA1779-1780.[4]

Firearms prohibitions in parks began in New York's Central Park, the paradigm of the parks movement, and quickly spread nationwide. JA76-79 ¶¶30-31. Central Park's original 1858 rules forbade "[a]ll persons" to "carry fire-arms." JA117.[5] Similar prohibitions followed as

---

[4] As explained below, *see infra* Part II.D.4, open common areas that existed before the mid-19th century were not parks as we understand them today. *See, e.g.*, *Antonyuk*, 120 F.4th at 1024-25.

[5] Professor Young's Report attached copies of historical laws as Exhibits 2 to 116. JA115-888. The County also provided a table, prepared by counsel, excerpting key language from each historical

other cities established parks. In 1866, Brooklyn's Prospect Park rules declared that "[a]ll persons are forbidden … [t]o carry firearms." JA131. In 1868, the Pennsylvania legislature decreed that "[n]o person shall carry fire arms" in the newly created Fairmount Park in Philadelphia "or within fifty yards thereof." JA136. In 1869, Chicago's city council prohibited individuals from "carry[ing] firearms" in public parks. Addendum A3. Similar prohibitions appeared in the 1870s in San Francisco (JA142), Buffalo (JA154; Addendum A6), Hyde Park, Ill., (JA161), and Phoenixville, Pa. (JA167), and in nine more locations in the 1880s, 26 more in the 1890s, another 35 in the 1900s, and more throughout the 1910s and 1920s, *see* JA1037-1057; Addendum Ai-ii.

The late 19th century also saw the first national parks—and, at or soon after the time of their creation, firearms prohibitions in those parks. The national park at Mackinac Island prohibited guns as early as 1882, JA588; Sequoia did so in 1890, JA583; and Yellowstone and

---

regulation and (where available) providing links to sources containing the original regulations. *See* JA1037-1057. Attachment B to Professor Young's Declaration dated April 24, 2024, contained 18 additional historical laws. JA889-981. Since April 2024, we have located an additional 37 historical parks prohibitions (including both earlier prohibitions in locations where laws had previously been identified and prohibitions in new locations); those are attached at Addendum A1-151.

Yosemite both had prohibitions by 1894, JA575, JA593. The cycle of park creation and firearms prohibition repeated as Congress created new parks through the 1930s, until, in 1936, the National Park Service adopted a prohibition applicable to all national parks and monuments. JA87 ¶43, JA675.

Around the same time, states and the District of Columbia also began establishing their own parks—and prohibiting guns in those parks. These laws appeared as early as 1895 in the District of Columbia and 1901 in Minnesota, and by 1936, at least 16 additional states prohibited firearms in at least some of their parks. *See* JA90 ¶¶52-53, JA721-722, JA981. Virginia opened its first state parks in 1936 and prohibited guns in those parks the same year. *See* JA89-90 ¶¶51, 53, JA775-776.

Altogether, research to date has identified well over 100 local, state, and national laws prohibiting guns in parks. *See* JA1037-1057; Addendum A1-151. Although the County need not identify "historical twin[s]," *see Rahimi*, 602 U.S. at 692, these historical prohibitions are just that: straightforward laws specifically prohibiting guns in parks. Unsurprisingly, they are also analogous to the Parks Restriction: they

imposed a comparable burden (preventing people from carrying guns in parks) for a comparable reason (addressing the particular harms that guns present when carried in those sensitive places). Moreover, research has not revealed any instance of a court invalidating them. In other words, they "were not merely adopted"—they were also "apparently accepted without any constitutional objection by anyone." *Antonyuk*, 120 F.4th at 1022; *see also Bruen*, 597 U.S. at 30 (finding it "settled" that certain locations were "'sensitive places' where arms carrying could be prohibited" because there were "no disputes regarding the lawfulness of such prohibitions"). In short, "[b]ecause many laws prohibited carrying firearms in parks, and the constitutionality of those laws was not in dispute, … the Nation's historical tradition includes regulating firearms in parks." *Wolford*, 116 F.4th at 983.

### 2. Founding-era and earlier regulatory traditions establish principles that confirm the constitutionality of the Parks Restriction

Three strands of founding-era laws also establish principles justifying the Parks Restriction: (a) laws protecting gathering places and public forums; (b) laws prohibiting going armed in public with the effect of terrifying people; and (c) the long-accepted tradition of

prohibiting firearms in schools. "Taken together," *Rahimi*, 602 U.S. at 698, these laws further demonstrate that the Parks Restriction is rooted in historical tradition.

### i. Prohibitions on guns in gathering places and public forums

The Parks Restriction is consistent with the "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." *Antonyuk*, 120 F.4th at 1019. These restrictions extend back to the English Statute of Northampton, which stated that "no Man great nor small" shall "go nor ride armed … in Fairs [or] Markets." 2 Edw. 3, 258, ch. 3 (1328), JA1064. In the founding era, at least two states—including Virginia—observed laws prohibiting going armed in fairs or markets. *See* 1786 Va. Acts 35, ch. 49, JA1070; *Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60-61, ch. 3 (F. Martin Ed. 1792), JA1073-1074. Thus, "medieval law survived to become our Founders' law." *Antonyuk*, 120 F.4th at 1019 (quoting *Bruen*, 597 U.S. at 35).[6]

---

[6] Firearms restrictions in gathering places increased around Reconstruction. *See, e.g.*, 1869-70 Tenn. Pub. Acts 23-24, ch. 22

Connecting that tradition to the eight municipal parks prohibitions New York presented, *Antonyuk* concluded that, together, this "wealth of evidence" of a "longstanding tradition of regulating firearms in places that serve as public forums" satisfied *Bruen*'s historical requirement, at least as applied to "urban" parks. *Id.* at 1023-26. Compared with New York's law, it held the historical laws similarly burdened the right to carry, and for a similar reason, "maintaining order in often-crowded public squares." *Id.* at 1024. The same is true for the Parks Restriction: it promotes public order and safety in heavily trafficked parks that are widely used for public gatherings. *See supra* pp. 5-6.

### ii. Prohibitions on going armed "to the terror" of the people

In addition to prohibiting going armed in specific places, early English law and founding-era American laws also prohibited going

---

(prohibiting weapons in "any fair, race course, or other public assembly"), JA1078-1079; 1870 Tex. Gen. Laws 63, ch. 46 (prohibiting weapons where "persons are assembled for educational, literary or scientific purposes," and in social gatherings), JA1082; 1883 Mo. Sess. Laws 76, JA1085; R.H. Clark, *The Code of the State of Georgia* 818 (1873), JA1091; W.A. McCartney et al., *The Statutes of Oklahoma, 1893* 504 (1893), JA1096.

armed *anywhere* in circumstances where doing so was likely to cause fear or terror. Summarizing Virginia's 1786 statute, along with statutes from Massachusetts (1795) and Tennessee (1801), *Bruen* explained that they "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 50.

*Bruen* concluded that New York could not rely on this well-established tradition to justify its challenged law because it "d[id] not offer any evidence showing that, in the early 18th century or after, the mere public carrying of a handgun would terrify people." *Id.* at 45. Here, by contrast, undisputed facts, based on a scientific survey of area residents, show that carrying firearms in County parks would "spread[] 'fear' or 'terror.'" *See id.* at 50. Specifically, the potential presence of guns in Fairfax County parks "induces feelings of less safety among most people in the local population" and would produce "chilling effects." JA1146, JA1152-1156; *see also* JA1784 (district court's conclusion that survey evidence establishes connection between historical laws and Parks Restriction). The analogy is straightforward: the historical laws prohibited carrying firearms in particular places to

prevent fear and terror among the population. The Parks Restriction imposes a comparable restriction and is justified on the same grounds.[7]

### iii. Prohibitions on guns in schools

The third strand of support for the Parks Restriction is the well-accepted principle that the government may prohibit firearms in schools. *Heller* announced that its decision did not "cast doubt" on "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. *Bruen* reiterated *Heller*'s description of schools as "sensitive places." *See* 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring). Although the Supreme Court has not clearly identified the historical tradition on which it based this conclusion, its place in Second Amendment doctrine is now firm, *see Antonyuk*, 89 F.4th at 339 n.56; *Bianchi*, 111 F.4th at

---

[7] Although this Court has recognized that spreading fear or terror is an "*effect* that our common-law tradition has long regarded as incompatible with lawful carry for self-defense," *Bianchi*, 111 F.4th at 459 (emphasis added), some other sources suggest that *intent* to cause fear, not just that effect, is required. The difference does not matter here. Factfinders may infer that defendants intend the natural and probable consequences of their actions. *See, e.g.*, *United States v. Silva*, 745 F.2d 840, 850-51 (4th Cir. 1984). Undisputed evidence establishes that fear is the consequence of carrying guns in County parks. *See* JA59-60, JA1152-1156, JA1784.

450, and Plaintiffs concede that banning guns in schools is constitutional, *see* Br. 21. Accordingly, as *Bruen* instructs, courts can now analogize from the permissibility of prohibitions in schools to approve prohibitions in analogous sensitive places. *See* 597 U.S. at 30.

The Parks Restriction is analogous to restrictions on firearms in schools. These regulations place a "comparable burden" on the right to armed self-defense—they both prohibit carrying arms in discrete locations—and this burden is "comparably justified"—prohibitions in schools serve to protect a vulnerable population (children), and that is likewise a key justification for the Parks Restriction given children's extensive use of County parks. *See supra* pp. 5-6.

### D. Plaintiffs fail to overcome the historical evidence establishing the Parks Restriction's constitutionality

In the face of this overwhelming historical record, none of Plaintiffs' arguments is persuasive.

### 1. Plaintiffs cannot satisfy the facial-challenge standard

To succeed in their facial challenge, Plaintiffs must "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (quoting *Salerno*, 481 U.S. at 745). Plaintiffs

ignore that binding principle. They assert that a facial challenge is proper "where a law implicates a constitutional right and imposes criminal penalties," even if the law has "some valid application." Br. 14 (citing vagueness cases, not Second Amendment cases). *Rahimi* held precisely the opposite: it involved a federal criminal law that implicates a constitutional right and imposes criminal penalties, and yet it held that a facial challenge to that law failed because the law is constitutional in *some of* its applications. *See* 602 U.S. at 693; *see also Bianchi*, 111 F.4th at 442, 453 (rejecting facial challenge to assault-weapons law, which carried criminal penalties, where plaintiffs had "failed to show that *each firearm* regulated by the Maryland statute is within the ambit of the Second Amendment" (emphasis added)). Moreover, *Rahimi* criticized the Fifth Circuit for the same mistake Plaintiffs make: focusing on "hypothetical scenarios" where the law "might raise constitutional concerns" rather than the circumstances where it is "most likely to be constitutional." 602 U.S. at 701; *see, e.g.*, Br. 31 (acknowledging that County parks range from "small playgrounds to vast wooded tracts"); Br. 23 (asserting that guns "may not be banned in vast, mostly wooded lands").

Plaintiffs cannot succeed under *Rahimi*'s controlling facial-challenge standard because there is no question that the Ordinance is constitutional in at least some of its applications. Specifically, the constitutionality of the Parks Restriction is clearest in the County's small playground parks. Those include Clemyjontri Park, a small park with playground equipment designed to be accessible for children with special needs, and 0.1 acre Farrington Park, a playground for children aged 2-12. JA1556 ¶6.

To be clear, the robust history of firearms restrictions in national and state parks establishes that prohibiting guns even in the largest and wildest parks is constitutional.[8] But to invalidate the Parks Restriction on its face, Plaintiffs must establish that prohibiting guns is

---

[8] In 1894, for example, when Yellowstone's regulations prohibited firearms, *see* JA574-576, the park covered over 3,300 square miles—more than eight times the entire size of Fairfax County. Although *Antonyuk* expressed skepticism that New York had compiled a sufficient record to show the constitutionality of firearms prohibitions in "rural" parks, that record contained just eight restrictions for city parks and none for national or state parks. 120 F.4th at 1022, 1025. In any event, *Antonyuk* held that record sufficient as to "urban" parks, and thus enough for facial constitutionality, *id.* at 1025-26; here, Plaintiffs have conceded that Fairfax County is urban-suburban and disclaimed reliance on an urban/rural distinction, JA52; Br. 33, 35 n.19.

unconstitutional even in parks like Clemyjontri and Farrington. *See Rahimi*, 602 U.S. at 693. They have not even attempted to do so.

### 2. Plaintiffs are wrong about the time period courts should consider

Plaintiffs say this Court should ignore all the County's evidence from the 1850s and beyond. *See* Br. 23-26. Their arguments disregard Supreme Court caselaw, decisions of this and other circuits, and common sense.

### i. Supreme Court and appellate decisions consider a wide span of history

As the district court correctly recognized, JA1772-1773, all the history the County presented is relevant to this Court's analysis. The Supreme Court has repeatedly examined history from the mid-19th century and beyond when assessing the validity of firearms regulations. *Heller* relied on "'19th-century cases that interpreted the Second Amendment,'" "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "'how post-Civil War commentators understood the right.'" *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614). Likewise, *Bruen* relied on mid-19th-century cases and statutes, *see id.* at 51-57, and surveyed

"public discourse surrounding Reconstruction," *id.* at 60. *Bruen* also invoked 19th-century evidence in discussing sensitive places in particular. It said that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added). Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all the 19th-century laws restricting guns in the locations the Court listed were from the *late* 19th century.[9]

*Rahimi* put the relevance of 19th-century evidence even further beyond doubt by resting its decision *upholding* a challenged law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 696

---

[9] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places). These sources also dispel Plaintiffs' suggestion (Br. 11) that a tradition must be "widespread" to support a modern restriction. The sources cited just two laws, both from Maryland, naming legislative assemblies and just two naming courthouses, yet *Bruen* considered those sufficient. *See* 597 U.S. at 30. "Thus, depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 120 F.4th at 972.

(relying on Mass. Rev. Stat., ch. 134, §16 (1836)); *id.* (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

This Court and other circuits have likewise recognized that 19th-century and later laws are crucial to the historical inquiry. In *Bianchi*, this Court emphasized that it "is vital to appreciate that while history may fix the date on which certain events occur, the understanding of history is not frozen in time." 111 F.4th at 462. It then considered evidence from the 19th century through the late 20th century to "trac[e] the broader and consistent story of our nation's [firearm] regulation" in upholding Maryland's assault-weapons law. *Id.* at 465-71. In *Antonyuk*, the Second Circuit explained that "evidence from the Reconstruction Era regarding the scope of the right to bear arms … is at least as relevant as evidence from the Founding Era." 120 F.4th at 988 n.36.

This focus on Reconstruction-era and later evidence follows the Supreme Court's instruction that "'examination of a variety of legal and

other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification"' is "'a critical tool of constitutional interpretation.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. 602 U.S. at 725 (Kavanaugh, J., concurring). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Additionally, the conclusion that 19th-century evidence is critical to the historical analysis is firmly grounded in originalist principles. The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868. *See id.* at 37. In a case against a state or local government, therefore, to disregard the Reconstruction-era

understanding would be to reject what the people understood the right to be at the time they gave it effect. *See Antonyuk*, 120 F.4th at 972-74. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35).

Giving weight to Reconstruction-era and later evidence is also consistent with common sense. If a regulation passed in the decades around Reconstruction was not deemed unconstitutional at the time of its passage, and there is no evidence of some radical shift in understanding in the 77 years from founding to Reconstruction, then it can be inferred that the regulation also comports with the founding-era understanding. *See, e.g.*, *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (recognizing that "postenactment history can … provide persuasive evidence of the original meaning"). After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011). Such an inference reflects and confirms the principle that

"individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37.

To be sure, *Bruen* clarified that, under *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text would not change that meaning. *See* 597 U.S. at 36, 66, 66 n.28. Whereas New York's law "operated to prevent law-abiding citizens with ordinary self-defense needs" from carrying arms anywhere in public, *see id.* at 60, the Court found overwhelming evidence that states could not completely prohibit public carry, *see id.* at 55, 57, 60. That "overwhelming" contrary evidence was why the Court dismissed later historical laws on which New York relied. *See id.* at 65-68. Here, however, there is no such contradiction: the understanding of the Second Amendment right has, for all purposes relevant to this case, remained consistent over time. *See supra* Part II.C.[10]

---

[10] If, in a different case, positive evidence showed that the understanding of the right *changed* between the founding and Reconstruction eras, this Court may then have to decide which period to prioritize. In such a case, originalist principles dictate that the understanding in the Reconstruction era should take precedence, including for the reasons the Eleventh Circuit identified in *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-24 & n.9 (11th Cir. 2023)

### ii. Plaintiffs' arguments for ignoring post-founding history are baseless

Plaintiffs' efforts to dispute the relevance of post-founding history rest on a slew of misstatements and omissions. *First*, they claim that *Rahimi* "eschewed any dependence on laws after the Founding Era." Br. 24. That is false: *Rahimi* relied on 19th-century surety laws. *See supra* pp. 34-35.

*Second*, Plaintiffs claim that "*Bruen rejected* reliance on Reconstruction Era history that lacked Founding Era precedents." Br. 24. That is also wrong: again, *Bruen* dismissed late-19th- and early-20th-century evidence only when it "*contradict[ed]* the overwhelming weight of other evidence." 597 U.S. at 66-67 (emphasis added); *see supra* p.38. Here, there is no such contradiction: there is no evidence the Second Amendment was ever understood to prevent governments from prohibiting guns in parks.

*Third*, Plaintiffs claim that, "while *Bruen* acknowledged the academic debate" between 1791 and 1868, "it *decided* that the Founding

("*NRA*"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023); *see also Antonyuk*, 120 F.4th at 964 n.11, 973-74 (citing *NRA* as persuasive despite vacatur).

Era is controlling." Br. 24. That is false. *Bruen* left the issue undecided. *See* 597 U.S. at 38 ("We need not address this issue today[.]"). *Rahimi* did the same. *See* 602 U.S. at 692 n.1.

*Fourth*, Plaintiffs rely on a quotation from *Bruen* but omit crucial words the Court used to make clear it was discussing an *assumption* made in prior cases, not a holding. *See* Br. 24. Properly stated, and with Plaintiffs' omission italicized, the quote reads: "*we have generally assumed that* the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. If the Court believed that prior assumption resolved the issue, it would have said so in *Bruen*. *See NRA*, 61 F.4th at 1322-23.

*Fifth*, Plaintiffs claim that the Supreme Court has defined the scope of other constitutional rights exclusively by reference to 1791 standards. *See* Br. 25-26. They are wrong again. Justice Kavanaugh explained in *Rahimi* that the Supreme Court has "looke[ed] to post-ratification history" in constitutional cases spanning "more than two centuries," and collected over thirty examples addressing a range of

constitutional rights. 602 U.S. at 728-29 (Kavanaugh, J. concurring); *see also id.* at 726 n.5 (citing additional opinions of Justice Scalia).[11]

### 3. Even if Plaintiffs were correct that only founding-era history counts, their case would still fail

#### i. Plaintiffs ignore two of the County's three categories of founding-era laws

In the district court, the County raised, and the court relied on, each of the three strands of founding-era laws they present in this brief. *See supra* Part II.C.2.[12] Plaintiffs' opening brief ignored two of them. Both are independent reasons to affirm the district court's decision.

*First*, even though the district court agreed that the Parks Restriction is justified by analogy to firearms prohibitions in schools, *see* JA1784-1786, Plaintiffs do not engage with that analogy. They *concede* that "firearms may be banned in … schools," Br. 11, and *concede* that

---

[11] Plaintiffs cite cases they claim say the opposite, *see* Br. 25-26 nn.7-11, but the majority, like the dozens Justice Kavanaugh cited, also examined post-founding history, and none engaged with the originalist case for prioritizing Reconstruction. *See, e.g.*, *Nevada Comm'n on Ethics*, 564 U.S. at 122-25 (examining history from founding era through 20th century in interpreting First Amendment).

[12] For concision, the County omits here the fourth strand presented below—laws prohibiting carrying firearms on privately-owned landscapes absent express permission—but maintains that it also supports the Ordinance. *See* County Mem. in Supp. 29-30, Dkt. 45 (Apr. 26, 2024).

this extends to playgrounds and athletic fields at schools, *see id.* at 21-22, and yet do not even attempt to explain how the analogy to schools could fail when the facts they admitted establish, for example, that millions of children use County parks each year and tens of thousands attend summer camps and school trips there. JA1785, JA52-53. Nor do they try to explain how the analogy could fail as to the County's small playground parks—a position rejected even by the *Koons* and *Antonyuk* district courts, which Plaintiffs invoke repeatedly. *See Koons v. Platkin*, 673 F. Supp. 3d 515, 639 (D.N.J. 2023) (denying preliminary injunction as to guns in playgrounds), *appeal docketed*, No. 23-1900 (3d Cir. May 17, 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 324 (N.D.N.Y. 2022) (same), *rev'd on other grounds*, 120 F.4th 941 (2d Cir. 2024). Plaintiffs' failure to address the district court's decision on the schools analogy in their opening brief constitutes forfeiture. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017); *see also U.S. ex rel. Ubl v. IIF Data Sols.*, 650 F.3d 445, 456 (4th Cir. 2011) (concluding that plaintiff waived challenge to district court's alternate grounds for decision by failing to address them in opening brief).

*Second*, Plaintiffs also fail to address the district court's conclusion that the Parks Restriction is analogous to historical prohibitions on carry to the terror of the people given the County's undisputed survey evidence. *See* JA1783-1784. Plaintiffs concede that historical laws prohibited carrying guns "to the 'terror' of the people," Br. 49-50; *see also id.* at 30, 37, yet they do not acknowledge, let alone address, the undisputed survey evidence showing that the prospect of firearms in County parks causes fear and has chilling effects among area residents, *see* JA1152-1156. Again, Plaintiffs' failure constitutes forfeiture. *See Grayson O Co.*, 856 F.3d at 316.

### ii. Plaintiffs' quibbles about founding-era prohibitions in "fairs and markets" get them nowhere

Plaintiffs argue that laws prohibiting going armed in fairs and markets in both Virginia and North Carolina contained a terror element and do not reflect a principle of prohibiting guns in busy public forums without terror. *See* Br. 36-41. Even if that were correct it would not help them, given the undisputed evidence that carrying firearms in County parks causes fear. *See supra* Part II.C.2.ii. It is also incorrect.

Virginia's law forbade carrying both in specifically-enumerated places and generally. *See* JA1070 (prohibiting going "before the justices of any court … with force and arms" or going armed "in fairs or markets, or in other places, in terror of the count[r]y"). Under Virginia interpretive principles, "qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent." *See, e.g.*, *Alger v. Commonwealth*, 590 S.E.2d 563, 565-66 (Va. 2004); *see also Sims' Lessee v. Irvine*, 3 U.S. 425, 444 n.* (1799) (note of Ellsworth, C.J.) (stating last-antecedent rule in interpreting 1779 Virginia statute). Accordingly, the Virginia statute is best understood as forbidding carrying arms "in other places," in terror of the country; or "in fairs or markets," *period*.[13] There was thus no need to make a special showing of terrorizing effect with respect to someone carrying in fairs and markets—just as there was no such need with respect to carrying in courthouses. The same is true of the Statute of Northampton, as *Antonyuk* recognized. *See* 120 F.4th at 1020 n.82.[14]

---

[13] Although *Antonyuk* appears to have taken a different view, *see* 120 F.4th at 1020 n.82, it did not apply Virginia principles of statutory interpretation.

[14] Plaintiffs claim that *Bruen* made the Statute of Northampton completely "[i]rrelevant" to understanding the Second Amendment. Br.

Plaintiffs' quarrel with North Carolina is that the volume of laws the County and *Antonyuk* cited set out the Statute of Northampton verbatim, and that "the North Carolina legislature … never enacted it." Br. 39. Both are self-evident from the volume's title: "A Collection of the Statutes of the Parliament of England in Force in the State of North Carolina." JA1072. But because the Statute was *observed* in North Carolina, it still reveals the public understanding of the scope of the Second Amendment right.[15] Plaintiffs also assert that this particular compilation of English laws in force in North Carolina is unreliable, because the preface to a later publication criticized it as both under- and over-inclusive. Br. 39 (citing JA1631). But the only relevant

_____

35-36. They are wrong: even though the Statute was an inadequate analogue for New York's broad public-carry prohibition, it can still support "more limited conclusions." *Antonyuk*, 120 F.4th 1020 n.82; *see also Rahimi*, 602 U.S. at 700 (applying same principle to rely on surety laws that were inadequate analogues in *Bruen*); *id.* at 694, 697 (invoking Statute of Northampton).

[15] In the early years of the republic, Americans continued to apply many English statutes. *See* 1 James Kent, *Commentaries on American Law* 473 (3d ed. 1836) ("It is also the established doctrine, that English statutes, passed before the emigration of our ancestors, and applicable to our situation, and in amendment of the law, constitute a part of the common law of this country."), JA1658. Accordingly, several state legislatures, including North Carolina's, instructed prominent lawyers to compile the English statutes that met those criteria. *See, e.g.*, JA1663 (1817 North Carolina law).

question is whether the compilation was correct to include the Statute of Northampton, and the same preface discussed—without criticism— an 1821 compilation prepared by a legislatively-appointed committee that *also* included the Statute of Northampton. *See* JA1631-1632, JA1669 (listing "2 Edward 3, 1328, Chap. 3").[16]

### 4. Plaintiffs are wrong about historical silence

Plaintiffs maintain that there were parks at the founding and claim that, because the historical record has not yet revealed firearms prohibitions in those locations, prohibiting firearms in County parks today is unconstitutional. They are wrong on both fronts.

As to the historical facts, the undisputed and admitted evidence in this case is that parks like the County's emerged only in the 1850s and earlier green spaces like Boston Common were dissimilar, utilitarian spaces. JA57 ¶¶36, 38; *see* JA1763-1764 (district court opinion setting out Professor Young's "unrebutted, expert evidence"). The Second and

---

[16] Plaintiffs also cite *State v. Huntly*, 25 N.C. 418 (1843) (per curiam), but it does not help them. The defendant there carried his gun "upon the public highway, and upon the premises of" a private individual, *id.* at 419, not in a sensitive place like a fair, market, or court. Thus, *Huntly* does not impugn *Antonyuk*'s conclusion, 120 F.4th at 1020 n.82, that carrying in specific sensitive places did not require an additional terror element.

Ninth Circuits and the court that adjudicated Plaintiffs' state-law claims have all reached the same conclusion. *See Antonyuk*, 120 F.4th at 1025 ("To today's minds, commons, greens, and public parks may seem alike; but … our 18th century forebears would have considered commons and greens to be public grazing areas and not places of social recreation."); *see also id.* at 1024 (explaining that the "'modern idea of the park emerged in the nineteenth century'" (citation omitted)); *Wolford*, 116 F.4th at 982 (agreeing with *Antonyuk* that founding-era green spaces like Boston Common "were not relevantly similar to parks in their modern form"); *LaFave*, 2023 Va. Cir. LEXIS 203, at *17 ("Parks in the modern sense did not come into being until the mid-19th century[.]").

Plaintiffs try to attack these conclusions with a handful of citations to websites and journal articles. *See* Br. 26-29. But the district court's rules required them to "cit[e] the parts of the record relied on" to dispute the County's facts, E.D. Va. Local Civ. R. 56(B), and they failed to do so. *See Hadeed v. Abraham*, 265 F. Supp. 2d 614, 620 n.19 (E.D. Va. 2003) ("The failure to cite to record evidence means that no dispute has been raised."), *aff'd*, 103 F. App'x 706 (4th Cir. 2004). That failure

was not just technical, because "a party opposing summary judgment must offer evidence that could be presented in a form that would be admissible at trial." *Doe v. Meron*, 929 F.3d 153, 165 (4th Cir. 2019). Plaintiffs needed to present a qualified expert witness willing to testify to the reliability of the materials they cited and put them in context, or at least establish grounds for judicial notice of reliability. *See* Fed. R. Evid. 802, 803(18) ("learned treatises" without such foundation are inadmissible hearsay). And even if this Court were to overlook these failures, still it should conclude that Plaintiffs have failed to raise a triable issue, because their sources are either immaterial or support the County. *See* Br. 27-29. Indeed, their principal source—literally titled "*Before* Parks"—states that "[p]ublic parks did not appear in the United States until the second half of the nineteenth century," and refers to earlier green spaces as "prepark landscapes." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 13 (2021).

Separately, Plaintiffs are mistaken about the legal significance of historical silence. The absence of a regulation in a historical period does not mean people at that time understood the regulation to be

unconstitutional. Rather, they might have chosen not to regulate for any number of practical or policy reasons. It is a "serious problem[]"to "assume[] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). To conclude otherwise would be to reject a central premise of federalism: governments may choose to regulate, or not, depending on local conditions. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion) (states and localities may "'experiment[] with reasonable firearms regulations'" (citation omitted)); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("local differences are cherished as elements of liberty" under our Constitution).

The Supreme Court made a similar point in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), when it explained that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Id.* at 253. Then, in *Rahimi*, neither the majority nor any of the five concurring opinions suggested that the absence of a law specifically disarming domestic

abusers at the founding was any evidence of unconstitutionality. To the contrary, eight justices had "no trouble concluding" that the modern law survived *Rahimi's* challenge. 602 U.S. at 700. Thus, *Antonyuk* was right that "'novelty does not mean unconstitutionality.'" 120 F.4th at 970 (citation omitted).

### 5. Historical evidence need not be legislation to be relevant

Plaintiffs claim that *Bruen* deemed only "the common law and legislation voted on by the people" relevant to its historical analysis and urge this Court to disregard any regulation adopted by appointed, as opposed to elected, officials. Br. 30-31. They are wrong. *Bruen* and *Heller* considered "a variety of legal and other sources" to reveal the public understanding of the right—including "public discourse," "commentators," and other sources much less like legislation than park regulations are. *See Bruen*, 597 U.S. at 20-21; *Heller*, 554 U.S. at 614-16 (surveying, among other things, commission report, newspaper editorial, and comments of individual legislators). Moreover, because the Constitution constrains executive officials just as much as legislatures, *see, e.g.*, *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 512, 525 (D.C. Cir. 2010), executive regulations reveal the limits of the

Second Amendment right just as much as legislation does. In any event, Plaintiffs' premise is wrong, because dozens of park regulations were passed by elected state or local officials. *See, e.g.*, JA136 (1868 Pennsylvania law), JA287 (1895 Michigan law), JA725 (1905 Minnesota law), JA211, JA228, JA258, JA275, JA297, JA314, JA323 (park rules adopted by city councils).

### 6. Sensitive places are not limited to locations with government-provided security

Plaintiffs suggest that guns cannot constitutionally be prohibited in any location that lacks government-provided security. Br. 18-19, 21-22. Their authority is paper-thin: they cite only *Koons* and a journal article they say *Bruen* "endorsed." *See id*. But *Koons* did not conclude that security is always required, because it refused an injunction as to playgrounds, *see* 673 F. Supp. 3d at 639, which lack security.[17] As for the journal article, *Bruen* cited it only for its historical source material, *see supra* n.9, not as an endorsement of its arguments.

---

[17] Even if *Koons* had said security is required, the Third Circuit's stay of most parts of the preliminary injunction, *see Koons v. Att'y Gen. N.J.*, No. 23-1900, Dkt. 29 (3d Cir. June 20, 2023), indicates that the State "has made a strong showing that it is likely to succeed on the merits" of its appeal, *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (alteration adopted).

In any event, the district court correctly rejected the government-security argument because "many recognized sensitive spaces lack enhanced security." JA1785-1786. This Court should follow other circuits in doing the same. *See Wolford*, 116 F.4th at 981 (rejecting argument because "[m]any schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those places as conclusively sensitive"); *see also Class*, 930 F.3d at 465 (observing that many schools and government buildings, *Heller*'s "paradigmatic" sensitive places, lack any special security); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015) (in rejecting Second Amendment challenge to prohibition on firearms in post offices under sensitive-places analysis, stating that post office at issue "d[id] not regularly employ any security officers").

### 7. Plaintiffs' remaining attacks on the Parks Restriction are meritless

None of Plaintiffs' remaining arguments has merit. *First*, they rely (Br. 42-44) on unpersuasive district court decisions: *Antonyuk* and *Wolford*, which have already been reversed, and *Koons*, which is likely to meet the same fate, *see supra* n.17. They also rely (Br. 44-46) on pre-*Bruen* decisions, but even to the extent those cases addressed issues

now relevant under *Bruen-Rahimi*, they did so when the body of discovered parks prohibitions was tiny, because governments could focus on more familiar means-end scrutiny.[18] *Second*, they suggest (Br. 22-23) that upholding the Parks Restriction would contravene *Bruen*'s admonition that New York could not deem all of Manhattan a sensitive place, *see* 597 U.S. at 31, ignoring that the restriction here is "much narrower," JA1785, and applies to individual parks ranging from 0.1 to 1,558 acres, JA1556 ¶6. *Third*, they opine (Br. 15-17) that founding-era Americans "had guns everywhere," relying once again on *Koons*.[19] But even if their source were sound, the presence of guns in any given

---

[18] In any event, they are distinguishable or mistaken for multiple other reasons. *DiGiacinto v. Rector & Visitors of George Mason University*, 704 S.E.2d 365, 370 (Va. 2011), for example, *upheld* a law prohibiting guns on parts of George Mason's campus, and Plaintiffs' effort to read dictum as suggesting that parks cannot be sensitive because they are "open to the general public" is irreconcilable with *Bruen*'s acknowledgement that courthouses and polling places are sensitive. *See* 597 U.S. at 30.

[19] *Koons* principally invokes colonial-era laws requiring some men to carry guns to church. *See* Br. 15-17 (quoting 673 F. Supp. 3d at 628-29). Reliance on those laws is misplaced. They "were not rooted in the Second Amendment's tradition," but rather were passed so that "militiamen or free white men" could "defend against potential attacks by Native Americans and Blacks during slave uprisings." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023). Moreover, reliance on such laws "mistakes a legal obligation for a right." *NRA*, 61 F.4th at 1331.

location does not establish a constitutional right to carry there. For example, the article *Bruen* cited in approving prohibitions in legislative assemblies also maintained that "through the mid-nineteenth century, it was common for Congressmen to be armed" at the Capitol. Kopel & Greenlee, 13 Charleston L. Rev. at 235.

*     *     *

The Parks Restriction is constitutional. This Court should affirm the grant of summary judgment to the County.

## III. Plaintiffs Failed to Establish Standing to Challenge the Events Restriction

Plaintiffs lack standing to challenge the Events Restriction, as to both their Second Amendment and due process claims, because they cannot establish injury-in-fact. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 564 (1992). Their fears that the Events Restriction will be enforced against them are speculative and belied by the undisputed record of how the Ordinance operates.

To support their pre-enforcement challenge, Plaintiffs must show "a credible threat of prosecution," which requires "fears of ... prosecution that are not imaginary or speculative," but "actual and well-founded enough to establish" that the Events Restriction "will be enforced

against them." *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2020) (cleaned up). In other words, they "must show it is substantially likely [they] will actually be *injured* by the law, not simply that [they] must operate under" it. *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 633 (4th Cir. 2023). This requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action," and ensures that legal questions are analyzed "'in a concrete factual context.'" *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 379, 381 (2024) (citation omitted).

Plaintiffs rely for standing on the possibility that they might inadvertently happen upon an event or adjacent area while carrying firearms and face enforcement. *See* JA1606-1607 ¶¶7-9, 12-14, JA1609-1610 ¶¶5-7, 11-12, JA1612-1613 ¶¶5, 7, 10. But that scenario simply ignores the undisputed record of how the County enforces the Ordinance: only where there is signage and only after officers request voluntary compliance. JA1541-1542 ¶¶ 14-15, 21-24, JA1553-1554. Thus, this case closely resembles *Maryland Shall Issue v. Hogan*, where this Court relied on enforcement guidance from the state police showing

that "Maryland ha[d] not threatened prosecution" for the plaintiffs'
intended conduct, and concluded that plaintiffs lacked standing. 971
F.3d at 218. Here, too, the undisputed record regarding enforcement
policy demonstrates that Plaintiffs face no threat of enforcement for
their intended conduct: simply carrying firearms in public.

Plaintiffs also cannot rely on forgoing public carry as an injury,
because they have not changed their behavior due to the Events
Restriction. They "previously carried firearms in public places in the
County and continue to do so." JA1606 ¶7, JA1608-1609 ¶5, JA1612 ¶5.
In any event, Plaintiffs "cannot manufacture standing merely by
inflicting harm on themselves based on their fears of hypothetical
future harm that is not certainly impending." *Clapper v. Amnesty Int'l
USA*, 568 U.S. 398, 416 (2013).

The district court nonetheless concluded Plaintiffs had standing
"because they intend to carry firearms ... at events or adjacent to events
that require a County permit." JA1790. But a careful reading of
Plaintiffs' declarations reveals that they assert no such thing. Instead,
Plaintiffs attest only to hypothetical possibilities that they might violate
the Events Restriction at some undefined time. Plaintiffs each

speculate: "I *may* find myself ... with a firearm ... adjacent to an affected event." JA1607 ¶13 (emphasis added); *see* JA1609 ¶11, JA1613 ¶10. They worry that, "*[s]hould* [they] possess, carry, or transport firearms" at or adjacent to covered events, they would violate the Events Restriction. JA1606 ¶9 (emphasis added), JA1613 ¶7; *see* JA1609 ¶7 (fearing enforcement "*if* I possess, carry, or transport firearms" (emphasis added)). And they generalize that they must avoid carrying at covered events or adjacent areas "[w]hen ... aware of such events," without specifying any. JA25 ¶5, JA1609 ¶5, JA1612 ¶5; *see also* JA1606 ¶7 (referring to "avoid[ing] areas that I know would be in violation of the Ordinance" without specifying any). Plaintiffs express no intent (or even desire) to carry firearms in locations they know are subject to the Events Restriction, and the undisputed record regarding notice and warnings makes inadvertent violation speculative at best.

Put differently, Plaintiffs do not identify a single event or adjacent area at which they have been or will be forced to comply with the Events Restriction. *See* JA55 ¶32. And their concerns about what *might* occur *if* they should find themselves at or adjacent to an event cannot support standing. Such "'some day'" speculation, "without any

description of concrete plans, or indeed even any specification of when the some day will be," fails to demonstrate an imminent injury. *Lujan*, 504 U.S. at 564; *see, e.g.*, *Antonyuk*, 120 F.4th at 1041 (holding claim not justiciable where plaintiff failed to show "he attended [an event] while armed, was dissuaded by law from doing so, or intends to attend another [event] in the future").

In sum, because Plaintiffs cannot establish a credible threat of enforcement, they lack standing to challenge the Events Restriction.

## IV. The Events Restriction is Constitutional

### A. The Events Restriction does not violate the Second Amendment

Plaintiffs' Second Amendment challenge to the Events Restriction also fails on the merits. Just as with the Parks Restriction, Plaintiffs have not demonstrated that the Second Amendment's text covers the specific conduct they wish to engage in and claim the Ordinance prohibits. *See supra* Part II.B. Even if they had, the Events Restriction also sits comfortably within this nation's historical tradition of firearm regulation, as the district court explained. *See* JA1786-1789.

Specifically, the Events Restriction is relevantly similar to the historical prohibitions on firearms in public gathering places and public

forums. *See supra* Part II.C.2.i; *see also Antonyuk*, 120 F.4th at 1019. It also sits firmly within the historical tradition of forbidding the carrying of guns where doing so causes fear or terror, *see supra* Part II.C.2.ii, given Professor Filindra's undisputed evidence that the prospect of firearms at the paradigmatic places where the Events Restriction prohibits them—open-air farmers' markets and political protests on County property, *see, e.g.*, JA1553, JA1576 —"produces 'chilling effects,' that is increased hesitancy to utilize such public spaces and stronger beliefs that these public spaces would be less safe." JA1152-1156. In addition, the restriction is analogous to historical laws restricting guns at gathering places that implicate heightened tensions or political activity: election grounds and legislative meetings. *See, e.g.*, *Bruen*, 597 U.S. at 30.

Plaintiffs limited their challenge to the areas "adjacent to" a County-permitted event or an event that requires a County permit; their complaint did not challenge the prohibition on guns within events. JA1786, JA18 ¶¶49-50.[20] The justification for prohibiting firearms in an

---

[20] Plaintiffs cannot expand their challenge on appeal to include the events themselves. *See, e.g.*, *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020).

area adjacent to an event is plainly "comparable to" the justification for the historical laws just discussed, given that the potential harms from someone carrying a firearm immediately next to an event or in the event are comparable. *See* JA1787-1788. Moreover, even if Plaintiffs could somehow establish that an area adjacent to an event was not *itself* sensitive, there is also a robust historical tradition of prohibiting firearms in the area surrounding sensitive places. *See* JA1788 (citing cases discussing "buffer-zones"), JA136, JA197, JA203, JA211, JA262, JA275, JA721-722, JA725 (forbidding guns within 50-100 yards or more of parks), JA154 (prohibition including "approaches" to and "streets connecting" parks), JA245 (prohibition including "sidewalks adjacent to" parks); *Wolford*, 116 F.4th at 989-90 (citing cases showing that firearms may be banned "within a reasonable buffer zone" of sensitive places).

Plaintiffs point to *Wolford*, claiming it "struck down a ban similar to the County's." Br. 49. But *Wolford* is readily distinguishable. *First*, the California law it examined is markedly different from the "narrow" and "limited restriction" in this case. JA1786-1788. California's law applies to public events that require a permit from any level of

government, "federal, state, or local," including on public streets. *See Wolford*, 116 F.4th at 997-98. The Events Restriction, by contrast, does not apply to events on public streets, because it is limited to events that have or require a *County* permit, and the County does not issue permits for events on its streets. JA52 ¶11 (undisputed facts explaining that Virginia Department of Transportation controls County streets and issues permits for events there). Accordingly, *Wolford*'s concern that the California law implicated *Bruen*'s admonition against designating all of Manhattan a sensitive place, *see* 116 F.4th at 998 (citing *Bruen*, 597 U.S. at 31), is inapplicable here.

*Second*, *Wolford* did not rely on founding-era Virginia law or the Statute of Northampton as observed in North Carolina because it thought they only prohibited carrying firearms "to the 'terror' of the people." 116 F.4th at 998 n.12. That was error: as explained above, those laws did not require a showing of terror when applied to carrying firearms in "fairs" or "markets." *See supra* Part II.C.2.i. And in any event, even if they did require such a showing, undisputed survey evidence establishes that the carrying of firearms at political protests and open-air markets in Fairfax County causes fear and has chilling

effects. JA59-60, JA1146, JA1152-1156. *Wolford* involved no equivalent evidence.

*Third*, *Wolford* gave only "some" weight to Reconstruction-era laws prohibiting guns at public gatherings and considered dispositive the "lack" of analogous earlier laws (about which, to reiterate, it was wrong). *See* 116 F.4th at 998. This cramped view of the relevant time period was mistaken, for the reasons discussed *supra* Part II.D.2.

*Fourth*, by choosing to challenge only the "adjacent to" portion of the Events Restriction under the Second Amendment in their Complaint, Plaintiffs implicitly recognized that prohibiting guns *in* County-permitted or permit-required events is constitutional. On that basis, *Wolford* favors the County on the Events Restriction, because it recognized that caselaw supports designating "reasonable buffer zone[s]" around sensitive places and upheld prohibitions on guns in many parking areas around sensitive places. 116 F.4th at 989-90.[21]

---

[21] *Wolford* and the cases it cites also answer Plaintiffs' attempt (Br. 50-51) to rely on *People v. Chairez*, 104 N.E.3d 1158 (Ill. 2018), because they show that a "buffer zone" is not constitutionally problematic under *Bruen-Rahimi*'s historical analysis. Moreover, *Chairez* emphasized the "lack of any notification" about where its restriction starts and ends, and the consequent "chilling effect" and impact on "[i]nnocent behavior." *Id.* at 1176. Here, the Ordinance's

In sum, even if Plaintiffs had standing to challenge it, the Events Restriction does not violate the Second Amendment.

## B. The Events Restriction does not violate due process

Plaintiffs also claim that the portion of the Events Restriction applying to "an event that would otherwise require a [County] permit," or to an area "adjacent" to such an event, is unconstitutionally vague. *See* Br. 51-52. Even if Plaintiffs had standing to bring this claim, *but see supra* Part III, they do not come close to making the "high showing" required for a facial vagueness challenge. *Lumumba v. Kiser*, 116 F.4th 269, 285 (4th Cir. 2024). As the district court correctly concluded, "[b]ecause the County has provided publicly available information about prohibited conduct under the Events Restriction, because guidelines have been adopted to avoid arbitrary enforcement …, and because the Ordinance's notice requirement prevents arbitrary enforcement," the Events Restriction is not unconstitutionally vague. JA1791.

A law violates due process only if it is "'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or is so

"limited scope," JA1787, its notice requirement, and the County's "no sign, no enforcement" policy fully address any similar concerns. *See infra* Part IV.B.

standardless that it invites arbitrary enforcement.'" *Lumumba*, 116 F.4th at 284 (citation omitted). Moreover, a court will construe a challenged law, "'if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'" *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (citation omitted). In doing so, a court examines the law "as a whole," as well as "'any limiting construction that a state court or enforcement agency has proffered.'" *Martin v. Lloyd*, 700 F.3d 132, 136 (2012) (citation omitted); *see, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 148-49 (4th Cir. 2017) (en banc) (relying on guidance and limiting constructions in Attorney General opinion and Maryland State Police advisory in rejecting vagueness challenge to state firearms law).

The Ordinance's text mandates that notice of its requirements "shall be posted" at all entrances to places where covered events are taking place. JA992-993. The County maintains a public website that identifies "the areas where County permits are required for public use subject to the Ordinance." JA1792; *see* JA52 ¶12. And the police department's Command Staff Memorandum reiterates that no enforcement will take place without notice, instructing that "[o]fficers

may <u>not</u> enforce the provisions of this ordinance unless first confirming that signs providing this notification are properly posted." JA1553; *see* JA1541-1543 ¶¶10-26.

Plaintiffs completely ignore this official "no sign, no enforcement" policy and claim there is no way to know whether an event should have a permit. *See* Br. 51-52. This ignores not only the undisputed fact that the County's website sets out "the six areas where and authorities from which permits for events can be sought," JA52 ¶12, but more importantly, the undisputed fact that if there is no sign, *there will be no enforcement*, JA50-52 ¶¶3-10. Thus, as the district court explained, "Plaintiffs and other ordinary citizens will know with complete certainty that an event is subject to the Ordinance" because its text and the County's official enforcement policy "establish that the Events Restriction applies only when notice of the Ordinance is posted, which safeguards citizens from any possible arbitrary enforcement." JA1793.[22] Finally, Plaintiffs' suggestion that the Events Restriction's lack of a scienter requirement renders it vague, *see* Br. 52, is wrong as a matter

---

[22] Plaintiff LaFave conceded as much when she acknowledged in her state court deposition that the County's "no sign, no enforcement" policy resolves any vagueness concerns. JA1124-1125.

of law. *See, e.g.*, *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853-54 (4th Cir. 1998) (rejecting vagueness challenge to ordinance that lacked scienter requirement).

In sum, even if Plaintiffs had standing to challenge it, the Events Restriction is not unconstitutionally vague.

## CONCLUSION

This Court should affirm the district court's judgment.

December 16, 2024                    Respectfully submitted,

                                     /s/ Janet Carter

Elizabeth D. Teare                   Janet Carter
Daniel Robinson                      William J. Taylor, Jr.
John W. Burton                       Priyanka Gupta Sen
Office of the County Attorney        Erik P. Fredericksen
12000 Government Center              Everytown Law
    Parkway, Ste 549                 450 Lexington Avenue,
Fairfax, VA 22035                        P.O. Box 4184
                                     New York, NY 10163
Douglas R. Kay                       Telephone: (646) 324-8174
Thomas W. Repczynski                 jcarter@everytown.org
Anders T. Sleight
Offit Kurman, P.C.                   Sana S. Mesiya
8000 Towers Crescent Drive,          Everytown Law
    Ste 1400                         P.O. Box 14780
Tysons Corner, VA 22182              Washington, DC 20044

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of 32(a)(7)(B)(i) because this brief contains 12,992 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Janet Carter
Janet Carter
*Counsel for Defendants-Appellees*