24-1886

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

KIMBERLY LAFAVE; GLENN M. TAUBMAN; ROBERT HOLZHAUER,

*Plaintiffs-Appellants,*

v.

THE COUNTY OF FAIRFAX, VIRGINIA; KEVIN DAVIS, in his official capacity as Chief of Police,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia

No. 1:23-cv-1605 (Porter, M.J.)

## BRIEF OF *AMICUS CURIAE* CITY OF RICHMOND IN SUPPORT OF APPELLEES AND AFFIRMANCE

Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL
 ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607

Ben Gifford
INSTITUTE FOR CONSTITUTIONAL
 ADVOCACY AND PROTECTION
Georgetown Law
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................................................ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ..................................................1

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................4

    I.  Restrictions on Firearms at Permitted Events Fall Well Within the Nation's
         Historical Tradition of Firearm Regulation .............................................................4

    II. The Presence of Firearms at Permitted Events Heightens the Risk of
         Violence and Chills Constitutionally Protected Expression ...............................10

CONCLUSION ..................................................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ..................................................................9

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) (per curiam) ...........................5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................... 4, 5

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ..................................................6

*English v. State*, 35 Tex. 473 (1871) ................................................................... 8, 9

*Hicks v. Ferreyra*, 965 F.3d 302 (4th Cir. 2020) ..................................................4

*Hill v. State*, 53 Ga. 472 (1874) ............................................................................9

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ...................5, 8, 9, 10

*State v. Shelby*, 90 Mo. 302 (1886) .......................................................................9

*United States v. Rahimi*, 602 U.S. 680 (2024) ....................................................10

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) .............................................9, 10

**Other Authorities**

*'Unite the Right' Rally in Charlottesville Turns Violent*, ABC News,
    https://perma.cc/EKU3-52MS .......................................................................3

*2020 Richmond Lobby Day: Blueprint for a Violent Year*, ADL (Jan. 18, 2021),
    https://perma.cc/MLW5-2AV7 .....................................................................1

Armed Conflict Location and Event Data Project & Everytown for Gun Safety,
    *Armed Assembly: Guns, Demonstrations, and Political Violence in America* (2021),
    https://perma.cc/A9QL-WK3E ............................................................. 3, 11

Danyelle Khmara & Clara Migoya, *Anti-Mask Protesters Storm Tucson School Board
    Meeting*, Ariz. Daily Star (Apr. 29, 2021), https://perma.cc/Z6G7-BRJU ................12

Darrell A. H. Miller, Alexandra Filindra & Noah Kaplan, *Technology, Tradition, and "The
    Terror of the People"*, 99 Notre Dame L. Rev. 1373 (2024) ...................................... 14, 15

Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J.
    459 (2019) ..................................................................................................5

Dean Mirshahi, *City Council Votes to Approve Stoney's Ordinance Banning Guns in City
    Buildings, Parks*, ABC 8News (July 1, 2019), https://tinyurl.com/bddy4n7v .............2

*Despite Anger, Threats of Insurrection, Massive Rally Is Carried Out Peacefully Outside State
    Capitol*, Wash. Post (Jan. 20, 2020), https://tinyurl.com/4xymnb5x ...........................2

Diana Palmer & Timothy Zick, *The Second Amendment Has Become a Threat to the First*, Atlantic (Oct. 27, 2021), https://tinyurl.com/3dn4emxy ..............................14

Hannah Allam, *An Uneasy July 4th in Richmond, Va., as Armed Groups Gather Warily*, NPR (July 6, 2020), https://perma.cc/G554-2459 ..............................2

Heather A. Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*, 32 J. Traumatic Stress 881 (2019) ..............................13

Jack Pointer, *Gun-Rights Activists Converge on Richmond*, WTOP (Jan. 20, 2020), https://perma.cc/5YHQ-LSHU..............................2

Jacob Knutson, *Election Officials: Armed "Vigilantes" Near Ballot Drop Box in Arizona*, Axios (Oct. 23, 2022), https://perma.cc/CC7L-W565 ..............................12

Jane C. Timm & Joe Murphy, *Local Officials Increasingly Targeted for Threats and Harassment, New Data Shows*, NBC News (Apr. 11, 2024), https://tinyurl.com/3vc8wwcu ..............................12

Jason Wilson, *Portland Suffers Serious Street Violence as Far Right Return 'Prepared to Fight'*, Guardian (Aug. 28, 2020), https://perma.cc/9AD9-Z5A4..............................3

Jeremy M. Lazarus, *City Council Approves Ban of Guns at Protests, Gatherings*, Richmond Free Press (Sept. 10, 2020), https://perma.cc/2T3U-YD9Z ..............................2

Kalhan Rosenblatt, *Las Vegas Shooting Is Deadliest in Modern U.S. History*, NBC News (Oct. 2, 2017), https://tinyurl.com/5n6mnf48 ..............................12

Kim Eckart, *More US Adults Carrying Loaded Handguns Daily, Study Finds*, UW News (Nov. 16, 2022), https://perma.cc/2ZF9-UEQ8 ..............................11

Manny Fernandez et al., *Five Dallas Officers Were Killed as Payback, Police Chief Says*, N.Y. Times (July 8, 2016), https://tinyurl.com/vhf98jhn..............................13

Mike McIntire, *At Protests, Guns Are Doing the Talking*, N.Y. Times (Nov. 26, 2022), https://tinyurl.com/2p7f326a ..............................13

Ned Parker & Peter Eisler, *Political Violence in Polarized U.S. at Its Worst Since 1970s*, Reuters (Aug. 9, 2023), https://perma.cc/X4HG-SKWK ..............................11

Patrick Boyle, *The Cost of Surviving Gun Violence: Who Pays?*, AAMC News (Oct. 18, 2022), https://perma.cc/GG7P-BWUD..............................13

*Protesters Swarm Mayor Stoney's Apartment*, ABC 8News (June 17, 2020), https://tinyurl.com/yxacx2h3..............................12

Rachel Kleinfeld, *The Rise of Political Violence in the United States*, J. Democracy, Oct. 2021, at 160 ..............................11

Sarah McCammon, *Virginia Governor Declares State Of Emergency Ahead Of Gun Rights Rally*, NPR (Jan. 15, 2020), https://perma.cc/Y73Q-W7HA ..............................2

*Sensitive Places*, Everytown Law, https://perma.cc/57MP-JZCT ..............................8

Stefan Becket, *Aaron Salter Jr., Security Guard Killed in Buffalo Shooting, Hailed as a Hero for Confronting Gunman*, CBS News (May 15, 2022), https://perma.cc/4LPD-TUT7 ....13

Timothy Zick & Diana Palmer, *The Next Fight Over Guns in America*, Atlantic (June 23, 2022), https://tinyurl.com/bdda5d9w ...........................................................................14

Tre Ward et al., *Highland Park Parade Shooting Leaves 6 Dead, 31 Hurt; 4th of July Events Canceled*, ABC7 Chi. (July 5, 2022), https://perma.cc/J7GJ-3K5B ............................13

**Ordinances**

Richmond, Va., Code § 19-335(iv) ........................................................................................2

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Richmond is the capital and one of the largest cities in the Commonwealth of Virginia. As the seat of government and home to several universities, Richmond frequently hosts demonstrations, parades, concerts, and other events requiring a permit. To protect attendees at these events, while promoting free expression and community engagement, Richmond recently enacted an ordinance—similar to one of the provisions at issue here—that prohibits firearms at events requiring a permit. Accordingly, Richmond has a strong interest in the outcome of this case. All parties have consented to the filing of this brief.[1]

## INTRODUCTION

On January 20, 2020, thousands of armed demonstrators flocked to the State Capitol in Richmond to protest the Legislature's consideration of various gun-safety measures. Along with mainstream gun-rights activists, the group included militias and extremist organizations, some of whom warned lawmakers that "The Penalty for Treason is Death." *2020 Richmond Lobby Day: Blueprint for a Violent Year*, ADL (Jan. 18, 2021), https://perma.cc/MLW5-2AV7. Threats ahead of the event prompted the Governor to declare a state of emergency and ban firearms from the Capitol grounds. *See* Sarah McCammon, *Virginia Governor Declares State Of Emergency Ahead Of Gun Rights*

_____

[1] Richmond affirms that no party's counsel authored this brief in whole or in part, and no person or entity other than Richmond or its counsel contributed money to the preparation or submission of this brief.

*Rally*, NPR (Jan. 15, 2020), https://perma.cc/Y73Q-W7HA.  And gun-safety advocates, concerned by the risk of violence, canceled events scheduled for that day or chose not to attend.  *See* Jack Pointer, *Gun-Rights Activists Converge on Richmond*, WTOP (Jan. 20, 2020), https://perma.cc/5YHQ-LSHU.

Fortunately for all, the protests took place peacefully, no doubt in part because weapons were banned at the Capitol itself.  *See Despite Anger, Threats of Insurrection, Massive Rally Is Carried Out Peacefully Outside State Capitol*, Wash. Post (Jan. 20, 2020), https://tinyurl.com/4xymnb5x.  Later that year, however, Richmond saw renewed risks arising from firearms at protests, particularly following the murder of George Floyd.  *See* Hannah Allam, *An Uneasy July 4th in Richmond, Va., as Armed Groups Gather Warily*, NPR (July 6, 2020), https://perma.cc/G554-2459.  In response to these risks, the Richmond City Council unanimously passed an ordinance—similar to one of the provisions at issue in this case—banning guns at events requiring a permit.  *See* Jeremy M. Lazarus, *City Council Approves Ban of Guns at Protests, Gatherings*, Richmond Free Press (Sept. 10, 2020), https://perma.cc/2T3U-YD9Z; Richmond, Va., Code § 19-335(iv).  The ordinance was an expansion of a prohibition on firearms at city buildings and parks—also similar to one of the provisions at issue in this case—which the City Council passed after a nine-year-old was killed by a stray bullet at a Richmond park, and after a mass shooter killed 12 people and injured several others in Virginia Beach.  *See* Dean Mirshahi, *City Council Votes to Approve Stoney's Ordinance Banning Guns in City Buildings, Parks*, ABC 8News (July 1, 2019), https://tinyurl.com/bddy4n7v.

The ability of state and local governments to restrict firearms in sensitive places is a critical tool for protecting public safety. This is especially true at protests and other events requiring a permit, where participants are often engaged in core First Amendment activities. With public carry rates and political violence on the rise, violence at armed protests is becoming more commonplace. High-profile examples include the 2017 Unite the Right rally in Charlottesville—which resulted in one death and dozens of injuries, *see 'Unite the Right' Rally in Charlottesville Turns Violent*, ABC News, https://perma.cc/EKU3-52MS—and clashes among protestors in cities like Portland during the summer of 2020, *see* Jason Wilson, *Portland Suffers Serious Street Violence as Far Right Return 'Prepared to Fight'*, Guardian (Aug. 28, 2020), https://perma.cc/9AD9-Z5A4. More generally, data shows that armed protests are measurably more violent than similar unarmed gatherings. *See* Armed Conflict Location and Event Data Project & Everytown for Gun Safety, *Armed Assembly: Guns, Demonstrations, and Political Violence in America* 4 (2021), https://perma.cc/A9QL-WK3E. And even when protests do not turn violent, the threat of gun violence deters people from participating—as demonstrated by several recent studies, including unrebutted evidence in this case. *See, e.g.*, JA1155 (Filindra Report ¶¶ 37, 40).

As Fairfax explains and the district court held, restrictions on firearms at permitted events and areas adjacent to those events fall well within the Nation's historical tradition of firearm regulation. *See* Appellees' Br. 58–59; JA1788 (Dist. Ct. Op. 31). With respect to the prohibition on carrying firearms in adjacent areas,

Fairfax has identified—both below and on appeal—"a robust historical tradition of prohibiting firearms not only within an area of sensitivity, but adjacent to it." JA1788 (Dist. Ct. Op. 31); *see* Appellees' Br. 60. And with respect to the prohibition on carrying firearms at events themselves, Plaintiffs did not challenge the ordinance below, and they barely raise the issue before this Court. *See* Appellants' Br. 49–50; JA1786 (Dist. Ct. Op. 29) ("Plaintiffs . . . do not challenge the Events Restriction prohibition on firearms within a County permitted event or within an event that requires a permit, but instead only the prohibition on firearms in the area 'adjacent' either to a County permitted event or to an event that requires a permit."). Any argument regarding the restriction on events themselves has thus been forfeited, *see Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020), and fails on the merits in any case.

This Court should affirm the district court's well-reasoned decision. Ruling otherwise would jeopardize both the safety of our citizens and their ability to participate in civic life.

## ARGUMENT

### I. Restrictions on Firearms at Permitted Events Fall Well Within the Nation's Historical Tradition of Firearm Regulation

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment confers an individual right to keep and bear firearms for self-defense, *id.* at 592. At the same time, however, the Court assured lawmakers that "laws forbidding the carrying of firearms in sensitive places

such as schools and government buildings" were "presumptively lawful regulatory measures." *Id.* at 626 & 627 n.26. The Court has since "repeat[ed] those assurances," *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion), including in its recent landmark decision, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Court held that the right recognized in *Heller* protected public carry outside the home, but the Justices nevertheless "assume[d] it settled" that locations such as "legislative assemblies, polling places, and courthouses" were "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 30. The Court also explained that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis omitted).

From the illustrative list of sensitive places identified by *Heller* and *Bruen*—and the historical record compiled in cases like this one—several unifying principles emerge. Two are particularly relevant here: First, "public forums and quintessentially crowded places" have traditionally been deemed sensitive locations where firearms can be prohibited. *Antonyuk v. James*, 120 F.4th 941, 1019 (2d Cir. 2024) (per curiam). Second, and relatedly, locations can be regulated as sensitive if they function as "'First Amendment institution[s] . . . designed for the 'right to peaceably assemble.'" *Id.* at 1018 n.79 (quoting Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 475 (2019)). Both of these principles justify the

5

regulation of firearms at permitted events. Indeed, permitted events are classic examples of crowded, public fora where participants engage in core First Amendment activities. *See, e.g., Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) (describing protests as "reflect[ing] an exercise of these basic constitutional rights in their most pristine and classic form").

The record in this case is replete with examples of historical laws that restricted firearms in places where people gathered, often for expressive purposes. As Fairfax explains, *see* Appellees' Br. 26, one of the earliest such laws was the 1328 Statute of Northampton, which provided that people generally could not "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." JA1064. This language was later incorporated nearly verbatim into Founding Era laws, including in Virginia. *See* JA1070 (1786 Virginia law providing that no one could "go nor ride armed by night nor by day in fairs or markets, or in other places"); JA1074 (1792 North Carolina law providing that no one could "go nor ride armed by night nor by day, in fairs, markets, . . . nor in no part elsewhere"). Plaintiffs argue that these laws are not analogous to the challenged ordinance because they applied only when an individual carried firearms in a manner that induced "terror." *See* Appellants' Br. 49–50. But as Fairfax explains, the terror requirement did not apply when someone carried firearms in "fairs" or "markets" (as opposed to "in other places" or "elsewhere"). *See* Appellees' Br. 43–44. And in any event, the fact that these prohibitions singled out centers of commerce—which were

archetypal gathering spots in the Founding era—indicates that such places can be subjected to heightened regulation. Furthermore, as explained in Part II, the record in this case contains unrebutted evidence that firearms do in fact induce terror at permitted events.

The nineteenth century saw an explosion of regulations targeting firearms at crowded (and often expressive) gatherings. Examples from the record include: an 1869 Tennessee prohibition on bringing firearms into "any fair, race course, or other public assembly," JA1078; an 1870 Texas prohibition on bringing firearms "into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering," JA1082; an 1870 Georgia prohibition on bringing firearms into "any place of public worship, or any other public gathering," JA1091; an 1883 Missouri prohibition on bringing firearms "into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, . . . or into any other public assemblage of persons," JA1085; and an 1893 Oklahoma prohibition on bringing firearms "into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, . . . or to any political convention, or to any other public assembly." JA1096. Other examples

include an 1817 New Orleans law forbidding weapons in public ball rooms, an 1853 New Mexico law prohibiting firearms in balls and fandangos, and an 1889 Arizona prohibition on bringing firearms into any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or to a ball room, social party or social gathering, . . . or to any other public assembly." *See Sensitive Places*, Everytown Law, https://perma.cc/57MP-JZCT.

These laws are analogous to Fairfax's with respect to both "how" they burdened the right to bear arms—by prohibiting firearms in specific locations—and "why"—to protect against the risk of firearms in crowded spaces, and to eliminate the chilling effect that guns can have on the exercise of other rights. *See Bruen*, 597 U.S. at 29 (explaining that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry" (cleaned up)). In addition, these laws were viewed as constitutional at the time they were enacted. *See id.* at 30 ("assum[ing] it settled that" sensitive place laws were constitutional where Court was "aware of no disputes regarding the lawfulness of such prohibitions"). In *English v. State*, 35 Tex. 473 (1871), the Texas Supreme Court found it "little short of ridiculous, that any one should claim the right to carry upon his person any of the [weapons] inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other

place where ladies and gentlemen are congregated together." *Id.* at 478–79.[2] A few years later, the Georgia Supreme Court agreed that "[t]he practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874). The Tennessee Supreme Court similarly recognized that "a man may well be prohibited from carrying his arms to church, or other public assemblage." *Andrews v. State*, 50 Tenn. 165, 182 (1871). And the Missouri Supreme Court likewise held that a prohibition on carrying firearms in "an assemblage of persons" was "in perfect harmony with the constitution." *State v. Shelby*, 90 Mo. 302, 305–06 (1886).

Plaintiffs offer little to counteract this robust record. They quote from the Ninth Circuit's decision in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), which struck down a restriction on firearms at public gatherings because "[p]ublic gatherings have existed since before the Founding," and because the government in that case failed to "point to a single regulation of public gatherings until after the ratification of

---

[2] In *Bruen*, the Court described *English* as an "outlier[]," but only with respect to *English*'s interpretation of a Texas law that "forbade anyone from carrying on or about his person any pistol unless he has reasonable grounds for fearing an unlawful attack on his person." 597 U.S. at 64–65 (internal quotation marks and alterations omitted). *Bruen* did not address *English*'s discussion of prohibitions on firearms in places of public assembly.

the Fourteenth Amendment." Appellants' Br. 49 (quoting *Wolford*, 116 F.4th at 998).

As just discussed, however—and as the government did in fact explain in *Wolford*, *see*

116 F.4th at 998 n.12—restrictions on firearms at public gatherings date back at least

to the Statute of Northampton. And that tradition of regulation continued through

the Founding and Reconstruction, with the passage of laws—which, again, were

viewed as uncontroversial—that prohibited firearms at a range of public assemblies.

These laws and the principles underlying them provide ample justification for

Fairfax's events restriction.[3] *See United States v. Rahimi*, 602 U.S. 680, 692 (2024)

(explaining that courts must "consider[] whether the challenged regulation is

consistent with the *principles* that underpin our regulatory tradition" (emphasis added)).

Plaintiffs' argument to the contrary is essentially a demand that Fairfax identify "a

'dead ringer' or a 'historical twin'" for the challenged ordinance, which is a showing

that the Supreme Court does not require. *See id.* (quoting *Bruen*, 597 U.S. at 30).

## II. The Presence of Firearms at Permitted Events Heightens the Risk of Violence and Chills Constitutionally Protected Expression

The ability of state and local governments to restrict firearms at permitted

events and areas adjacent to those events is particularly important in light of the risks

that arise when individuals are armed. According to a recent study of public

demonstrations, "the presence of an armed person is correlated to more . . . violence

---

[3] As Fairfax explains, the historical record also justifies the prohibition of firearms at areas adjacent to permitted events. *See* Appellees' Br. 60.

and destruction, and is a detriment to public safety and the right to organize, compared to demonstrations with unarmed participants." Armed Conflict Location and Event Data Project & Everytown for Gun Safety, *supra*, at 4. Specifically, "armed demonstrations are nearly six times as likely to turn violent or destructive compared to unarmed demonstrations." *Id.* at 2 (emphasis omitted). They are also more likely to turn deadly: "[a] fatality was reported at approximately one out of every 2,963 demonstrations where no firearm was identified, compared to about one out of every 62 demonstrations where there was a firearm identified." *Id.* at 3. This violence, moreover, is caused not only by those carrying guns, but also by unarmed demonstrators, thus indicating that "the presence of firearms at a demonstration can serve to escalate tensions in contentious contexts, *indirectly* contributing to a more dangerous environment." *Id.* at 4.

The risks posed by firearms at and around permitted events are likely to persist. Even before the Supreme Court issued its decision in *Bruen*, public carry rates were rising. *See* Kim Eckart, *More US Adults Carrying Loaded Handguns Daily, Study Finds*, UW News (Nov. 16, 2022), https://perma.cc/2ZF9-UEQ8. And political violence in the United States has "skyrocketed" in recent years, Rachel Kleinfeld, *The Rise of Political Violence in the United States*, J. Democracy, Oct. 2021, at 160, 160, amid increasing polarization, domestic extremism, and government distrust, *see* Ned Parker & Peter Eisler, *Political Violence in Polarized U.S. at Its Worst Since 1970s*, Reuters (Aug. 9, 2023), https://perma.cc/X4HG-SKWK. This trend is perhaps best exemplified at

the national level by the attack on the U.S. Capitol on January 6, 2021, and the attempted assassination of Donald Trump on July 13, 2024. But state and local governments have also seen a swell of armed activity at civic institutions like polling places, vote-count centers, and public board meetings. *See, e.g.*, Jacob Knutson, *Election Officials: Armed "Vigilantes" Near Ballot Drop Box in Arizona*, Axios (Oct. 23, 2022), https://perma.cc/CC7L-W565; Danyelle Khmara & Clara Migoya, *Anti-Mask Protesters Storm Tucson School Board Meeting*, Ariz. Daily Star (Apr. 29, 2021), https://perma.cc/Z6G7-BRJU. This activity threatens citizens engaged in core democratic functions, and it is also part of a broader trend of increasing threats and harassment of government officials. *See* Jane C. Timm & Joe Murphy, *Local Officials Increasingly Targeted for Threats and Harassment, New Data Shows*, NBC News (Apr. 11, 2024), https://tinyurl.com/3vc8wwcu; *see also Protesters Swarm Mayor Stoney's Apartment*, ABC 8News (June 17, 2020), https://tinyurl.com/yxacx2h3 (reporting on incident in which protestors entered Richmond Mayor Levar Stoney's apartment building without authorization).

The recent rise in mass shootings also poses a serious risk for those at or near permitted events. The deadliest mass shooting in American history took place at a concert, *see* Kalhan Rosenblatt, *Las Vegas Shooting Is Deadliest in Modern U.S. History*, NBC News (Oct. 2, 2017), https://tinyurl.com/5n6mnf48, and attendees and bystanders at parades, protests, and other public gatherings have lost their lives to rampaging gunmen, *see, e.g.*, Tre Ward et al., *Highland Park Parade Shooting Leaves 6*

*Dead, 31 Hurt; 4th of July Events Canceled*, ABC7 Chi. (July 5, 2022),

https://perma.cc/J7GJ-3K5B.  Even for those who survive, mass shootings inflict

devastating and long-lasting injuries, including pain, suffering, and "diminished quality

of life for victims and their families."  Patrick Boyle, *The Cost of Surviving Gun Violence:*

*Who Pays?*, AAMC News (Oct. 18, 2022), https://perma.cc/GG7P-BWUD.  The

effects are particularly acute for children and adolescents, who can suffer

psychological harm even from indirect exposure to gun violence.  *See, e.g.*, Heather A.

Turner et al., *Gun Violence Exposure and Posttraumatic Symptoms Among Children and Youth*,

32 J. Traumatic Stress 881, 887 (2019).  And the burdens are heavy for local

governments like Fairfax and Richmond, whose first responders often risk their lives

during mass shootings and are sometimes even targeted.  *See, e.g.*, Stefan Becket, *Aaron*

*Salter Jr., Security Guard Killed in Buffalo Shooting, Hailed as a Hero for Confronting Gunman*,

CBS News (May 15, 2022), https://perma.cc/4LPD-TUT7; Manny Fernandez et al.,

*Five Dallas Officers Were Killed as Payback, Police Chief Says*, N.Y. Times (July 8, 2016),

https://tinyurl.com/vhf98jhn.  It is unsurprising that a recent mass shooting was part

of what motivated Richmond to pass an ordinance similar to one of the Fairfax

restrictions at issue in this case.  *See supra* p. 2.

The risk of gun violence at permitted events has brought with it a concomitant

chilling effect on participation.  *See, e.g.*, Mike McIntire, *At Protests, Guns Are Doing the*

*Talking*, N.Y. Times (Nov. 26, 2022), https://tinyurl.com/2p7f326a ("Armed

Americans . . . are increasingly using open-carry laws to intimidate opponents and

shut down debate."). It is commonsensical that firearms chill speech, but it is also supported by a wealth of empirical data. According to one recent study, participants "were far less likely to attend a protest, carry a sign, vocalize their views, or bring children to protests if they knew firearms would be present." Diana Palmer & Timothy Zick, *The Second Amendment Has Become a Threat to the First*, Atlantic (Oct. 27, 2021), https://tinyurl.com/3dn4emxy. This chilling effect was widespread: "When asked if they would attend a local rally on a topic they cared about if they knew some protest participants would be carrying firearms, *71 percent of survey participants* said they were unlikely or very unlikely to attend." Timothy Zick & Diana Palmer, *The Next Fight Over Guns in America*, Atlantic (June 23, 2022), https://tinyurl.com/bdda5d9w (emphasis added). The effect was also "present regardless of respondents' political ideology," and it "was experienced by gun owners and nonowners alike." *The Second Amendment Has Become a Threat to the First*, *supra*.

Another recent study reached similar results. The authors—one of whom, Dr. Alexandra Filindra, is an expert in this case—found that survey respondents were less likely to recommend that a friend attend a political protest if guns were allowed in public spaces. *See* Darrell A. H. Miller, Alexandra Filindra & Noah Kaplan, *Technology, Tradition, and "The Terror of the People"*, 99 Notre Dame L. Rev. 1373, 1405–08 (2024). Whereas 37 percent of respondents said that they would "strongly" or "somewhat" encourage a friend to attend a protest as a baseline matter, only 24 percent gave the same answer when told that guns were allowed in public spaces. *Id.* at 1406. The

authors also found that survey respondents were less likely to recommend that someone carry a sign or flag at a political protest if they were told that guns were allowed in public spaces. *See id.* at 1408–11. Whereas 31 percent of respondents said that they would "strongly" or "somewhat" encourage a friend to carry a sign at a protest as a baseline matter, only 22 percent did so when told that guns were allowed. *Id.* at 1410. Notably, the chilling effects measured in both scenarios were statistically significant, even though each scenario posed "a hard test for establishing chilling effects" due to the fact that only a small percentage of respondents were willing to encourage attendance at protests to begin with. *Id.* at 1405; *see id.* at 1409 (explaining that the scenario involving carrying a sign was designed "to make it even more difficult to find chilling effects" given that even fewer people were willing to encourage the behavior as a baseline matter). The authors concluded that "it is safe to extrapolate . . . that Americans will be significantly less likely to exercise their First Amendment rights to protest the government if people are allowed to bring firearms to such events." *Id.* at 1408.

The study just mentioned involved a national survey, *see id.* at 1398 & n.151, but unrebutted evidence in this case tells the same story with respect to Fairfax specifically. In the expert report that she submitted in support of Fairfax's motion for summary judgment, Dr. Filindra found that survey participants who lived in and around Fairfax County were "less likely to recommend to a friend to attend a protest in Fairfax County if guns are allowed in public spaces." JA1155 (Filindra Report

¶ 37).  This chilling effect was both large and statistically significant; whereas 49

percent of respondents said that they would be very or somewhat likely to

recommend that a friend attend a political protest in Fairfax County, only 16 percent

of respondents gave the same answer when told that guns were allowed.  JA1234.

Conversely, while only 21 percent of respondents said as a baseline matter that they

would be very or somewhat *unlikely* to recommend that a friend attend a political

protest in Fairfax County, that number soared to 67 percent when respondents were

told that guns were allowed.  *See* JA1234.

Dr. Filindra also found that respondents were "less likely to recommend to a

friend to bring a sign to a protest in Fairfax County if guns are allowed in public

spaces."  JA1155 (Filindra Report ¶ 40).  The chilling effect was again large and

statistically significant, with only 19 percent of respondents saying that they would be

very or somewhat likely to recommend that the friend carry a sign if guns were

allowed, as compared to 34 percent who gave the same response as a baseline matter.

JA1238–39.  Conversely, 66 percent of respondents said that they would be *unlikely* to

recommend that a friend bring a sign to a protest if guns were allowed, as compared

to 34 percent in the absence of the guns condition.  JA1239.

These studies confirm what policymakers already know: the presence of

firearms at public gatherings makes people less likely to attend and participate.  This

deterrent effect is unsurprising given the heightened risk of violence discussed above.

Plaintiffs would deprive government officials of the ability to protect public safety and

promote public engagement.  This position finds no support in the Constitution, and the Court should reject it.

## CONCLUSION

Since the Founding, firearms have been regulated in and around places where people gather to express themselves and engage with fellow community members. Fairfax's events restriction falls well within that historical tradition.  As Richmond knows from first-hand experience, the ability to regulate guns at and adjacent to permitted events is a critical tool for state and local governments.  Because the district court correctly upheld the events restriction, this Court should affirm.

December 20, 2024

Respectfully Submitted,

<u>/s/ Mary B. McCord</u>

Mary B. McCord
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607

Ben Gifford
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY AND PROTECTION
Georgetown Law
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,315 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ Mary B. McCord
Mary B. McCord
*Counsel for Amicus Curiae City of Richmond*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2024, I caused the foregoing to be filed with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: December 20, 2024

/s/ Mary B. McCord
Mary B. McCord

*Counsel for Amicus Curiae City of Richmond*