No. 24-1886

---

In The

# United States Court of Appeals

### For the Fourth Circuit

**KIMBERLY LAFAVE, GLENN M. TAUBMAN, ROBERT HOLZHAUER,**

*Plaintiffs-Appellants,*

**v.**

**THE COUNTY OF FAIRFAX, VIRGINIA, AND KEVIN DAVIS, in his official capacity as Chief of Police,**

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Case No. 1:23-cv-1605 (WBP)
Honorable William B. Porter

---

## REPLY BRIEF OF PLAINTIFF-APPELLANTS
## KIMBERLY LAFAVE, GLENN TAUBMAN, AND ROBERT HOLZHAUER

---

Earl N. "Trey" Mayfield, III
VA Bar No. 41691
CHALMERS, ADAMS, BACKER &
KAUFMAN, LLC
10521 Judicial Drive, Suite 200
(703) 268-5600
tmayfield@chalmersadams.com

Stephen P. Halbrook, PhD
ATTORNEY AT LAW
3925 Chain Bridge Road
Suite 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

# TABLE OF CONTENTS

ARGUMENT ................................................................................................1

I. The County Ignores and Misstates *Bruen's* Historical Test, Misrepresents History from the Founding-Era, and Relies on Irrelevant Practices from Well After the Founding-Era.....................................................................5

    A. The County Provides No Founding-Era History Demonstrating Firearms Were Banned in Crowded Places, Including Parks, a Conclusion *Bruen* Expressly Rejects ....................................................6

    B. Founding-Era Regulatory Traditions Conflict with the Park Firearms Ban........................................................................................................11

    C. The County's Ban is a Prohibition of the Constitutional Right to Go Armed Peaceably, not a Lawful Prohibition on the Criminal Conduct of Going Armed "To the Terror" of the People ...................................14

    D. Historical Analogues Must be Derived from the Founding-Era, and Later History Must be Consistent with the Founding Historical Tradition ............................................................................................17

    E. The County's Urban-Suburban Character, and Its Comparisons to Schools, are Irrelevant.........................................................................19

    F. Plaintiffs Satisfy the Facial-Challenge Standard Presented in *Bruen* .20

I. Plaintiffs Have Standing to Challenge the Events Restriction ......................24

II. The Police Department's Enforcement Policy Memo Has No Legal Effect on Plaintiffs' Right to Seek Relief................................................................26

CONCLUSION ...........................................................................................27

CERTIFICATE OF COMPLIANCE.........................................................28

CERTIFICATE OF SERVICE ..................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Alger v. Commonwealth,*
  267 Va. 255, 259-60 & n.2 (2004)......................................................................16

*Ams. for Prosperity Found. v. Bonda,*
  594 U.S. 595, 615 (2021).................................................................................23

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024).............................................................................5

*Bachellar v. Maryland,*
  397 U.S. 564 (1970).......................................................................................17

*Bianchi v. Brown,*
  111 F.4th 438, 461 n.2 (4th Cir. 2024) .............................................................7

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786, 795-804 (2011)...........................................................................2

*Brown v. NuCor Corp.,*
  785 F.3d 895, 920 (4th Cir. 2015).....................................................................14

*Bryant v. Woodall,*
  1 F.4th 280, 288-89 (4th Cir. 2021) .................................................................26

*Chapman v. Cal.,*
  386 U.S. 18, 21 and n.4 (1967) .........................................................................1

*City of Chicago v. Wilson,*
  75 Ill.2d 525 (1978).........................................................................................8

*Commonwealth v. Chubb,*
  26 Va. 715, 718 (1827) ...................................................................................12

*Cox v. Louisiana,*
  379 U.S. 536, 551 (1965).................................................................................17

ii

*Cutchin v. Roanoke,*
   113 Va. 452, 474 (1912) ....................................................................31

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................................4, 17

*Johnson v. United States,*
   576 U.S. 591, 602 (2015) ...............................................................23

*Kamen v. Kemper Fin. Servs., Inc.,*
   500 U.S. 90, 99 (1991) ..................................................................14

*Kelsoe v. Commonwealth,*
   226 Va. 197, 198 (1983) ................................................................20

*Kenny v. Wilson,*
   885 F.3d 280, 288 (4th Cir. 2018)............................................... 24, 25

*Kipke v. Moore,*
   695 F.Supp.3d 638, 661 (D. Md. 2023) ............................................25

*Kolender v. Lawson,*
   461 U.S. 352, 358 n.8 (1983) .........................................................23

*Koons v. Platkin,*
   673 F.Supp.3d 515, 639 (D.N.J. 2023) ............................................22

*LaFave v. Cnty. of Fairfax,*
   No. CL2021-01569, 2023 Va. Cir. LEXIS 203 (June 23, 2023) ................ *passim*

*Lebron v. Nat'l R.R. Passenger Corp.,*
   513 U.S. 374, 379 (1995).................................................................14

*Lucas v. Forty-Fourth Gen'l Ass. of State of Colo.,*
   377 U.S. 713, 736 (1964) ..................................................................1

*McDonald v. City of Chicago, Ill.,*
   561 U.S. 742 (2019) .........................................................................4

*Md. Shall Issue, Inc. v. Moore*,
   116 F.4th 211 (4th Cir. 2024) (en banc), petition for cert. filed, No. 24373 (Oct. 2, 2024)........................................................................................24

*Moore v. Madigan*,
   702 F.3d 933, 936 (7th Cir. 2012)........................................................16

*New York State Rifle & Pistol Ass'n, Inc., v. Bruen*,
   597 U.S. 1, 33 (2022) ................................................................ *passim*

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149, 159 (2014) .....................................................................25

*Sutton v. Commonwealth*,
   228 Va. 654, 663 (1985) ......................................................................16

*The Real Truth About Abortion, Inc. v. FEC*,
   681 F.3d 544 (4th Cir. 2012)................................................................31

*United States v. American Library Ass'n, Inc.*,
   539 U.S. 194, 222 (2003) .......................................................................3

*United States v. Hasson*,
   26 F.4th 610, 617 (4th Cir. 2022) .......................................................23

*United States v. McIver*,
   470 F.3d 550, 562 (4th Cir.2006)..........................................................4

*United States v. Perkins*,
   67 F.4th 583, 640 (4th Cir. 2023) ..........................................................8

*United States v. Rahimi*,
   602 U.S. 680, 698 (2024) ............................................................... 19, 22

*United States v. Salerno,  481 U.S. 739 (1987)*,
   481 U.S. at 745......................................................................................23

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379, 388 (4th Cir. 2001)........................................................26

*Vlaming v. West Point School Bd.*,
  302 Va. 504, 543 n.13 (2023) ...............................................................12

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024) .................................................................*5*


**Statutes**

2 Edw. 3 c. 3 (1328) .................................................................................11

*Collection of Statutes of the Parliament of England in Force in the State of North
  Carolina*, ch. 3 (F. Martin Ed. 1792) ......................................................13

Fed. R. Evid. 201(a) ................................................................................10

Va. Stat. § 18.2-282 .................................................................................19


**Other Authorities**

Atty Gen. Op. 02-074, 2002 WL 31311963 ..............................................10

*Autobiography of John Adams* 257-61 (1961).
  https://founders.archives.gov/documents/Adams/01-03-02-0016-0002.................3

BSA Rifle Shooting Merit Badge,
  https://www.scouting.org/merit-badges/rifle-shooting/ ............................3

BSA Shotgun Merit Badge,
  https://www.scouting.org/merit-badges/shotgun-shooting/ .......................3

https://en.wikipedia.org/wiki/Deborah_Sampson .......................................4

https://en.wikipedia.org/wiki/Joseph_Plumb_Martin ..................................4

https://en.wikipedia.org/wiki/Virginia_Thrasher .......................................3

James Iredell, *Laws of the State of North-Carolina* 70 (1791) ..................13

List of Fairfax high schools with rifle clubs:
  https://sites.google.com/site/potomachighschoolrifle/schools...............................3

New York City Planning, *Population Fact Finder,*
  https://popfactfinder.planning.nyc.gov/explorer/cities/NYC?compareTo=1,
  accessed Jan. 15, 2024. .......................................................................................20

Robinson High School Rifle Club,
  https://www.robinsonrifle.org/wp/about-us/........................................................3

Tim McGrath, *James Monroe: A Life* Kindle loc. 244 (N.Y.: Dutton, 2020)..........4

U.S. Census Bureau,
  https://www.census.gov/quickfacts/fact/table/fairfaxcountyvirginia/PST04522 .11

World Population Review,
  https://worldpopulationreview.com/boroughs/manhattan-population. Accessed
  Jan. 15, 2024...........................................................................................................20

# ARGUMENT

**"The Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense."** *New York State Rifle & Pistol Ass'n, Inc., v. Bruen,* **597 U.S. 1, 33 (2022).** That some of the residents of Fairfax County don't want their fellow citizens to exercise their right is irrelevant to determining whether the State may impose restrictions thereon. The right to bear arms exists even where it is unpopular, and "[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be." *Lucas v. Forty-Fourth Gen'l Ass. of State of Colo.,* 377 U.S. 713, 736 (1964).

The federal courts are the Bill of Rights' guardians. *Chapman v. Cal.*, 386 U.S. 18, 21 and n.4 (1967) (citing James Madison, 1 Annals of Cong., 439). The courts "cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights." *Chapman*, 386 U.S. at 21.

*Bruen* directs that those seeking to restrict firearms must find factually analogous laws from the Founding Era demonstrating that the modern restriction the government seeks is something the American people would have practiced in 1791. The County *does not accurately cite a single supporting law or practice from that time.* Instead, it larders the record with precisely the kind of "support" the Supreme Court explicitly stated *may not* be used to rationalize such restrictions. The County

1

invokes the medieval English Statute of Northampton, which *Bruen* says is irrelevant to determining American law, and didn't even apply to not-yet-invented firearms. The County misrepresents laws from Virginia and North Carolina prohibiting the *criminal* use of guns, pretending they were general bans. The County points to administrative regulations for parks from 1858 and beyond that no one voted on, which *Bruen* stated are irrelevant to the analysis.

The County's entire historical case depends on inundating the Court with what *Bruen* has already forbidden—or misrepresenting a handful of laws directed at the *criminal* use of weapons as applying to the bearing of arms generally. There is no escaping the historical fact that firearms were borne in public almost ubiquitously in the era surrounding the Bill of Rights' ratification

Perhaps recognizing the weakness of its legal position, [t]he County repeatedly invokes "the children," in the apparent hope that a nonsensical appeal to emotion might bolster its flagrantly unconstitutional Ordinance. *See, e.g.,* Fairfax Br. ("Fairfax") 5-6, 30, 32, 41-42 (suggesting that any place frequented by children is necessarily a "sensitive place"). The government has no authority to prevent children from being exposed to legal activities and ideas on the rationale that some adults find those activities and ideas distasteful. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795-804 (2011). The constitutional rights of adults cannot be diminished under the guise of society's interest (whether real or feigned) in

protecting children. *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 222 (2003).

Notwithstanding the County's professed concern at what might happen if law-abiding adults carry firearms into parks (or on the streets and sidewalks), children are not harmed upon seeing—or even touching—a firearm. The Scouts (whom the County observes often frequent the parks), Fairfax 5, have merit badges for shooting shotguns and rifles.[1] The Fairfax public high schools have *rifle clubs*, in which children not only see, but actually *use* firearms, including .22 caliber rifles.[2] Indeed, Fairfax children witness firearms being carried by adults with some regularity; some of those adults are called "police officers," while others (at least in places where the County hasn't banned them), are known as "citizens bearing arms."[3]

---

[1] BSA Shotgun Merit Badge: *See* https://www.scouting.org/merit-badges/shotgun-shooting/; BSA Rifle Shooting Merit Badge: *See* https://www.scouting.org/merit-badges/rifle-shooting/.

[2] List of Fairfax high schools with rifle clubs: https://sites.google.com/site/potomachighschoolrifle/schools; Robinson High School Rifle Club: https://www.robinsonrifle.org/wp/about-us/ (using both air rifles and .22 caliber rifles). Indeed, one member of the West Springfield High School Rifle Team won an Olympic Gold Medal for the United States in 2016. *See* https://en.wikipedia.org/wiki/Virginia_Thrasher.

[3] American children in the Founding-era were, of course, quite familiar with firearms. *E.g.,* John Adams wrote that he spent his childhood "above all in shooting, to which Diversion I was addicted to a degree of Ardor which I know not that I ever felt for any other Business, Study or Amusement." 3 *Autobiography of John Adams* 257-61 (1961). https://founders.archives.gov/documents/Adams/01-03-02-0016-0002. When he was 11 years-old, James Monroe "left for school,

Seeking to bolster a case that fails on the historical merits, the County proffers the testimony of "experts" on the historical development of U.S. parks, and surveying public attitudes in Fairfax towards firearms. *See, e.g.,* Fairfax 7-8, 28 (labeling its public opinion survey as "scientific") 43, 61-62. While the County is free to introduce historical laws demonstrating prior American traditions concerning firearms (indeed, *Bruen* requires that record), experts are unnecessary for this exercise. Determining what the law is, and how it applies to ordinary facts—like how the public uses parks, sidewalks, and streets—is solely for the legal expert in the courtroom known as a "judge." *See, e.g., United States v. McIver*, 470 F.3d 550, 562 (4th Cir.2006). The Supreme Court required no experts to discern the Second Amendment's meaning in *Bruen*, or in its predecessors, *District of Columbia v. Heller*, 554 U.S. 570 (2008), or *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2019).

---

carrying his books under one arm with his powder horn under the other and his musket slung across his back." Tim McGrath, *James Monroe: A Life* Kindle loc. 244 (N.Y.: Dutton, 2020). The American Revolution even witnessed children volunteering to fight with firearms, including Joseph Plumb Martin, who joined the Connecticut Militia at age 15, *see* https://en.wikipedia.org/wiki/Joseph_Plumb_Martin; and Deborah Sampson, who fought in the Continental Army at the same age. *See* https://en.wikipedia.org/wiki/Deborah_Sampson.

Public parks, streets, and sidewalks are not sensitive places.  If they were, then every public space would be a sensitive place, and there would be no right to "bear" arms.  That is the result Fairfax desires, but the Constitution does not permit it.[4]

## I.  The County Ignores and Misstates *Bruen*'s Historical Test, Misrepresents History from the Founding-Era, and Relies on Irrelevant Practices from Well After the Founding Era.

*Bruen* held that the Second Amendment presumptively protects conduct covered by its plain text, and the government must demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 17. The Court recognized Founding-era analogues for certain "sensitive places," which may not be expanded to include "all places of public congregation that are not isolated from law enforcement…." *Id.* at 30-31.

The County's modern case support to justify the park ban comes primarily from *Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024) ("*Antonyuk II*") and *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), but those analyses made critical errors, as explained in the Opening Brief and *infra*.

---

[4] *Amici* briefs add little beyond the County's brief. City of Richmond argues the Events Restriction is valid, which Plaintiffs did not challenge. (Rich. 4.)  The Brady Center characterizes Plaintiffs' choice not to challenge the permitted events restriction as a "concession" (Brady 5), but the instant challenge implies nothing about other provisions.  The District of Columbia's brief asserts that the "adjacent to" provision is valid (D.C. 16) without providing any applicable historical analogues.

## A. The County Provides No Founding-Era History Demonstrating Firearms Were Banned in Crowded Places, Including Parks, a Conclusion *Bruen* Expressly Rejects.

Fairfax asserts there is a "robust tradition of prohibiting firearms in parks." Fairfax 22. In fact, there is no such tradition from the era *Bruen* directs is controlling in construing the right to bear arms: The Founding Era. At the Founding, there were woods, paths, and places where people enjoyed recreation, gathered for civic and social activities, and children played. No principled difference exists about such activities on tracts of land whether such places are labeled "green spaces" or "modern parks." No special security concerns arise from "the Romantic idea that contemplating parks' natural scenery could improve viewers' lives, and, ultimately, society." Fairfax 8. Though the County repeatedly offers various iterations of buzz words about "modern parks," asserting they "implicat[ed] unprecedented societal concerns," and "concern[ed] societal conditions that did not exist at the founding," Fairfax 17-18, the County never identifies what exactly it was that happened in parks after 1858 that had never been experienced before in America. *See also id.* at 46-47. The discreet, lawful carrying of concealed handguns by law-abiding citizens poses no danger to anyone, and "Romantic ideas" do not override constitutional rights.

Nothing in Professor Young's report suggests that the pre-mid-19th century "green spaces" were not used for activities like walking and admiring nature's

beauty.  Plaintiffs demonstrated that numerous municipalities had parks (also known as landscapes open to the public) prior to 1791, from Boston Common in 1634 through the National Mall in 1790, and firearms were not banned in any of them. LaFave Br. ("LaFave") 26-29.  The County argues that plaintiffs needed expert witnesses to make that demonstration.  Fairfax 48.  Not so.  Plaintiffs presented legislative facts of which courts routinely take notice.  *See* FRE 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact.").

This Court recently resolved a Second Amendment issue based on its "thorough review of such legislative facts," also noting that the Supreme Court concluded that "a case-specific factual record was unnecessary to decide *Bruen*." *Bianchi v. Brown*, 111 F.4th 438, 461 n.2 (4th Cir. 2024) (en banc) (citing 597 U.S. at 11).[5]  Indeed, *Bruen* held the challenged New York law to be facially invalid based on the pleadings without an evidentiary record, finding that "[t]hat conclusion does not depend upon any of the factual questions raised by the dissent."  597 U.S. at 33 n.8.  Likewise, this Court has also noted a "substantial and continuing increase in the [Supreme] Court's citation of nonlegal sources," including citations to history,

---

[5] *Bianchi* contains numerous citations to newspapers, websites, and other non-legal publications.  *E.g.,* 111 F.4th at 454-56.

political science, academic journals, newspapers, and popular periodicals. *United States v. Perkins*, 67 F.4th 583, 640 (4th Cir. 2023).[6]

The County invokes mid-to-late 19th century park rules banning firearms, but ignores that those bans were for parks that were walled in, required entry through gates, and provided security. *Compare* Fairfax 22 with LaFave 31 (New York's Central Park). For the first time, it cites an 1869 Chicago ordinance that prohibited "carry[ing] firearms" in public parks. Fairfax 23. Yet those same park rules also provided that a person could not enter the park except by a gateway, there were walls and fences, and entrances might be closed at any time, implying that security was provided. Fairfax Addendum A3. Chicago's provision of protection to park patrons thus brooks no comparison with the thousands of acres of open County parkland at issue here. The Chicago rules also had constitutionally suspect provisions, such as the ban on posting any paper or carrying a flag or banner.[7] Addendum A4.

Most of the park bans cited by the County are from the late 19th century and the 20th century. Fairfax 22-24 and n.5. Of the 115 park bans originally cited by

---

[6] Legislative acts "bear on the justification for legislation," while adjudicative facts concern "the conduct of parties in a particular case." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (resolving status of state firearm law under the Second Amendment with legislative facts).

[7] *See City of Chicago v. Wilson*, 75 Ill.2d 525 (1978) (park ban on wearing clothing of the opposite sex held unconstitutional intrusion on liberty interest).

the County, 106 are from between 1880 and 1936. LaFave 32. The remaining nine are from 1858-1878. JA 1037-38.

The County additionally relies on national park restrictions (mostly from the 20th century, Fairfax 23-24), but ignores that gun permits were available under those same restrictions. LaFave 32. Nor is its argument supported by the 20th century state park rules it cites, as *Bruen* renders them irrelevant. *See* Fairfax 24. "The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787." *Bruen*, 597 U.S. at 36-37 (cleaned up).

The County asserts that the rules it cites "imposed a comparable burden (preventing people from carrying guns in parks) for a comparable reason (addressing the particular harms that guns present when carried in those sensitive places)." Fairfax 24. But the County posits no "harms" to the public posed by individuals peaceably carrying firearms in parks. Instead, the County relies on a mystical "Romantic idea" about "contemplating parks' natural scenery," Fairfax 8, which has nothing to do with carrying firearms, security, or defending attendees. True sensitive places, such as courts and the secured areas of airports, have obvious, genuine security concerns.

According to the County, "research has not revealed any instance of a court invalidating" such park rules. Fairfax 24. The purported absence of such judicial

activity did not render those restrictions constitutionally valid. For instance, the agency that adopted Virginia's 1936 rule was "without authority to prohibit, within state parks, the carrying of concealed handguns by holders of valid permits." Va. Atty Gen. Op. 02-074, 2002 WL 31311963 at *3 (Sept. 9, 2002). Moreover, there is no evidence that such rules were even enforced or, if they were, that anyone had the incentive or the resources to appeal the *de minimus* fine that may have been imposed.

The County also posits that merely because it cannot locate a single firearms ban generally applicable to the public in open spaces prior to 1858, one should not assume legislatures lacked that power. Fairfax 48-49. That, of course, is *Bruen*'s entire point: What is constitutionally permissible under the Second Amendment is determined by what the laws and practices were in the period surrounding its ratification. *Bruen* explains that the historical trajectory demonstrates that governments had the authority to prevent firearms from being used in criminal conduct, and banned in sensitive places where security was provided (or, in the case of schools, could be provided), but *rejects* the proposition that governments could ban the public bearing of arms by the law abiding. "[H]istory reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53 (emphasis in original).

The County posits that "[c]hildren make up about a quarter of County parks' . . . annual visitors." Fairfax 5. That statistic reflects nothing more than the fact that 22.6% of the County's population is under age 18.[8] Yet the entire County is not transmuted into a sensitive place simply because it is a "location[] where vulnerable populations congregate," including "places heavily trafficked by children . . . ." Fairfax 21 (quoting *Antonyuk II*, 120 F.4th at 1012, 1027). Citizens may lawfully carry firearms in the County's many public areas, one-quarter the population of which is children.

## B. Founding-Era Regulatory Traditions Conflict With The Park Firearms Ban.

The County half-heartedly argues that Plaintiffs have not carried their textual burden because what they only "attempted to establish was a right to bear arms in public generally," but not "in the 'narrow' areas to which the Ordinance applies." Fairfax 20-21. The County simply skips over *Bruen*'s mandate that "The Second Amendment's plain text [ ] presumptively guarantees … a right to 'bear' arms in public for self-defense." 597 U.S. at 33. "In public" includes parks.

The County relies on the medieval Statute of Northampton, Fairfax 26, which provided that a man shall "bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets…." 2 Edw. 3 c. 3 (1328). The Statute

---

[8] U.S. Census Bureau,
https://www.census.gov/quickfacts/fact/table/fairfaxcountyvirginia/PST045222

"has little bearing on the Second Amendment adopted in 1791." *Bruen*, 597 U.S. at 41. In the 17th and 18th centuries, the Statute was construed as applying only to going armed with evil intent in a manner to terrify others. *Id.* at 44-45.

Plaintiffs have established that the Founding-Era Virginia and North Carolina "going-armed" laws included "terror" as an element of the offense. LaFave 36-38. The County asserts that Virginia and North Carolina "observed laws prohibiting going armed in fairs or markets." Fairfax 26. Neither had any such law.

Virginia's 1786 statute provided that no person shall "go nor ride armed … in fairs or markets, or in other places, in terror of the Country." *Bruen*, 597 U.S. at 49 (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794)). The County claims that the terror element applied only to carrying "in other places," but not "in fairs or markets."[9] Fairfax 44. *Bruen* recognized no such distinction, and instead said that this law "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." 597 U.S. at 50. Moreover, the County's reading would violate the common law rule of construction "that all penal statutes should be construed strictly[.]" *Commonwealth v. Chubb*, 26 Va. 715, 718 (1827).

---

[9] The County appeals to the rule of the last antecedent applied in *Alger v. Commonwealth*, 267 Va. 255, 259-60 & n.2 (2004), but the statute there "differentiated between" the terms "by inserting the 'a' and 'b' designations before those terms." *Id.* at 260. The rule is inapplicable here, as "the last-antecedent rule plays no role when the sense of the passage requires a different construction." *Vlaming v. West Point School Bd.*, 302 Va. 504, 543 n.13 (2023) (cleaned up).

The County cannot bring itself to acknowledge that North Carolina's only relevant statute recognized that it was a crime to "ride or go armed *offensively*." *See United States v. Rahimi*, 602 U.S. 680, 698 (2024) (quoting 1741 law) (emphasis added); James Iredell, *Laws of the State of North-Carolina* 70 (1791). JA1615-19. The term "Offensively," *Bruen* observes, "merely codified the existing common-law offense of bearing arms to terrorize the people…." 597 U.S. at 47.

Instead, the County clings to a privately-published book of English statutes that its author mistakenly thought were in force, including the Statute of Northampton. Fairfax 45 (citing *Collection of Statutes of the Parliament of England in Force in the State of North Carolina*). No judicial decision recognized the Statute as in force. The County cites *State v. Huntly*, Fairfax 46 (citing 25 N.C. (3 Ired.) 418 (1843)), without acknowledging that the *Huntly* court explicitly identified the common-law offense as "riding or going about armed with unusual and dangerous weapons, to the terror of the people." *Id*. at 420.

As an afterthought, the County also mentions four laws enacted between 1869 and 1893 (again, long after the Founding-Era) prohibiting weapons at public assemblies. Fairfax 26 n.6. Public assemblies typically took place in enclosed spaces and have no relevance to the County's ban on firearms in thousands of acres of mostly-wooded parkland. At bottom, the County cannot avoid the fact that "None of these [antebellum America] historical limitations on the right to bear arms"

13

"operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Bruen*, 597 U.S. at 60.

### C. The County's Ban Is A Prohibition of the Constitutional Right to Go Armed Peaceably, Not a Lawful Prohibition On the Criminal Conduct of Going Armed "To the Terror" of the People.

The County asserts that early English law and Founding Era American laws "prohibited going armed *anywhere* in circumstances where doing so was likely to cause fear or terror." Fairfax 28. It then quotes *Bruen*'s explanation contradicting that assertion – the actual laws "prohibit bearing arms *in a way* that spreads 'fear' or 'terror' among the people." 597 U.S. at 50 (emphasis added). This "*in Terrorem Populi* element" required "something more than merely carrying a firearm in public." *Id.*

Ignoring *Bruen*'s requirement that the terror element means "bearing arms *in a way* that spreads 'fear' or 'terror,'" the County asserts that "undisputed facts, based on a scientific survey of area residents, show that carrying firearms in County parks would "spread[]'fear' or 'terror.'"[10] Fairfax 28. In fact, the County's evidence

---

[10] The County erroneously avers that because Plaintiffs' opening brief did not directly address the "terror survey" and the schools analogy forfeits those arguments. Fairfax 41-42. The County confuses claims with arguments; if a legal claim is properly preserved, any supporting argument may be made on appeal, and there can be no assertion of prejudice when the argument was addressed below. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *Brown v. NuCor Corp.*, 785 F.3d 895, 920 (4th Cir. 2015).

shows no such thing; instead, it merely purports to show that for some significant portion of Fairfax residents "the potential presence of guns in Fairfax County Parks 'induces feelings of less safety among most people in the local population . . . and may drive people to visit such spaces less.'" *Id.* (citing JA1146, JA1152-56).[11] This isn't terror; it's simply a social preference. The County's "survey" was nothing more than a craftily-worded popularity test on whether respondents like or dislike the Second Amendment. Notably, the "survey" did not ask questions like whether the respondents were in fear of going to the parks *before* the Ordinance passed, when firearms could be lawfully carried in the parks, or whether they even knew if that had always been the case prior to the Ordinance. Nor did the survey inquire whether respondents fear going to other public places in the County or Commonwealth, where firearms may be lawfully carried.

The Founding Era "terror" element is equivalent to today's crime "to point, or brandish any firearm ... in such manner as to reasonably induce fear in the mind of another." Va. Code § 18.2-282. *See Kelsoe v. Commonwealth*, 226 Va. 197, 198 (1983) (defendant "'pointed the pistol toward' the three men and … each was 'afraid

---

[11] The County did not produce a survey indicating whether Fairfax residents were more or less likely to frequent parks where gangs, drug addicts, and homeless people are present, or whether a disinclination to share those public spaces with such people might be described as "terror."

and backed away from the defendant.'").[12]  Both then and now, it is constitutionally permissible to ban objectively threatening behavior with arms.

By claiming that "fear is the consequence of carrying guns in County parks," Fairfax 29 n.7, the County essentially argues that exercise of the Second Amendment right to bear arms per se creates fear, even if no one around the bearer knows that she is carrying a firearm.  "Some weapons do not terrify the public (such as well-concealed weapons), and so if the statute was (as it may have been) intended to protect the public from being frightened or intimidated by the brandishing of weapons, it could not have applied to all weapons or all carriage of weapons." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).

The County's rationale puts myriad constitutional rights at the mercy of popular whim. Should a majority of the County's residents express dismay at potentially being exposed to things that give them discomfort, the County is free to ban those things in public spaces by declaring anywhere one might be so exposed to be a "sensitive place." Hence, if the majority of the public believes racial intermingling is dangerous or that gay couples hand-holding is threatening, the "fear" or "terror" rationale posited here must allow the County to ban such conduct.

---

[12] *See Sutton v. Commonwealth*, 228 Va. 654, 663 (1985) (to constitute intimidation, "fear must arise from the willful conduct of the accused, rather than from some mere temperamental timidity of the victim").

Wishing the Second Amendment didn't exist isn't "terror," and even if it was, it would be irrelevant. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. The County seeks here to exercise an unconstitutional heckler's veto of the right to bear arms. *See Brown*, 564 U.S. 786, 795-804 (2011); *Bachellar v. Maryland*, 397 U.S. 564 (1970) ("it is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers") (cleaned up). "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise." *Cox v. Louisiana*, 379 U.S. 536, 551 (1965).

### D. Historical Analogues Must be Derived from the Founding Era, and Later History Must be Consistent With the Founding Historical Tradition.

Proper historical analogues must be derived from the Founding Era, or thereafter only if consistent with the founding historical tradition. *See* LaFave 23-26. The Second Amendment was adopted in 1791, and "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen*, 597 U.S. at 36.

Seeking to justify its inability to find Founding Era support for its Ordinance, [t]he County claims that "*Bruen* relied on mid-19th-century cases and statutes,"

Fairfax 33 (citing *Bruen* at 51-57). But these sources were consistent with earlier sources. *Bruen* states: "As during the colonial and founding periods, the common-law offenses of 'affray' or going armed 'to the terror of the people' continued to impose some limits on firearm carry in the antebellum period." *Id*. at 50. Statutory bans on concealed carry enacted in "the early to mid-19th century" did not violate the right because open carry was allowed. *Id*. at 52-55. The surety statutes were derived from early laws prohibiting "going armed offensively," e.g., Massachusetts' 1836 law derived from its 1795 law. *Id*. at 55. "None of these historical limitations on the right to bear arms … operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id*. at 60.

*Rahimi* repeated similar analogues that were traced back to the Founding Era, such as the affray laws passed in Massachusetts (1780) and other original States. *Rahimi*, 602 U.S. at 698. The County disregards the Founding Era pedigree of such laws. Fairfax 34-35 (citing *Rahimi*, 602 U.S. at 696).

The County argues that post-ratification history need not be anchored in the Bill of Rights' original public understanding. Fairfax 36-37. Again, "post-ratification … laws that are *inconsistent* with the original meaning of the constitutional text" cannot alter the text. *Bruen*, 597 U.S. at 36 (citation omitted). "[T]he history that matters most is the history surrounding the ratification of the

text…. History (or tradition) that long postdates ratification does not serve that function." *Rahimi*, 602 U.S. at 737-38 (Barrett, J., concurring).

The County asserts that "the understanding in the Reconstruction era should take precedence" over that of the Founding. Fairfax 38 n.10. It claims that "*Bruen* left the issue undecided" about whether the original understanding of 1791 or that of 1868 governs. Fairfax 39-40. *Bruen* did no such thing, instead stating that "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. The County has no license to argue that the Court's framework for incorporating the Bill of Rights is incorrect.

The County reads too much into *Bruen*'s further statement "that there is an ongoing scholarly debate" on whether the understanding should be pegged to when the Fourteenth Amendment was ratified in 1868. *Id*. *See* Fairfax 40. Given what the Court has "generally assumed" in countless decisions on Bill of Rights guarantees, *Bruen*, 597 U.S. at 37, only the Court can change that longstanding assumption.

### E. The County's Urban-Suburban Character, and Its Comparisons to Schools, Are Irrelevant.

The County invokes Fairfax's urban-suburban demographic character. E.g., Fairfax 5, 27, 32 n.8. While true, this fact is irrelevant. Population density and congestion have no bearing on where the right to bear arms may be exercised. *Bruen*, 597 U.S. at 29-31. The sensitive-places exception analyzes the specific site from

which firearms are sought to be excluded, not the demographic features of the political entity proposing the restriction.

The County also argues that parks are like schools where children congregate. Fairfax 29-30. This analogy fails; schools are restricted spaces that are not only securable and supervised by authorized adults, but also are not public spaces for everyone else. By contrast, parks are open to and frequented by all members of society. If the presence of children is sufficient to make any place "sensitive," then the right to bear arms could be restricted in nearly any public place. Children are ubiquitous. Indeed, nearly 20% of Manhattan, the most densely populated municipality in America,[13] consists of children.[14] If Manhattan is not a sensitive place, then neither are Fairfax's parks, streets, and sidewalks.

### F. Plaintiffs Satisfy the Facial-Challenge Standard Presented in *Bruen*.

*Bruen* found that "the plain text of the Second Amendment protects [plaintiffs] Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32. It held that "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-

---

[13] *World Population Review*,
https://worldpopulationreview.com/boroughs/manhattan-population. Accessed Jan. 15, 2024.

[14] *See* New York City Planning, *Population Fact Finder*,
https://popfactfinder.planning.nyc.gov/explorer/cities/NYC?compareTo=1,
accessed Jan. 15, 2024.

abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id*. at 71.

*Bruen* thus upheld the plaintiffs' facial challenge, even though it recognized exceptions to the right at "sensitive places" such as legislative assemblies, polling places, and courthouses. *Id*. at 30-31. The County argues that because there are some county properties for which it might conceivably impose a constitutional firearms ban (though it failed to pass such a law for its parks), it can therefore bootstrap all such property within such a ban. Fairfax 31-33. But *Bruen* stated that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." 597 U.S. at 31. The County's forested parklands are twice the size of Manhattan, LaFave 23, and they are anything but "crowded."

Contrary to the County's argument, Fairfax 31-33, the existence of sensitive places did not preclude *Bruen* from declaring the New York's ban on carrying firearms in public places unconstitutional, even though the law could be applied in such narrowly-defined places. The Thurgood Marshall United States Courthouse and the New York County Courthouse are located at Foley Square in Manhattan, and hundreds of schools are on that urban island. But *Bruen* did not decline to resolve the Second Amendment issue on the basis these constituted narrow circumstances—

the exceptions to the default rule—in which New York's carry ban could be validly applied.

The County points to small playgrounds[15] in the County's vast parklands. Fairfax 32. Manhattan undoubtedly has small playgrounds as well, and even assuming *arguendo* that guns may be banned in them, that did not keep *Bruen* from invalidating New York's public carry ban.

The County invokes *Rahimi* for its argument that standing requires plaintiffs to "establish that no set of circumstances exists under which [the challenged law] would be valid." Fairfax 30. But that is not how the *Rahimi* Court analyzed the statute at issue there. The Court upheld the ban because "the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 693. The Court thus upheld the law facially on the merits rather than simply dismissing the challenge under the "no-set-of-circumstances" rule that it applies in some cases.

*Rahimi* repeated the *Salerno* rule that a facial challenge is the "most difficult challenge to mount successfully," because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *Id.* at 693,

---

[15] Citing the District Court's decision in *Koons* refusing an injunction for firearms bans in playgrounds, the County asserts that providing security is not a prerequisite for labeling playgrounds as "sensitive places." Fairfax Br. at 51-52, citing *Koons v. Platkin*, 673 F.Supp.3d 515, 639 (D.N.J. 2023). But that law differentiated playgrounds from parks. *Id.* at 546-47.

(quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).   In the very next sentence, however, *Salerno* stated, "The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid…." *Id*.   The issue related to dangerousness of defendants in the bail context, and the evidence was that Salerno was the "boss" of the Genovese crime family who participated in murder conspiracies.  *Id*. at 743.

But post-*Salerno*, the Court clarified that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015) (citations omitted).[16]   A law that reaches "a substantial amount of constitutionally protected conduct" and "imposes criminal penalties" has led the Court "to invalidate a criminal statute on its face even when it could conceivably have had some valid application." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983).

---

[16] The Fourth Circuit repeated this quotation in a challenge to a conviction under the federal Gun Control Act.  *United States v. Hasson*, 26 F.4th 610, 617 (4th Cir. 2022).

*Bruen* was resolved as a facial challenge because of the substantiality of the constitutionally-protected conduct being denied by the law.[17]  New York's ban (like the ban here) obliterated the exercise of the right to bear arms by law-abiding citizens generally.  By contrast, *Rahimi* and *Salerno* involved statutes that applied to dangerous people, and the fact that a constitutional issue may arise "under some conceivable set of circumstances," *Salerno*, 481 U.S. at 745, did not suffice to invalidate those statutes.

Additionally, this Court's rejection of a facial challenge in *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 (4th Cir. 2024) (en banc), is inapplicable here.  The *Moore* plaintiffs challenged a 30-day limit on applications to purchase handguns.  But factually, the law did not reach "a substantial amount of constitutionally protected conduct" because no applications were "pending disposition for longer than 15 days," *id.* at 227 (citing data for one quarter).  Indeed, applications had been processed within 24 hours.  *Id*. That's a far cry from the facts here, where firearms are permanently banned in thousands of acres of mostly wooded parklands for all law-abiding citizens.

**II. Plaintiffs Have Standing To Challenge the Events Restriction.**

---

[17] *See Ams. for Prosperity Found. v. Bonda*, 594 U.S. 595, 615 (2021) ("a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.").

The County asserts that Plaintiffs must establish a credible threat of prosecution to have standing to bring suit. Fairfax 54-58. However, "there is a sufficiently imminent injury in fact if plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted). "It is not necessary that a plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Kenny,* 885 F.3d at 288 (citation omitted) (cleaned up). Plaintiffs have alleged that they are deterred from bringing their firearms into parks, and they have no way of knowing if and when they are violating the Ban when traversing Fairfax's byways while armed.

The same issue was resolved against the state in *Kipke v. Moore*, in which the plaintiff alleged a wish to carry a handgun at a proscribed location, and thus "adequately alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.'" 695 F.Supp.3d 638, 661 (D. Md. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Like the County here, the *Kipke* defendants "suggest[ed] that no individual has ever been prosecuted under the statute," but "they have also failed to disavow prosecution, and Kipke's desired conduct is barred by the statute's plain language."

*Id*. at 661. "Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future." *Kenny,* 885 F.3d at 288 (citation omitted). Fairfax's argument that the Ordinance is enforced "only where there is signage and only after officers request voluntary compliance," Fairfax 55, is a clear threat of enforcement.

"Separately, there is an ongoing injury in fact if plaintiffs make a 'sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id*. at 288 (citation omitted). Similar injury is ongoing here, where Plaintiffs are chilled from exercising their right to bear arms in public places.

### III. The Police Department's Enforcement Policy Memo Has No Legal Effect on Plaintiffs' Right to Seek Relief.

The County gives great weight to the Chief of Police's issuance of a memorandum (the "CSM") stating that the Ordinance will be enforced only where there is signage, even though the Ordinance contains no such limiting language. Fairfax 63-66. However, "[n]o officer may substitute his discretion in the place of the law, which alone expresses the will and policy of the State." *Cutchin v. Roanoke*, 113 Va. 452, 474 (1912). As this Court has explained, "Unofficial and non-binding statements such as [enforcement policy memos] do not and cannot override the plain text of the statutes when it comes to establishing a credible threat of enforcement." *Bryant v. Woodall*, 1 F.4th 280, 288-89 (4th Cir. 2021) (cleaned up); *see*

*also Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 388 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012) (holding a formal policy of non-enforcement that "d[id] not carry the binding force of law" was insufficient to defeat standing). Nor does that defeat the reality of enforcement; the fact that an arresting officer saw a sign somewhere at an event, or somewhere near a park, does not demonstrate that any member of the public saw it. This is nowhere more true than with respect to trails in County parks, with limitless points for ingress.

## CONCLUSION

The Court should reverse the district court's judgment, hold these provisions violative of the right to bear arms and to due process, and direct a permanent injunction against their enforcement.

Dated: January 10, 2025                    Respectfully Submitted,

                                           */s/ Earl N. "Trey" Mayfield, III*
                                           Earl N. "Trey" Mayfield
                                           *Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitations in Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 5,673 words, excluding those parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was produced in a proportionally spaced typeface using Microsoft 2411 in Times New Roman 14-point font.

*/s/ Earl N. "Trey" Mayfield, III*
Earl N. "Trey" Mayfield

## CERTIFICATE OF SERVICE

I certify that on January 10, 2025, the foregoing was electronically filed with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Earl N. "Trey" Mayfield, III*
Earl N. "Trey" Mayfield